FISH & RICHARDSON P.C.

Katherine K. Lutton
(CSB No. 194971 / lutton@fr.com)
Kelly C. Hunsaker
(CSB No. 168307 / hunsaker@fr.com)
Enrique Duarte
(CSB No. 247523 / duarte@fr.com)
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel: (650) 839-5070 Fax:  (650) 839-5071

Ruffin B. Cordell (*pro hac vice*)
cordell@fr.com
1425 K Street, NW, Suite 1100
Washington, DC 20005
Tel: (207) 783-5070 Fax:  (207) 783-2331

Christopher O. Green (*pro hac vice*)
cgreen@fr.com
Aamir A. Kazi (*pro hac vice*)
kazi@fr.com
Jacqueline Tio (*pro hac vice*)
tio@fr.com
1180 Peachtree Street, 21st Floor
Atlanta, GA 30309
Tel: (404) 892-5005 Fax: (404) 892-5002

Benjamin C. Elacqua (*pro hac vice*)
elacqua@fr.com
1221 McKinney Street, Suite 2800
Houston, TX 77010
Tel: (713) 654-5300 Fax: (713) 652-0109

WILMER CUTLER PICKERING
 HALE AND DORR LLP

Joseph J. Mueller (*pro hac vice*)
joseph.mueller@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Tel:  (617) 526-6000 Fax: (617) 526-5000

Matthew Hawkinson (CSB No. 248216)
matthew.hawkinson@wilmerhale.com
350 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Tel:  (213) 443-5300 Fax: (213) 443-5400

Mark D. Selwyn (CSB No. 244180)
mark.selwyn@wilmerhale.com
950 Page Mill Road
Palo Alto, California 94304
Tel:  (650) 858-6000 Fax: (650) 858-6100

Attorneys for Defendant APPLE INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### (SAN JOSE DIVISION)

| | |
|---|---|
| GPNE CORP.,<br><br>              Plaintiff,<br><br>       v.<br><br>APPLE INC.<br><br>              Defendant. | Case No. 5:12-cv-02885-LHK<br><br>**APPLE'S OPPOSITION TO GPNE'S MOTION TO EXCLUDE OPINIONS OF DAMAGES EXPERT PAUL K. MEYER**<br><br>Date:        April 3, 2014<br>Time:        1:30 PM<br>Place:       Courtroom 8, 4th Floor<br>Judge:       Hon. Lucy H. Koh |

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................. 1

II.   STATEMENT OF THE ISSUES TO BE DECIDED........................................... 1

III.  STATEMENT OF RELEVANT FACTS ................................................. 2

      A.   GPNE's Business Model is Based on Litigation and Licensing................ 2

      B.   The Methodologies Used By Mr. Meyer ..................................... 3

IV.   LEGAL STANDARDS .............................................................. 6

V.    ARGUMENT ..................................................................... 6

           1.    Mr. Meyer Properly Apportions Damages According to the
                 "Smallest Saleable Patent-Practicing Unit" Rule ......................... 6

           2.    The Component Royalty Stack Approach Is Reliable Because It Is
                 a Mathematical Calculation with Quantifiable, Verifiable Inputs 12

           3.    The Basic Principles of the Component Royalty Stack Approach
                 Are Known, Used, and Accepted by Courts ................................ 16

      B.   GPNE's Criticisms of Mr. Meyer's Consideration of the Parties' License
           Agreements Go to Weight, Not to Admissibility..................................... 18

           1.    Mr. Meyer' Properly Considered Apple's Licenses Under *Georgia-
                 Pacific* Factor 2 ........................................................ 19

           2.    Mr. Meyer's Properly Considered GPNE's Licenses Under
                 *Georgia-Pacific* Factor 1 ............................................. 21

VI.   CONCLUSION ................................................................... 25

ActiveUS 125080663v.1

# TABLE OF AUTHORITIES

CASES

*Apple Inc. v. Samsung Elecs. Co.*,
No. 11-cv-01846-LHK, 2013 U.S. Dist. LEXIS 160337 (N.D. Cal. Nov. 7, 2013) ................................................................................................23

*AVM Tech., LLC v. Intel Corp.*,
No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)...............................9, 10

*CardSoft, Inc. v. Verifone Sys., Inc.*,
No. 2:08-cv-98-RSP, 2012 WL 1995325 (E.D. Tex. June 4, 2012).......................22

*Cornell Univ. v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ...............................................................6, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...................................................................................1, 6, 18

*Dynetix Design Solutions, Inc. v. Synopsis, Inc.*,
No. C11-5973-PSG, 2013 WL 4537838 (N.D. Cal. Aug. 22, 2013)................10, 21

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
No. 10-cv-03972-LHK, 2012 WL 5835741 (N.D. Cal. Nov. 16, 2012).................18

*Garretson v. Clark*,
111 U.S. 120 (1884) ...........................................................................................7

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)............................................................... passim

*In re Innovatio Ventures, LLC Patent Litig.*,
No. 1:11-cv-09308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ..........12, 16, 17, 18

*LaserDynamics v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)......................................................................... passim

*Lucent Tech., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)...........................................................................20

*Microsoft Corp. v. Motorola, Inc.*,
No. C10-1823JLR, 2013 WL 2111217 (W.D. Wa. Aug. 26, 2013) ................10, 12

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ...............................................................................6

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)......................................................................12, 21

*Seymour v. McCormick*,
   57 U.S. 480 (1853) ............................................................................................7

*Stragent, LLC v. Intel Corp.*,
   No. 6:11-cv-421 (Mar. 6, 2014 E.D. Tex.) (Ex. L) .............................................23, 24

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
   608 F. Supp. 2d 1166 (N.D. Cal. 2009) .................................................19, 20, 25

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F. 3d 1292 (Fed. Cir. 2011) ...........................................................6, 7, 10, 12

**OTHER AUTHORITIES**

Lemley & Shapiro, Patent Holdup & Royalty Stacking, 85 TEX. L. REV. 1991,
   1992-2049 (2007)............................................................................................13

Federal Rule of Evidence 702.................................................................................6, 18

ActiveUS 125080663v.1

## I.   INTRODUCTION

As the Supreme Court has emphasized, the focus of a *Daubert* inquiry is on principles and methodology, not on the conclusions that they generate.   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).  Rather than focus its arguments on Mr. Meyer's methodology, GPNE attacks the facts used by Mr. Meyer in his analysis and the conclusions his methods generate.  The one arguably methodological critique that GPNE levels at Mr. Meyer is that, according to GPNE, he improperly uses the baseband processor as the smallest saleable patent-practicing unit.  Dkt. No. 185 at 12-16.  This criticism is premised on GPNE's misunderstanding of the law, and highlights a fundamental error underlying the report of GPNE's own damages expert, Mr. Dansky.  The remainder of the alleged deficiencies in Mr. Meyer's report are factual and go to the weight of Mr. Meyer's testimony, not its admissibility.

Unlike Mr. Dansky's "black box" approach, Mr. Meyer applies two transparent and rigorous approaches to determine a proper royalty for GPNE's patents at the time of the hypothetical negotiation between Apple and GPNE.  Each is consistent with controlling law on patent damages and supported by basic economics.  Neither contains any methodological flaws that would bar admissibility.  Accordingly, Apple respectfully requests that GPNE's motion be denied.

## II.  STATEMENT OF THE ISSUES TO BE DECIDED

1.       Should GPNE's motion to exclude Mr. Meyer's opinions based on his application of the Component Royalty Stack Approach be denied, where he applied a transparent and mathematically rigorous approach that is consistent with relevant precedent?

2.      Should GPNE's motion to exclude Mr. Meyer's application of the "smallest saleable patent-practicing unit" rule be denied, where GPNE relies on the legally incorrect premise that the relevant "units" must be products actually sold by the defendant (which in this case would be the accused iPhone and iPad devices) and can never be a component supplied by a third party?

3.      Should GPNE's motion to exclude Mr. Meyer's opinion on the basis of Mr. Meyer's consideration of the parties' license agreements be denied, where Mr. Meyer applied well-settled license-analysis methodology?

**III. STATEMENT OF RELEVANT FACTS**

**A.  GPNE's Business Model is Based on Litigation and Licensing**

GPNE alleges that Apple's iPhones and iPads infringe U.S. Patent Nos. 7,555,267; 7,570,954; and 7,792,492 (the "Patents-in-Suit").  GPNE's infringement case claims that the Patents-in-Suit are essential to the GPRS, EDGE, and LTE cellular communication standards.[1]

GPNE has never sold a product and does not compete with Apple.[2]  Instead, GPNE's business model is based on licensing and litigation.  GPNE's website lists

---

[1] *See* Dkt. No. 187-6 (GPNE Amended Infringement Contentions) (relying upon compliance with standards to allege infringement); Dkt. No. 187-12 (Dinan Expert Report at 3); Dkt.183-2 & 184-5 (Dansky Report at 23) ("███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████"); Ex. A ██████████████████████ (Nov. 18, 2013 Hearing Tr. at 8:23-9:2 ("The Court: And I take it, Mr. Susser, your position, having undertaken your own investigation, met your rules, obligations, and all that, your position is that any product which implements either or any of these standards necessarily practices each limitation of the asserted claims.  Mr. Susser: Yeah, yeah. That's right.")).
[2] Ex. B (Edwin Wong Dep. Tr. at 74:5-76:16 (████████████████████ ████████████████████████).

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

license agreements entered into between GPNE and various telecommunications

companies, including at least Nokia Inc., Huawei Technologies Co. Ltd., Amazon.com,

Inc., Research in Motion Ltd., Sony Mobile Communications (USA) Inc. and Sony

Mobile Communications AB, Sharp Corporation and Sharp Electronics Corporation,

Samsung Electronics Co. Ltd., and Motorola, Inc.  Ex. C, GPNE's website

(http://www.gpnecorp.com/presscenter.html) (last accessed March 4, 2014).  GPNE's

CEO testified that ███████████████████████████████████████

███████ *See* Ex. B, Edwin Wong Dep. Tr. at 94:11-18 ("████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████ .  The website further publicizes that several of

these license agreements resulted from the settlement of patent litigation.  Ex. C.  Apple

is aware of ███████████████████████████████████████

██████████████████████████████████ . Ex. D (██████████

█████████████████ GPNE-APP00183314-GPNE-APP00183321).

       ██████████████████████████████████████████

   *See* Dkt. No. 183-4 & 184-6 (Exhibit 3 to Dansky Report, ██████████████

███████████████████████████████████ ); Dkt. No. 183-

10 & 184-11 (Attachment 5 to Meyer Report) (same).

       **B.  The Methodologies Used By Mr. Meyer**

       On February 7, 2014, Apple served the Expert Rebuttal Report of Paul K. Meyer.

████████ ; Dkt. No. 183-2 & 184-5 at 9 █████████████████

██████████████████ ."); *id.* at 56 ("██████████████████

████████████████ ").

ActiveUS 125080663v.1

Mr. Meyer applies two independent methodologies to determine a reasonable royalty amount sufficient to compensate GPNE for Apple's use of the three Patents-in-Suit, assuming they are both valid and infringed:  (1) a methodology based on analyzing a proper royalty for GPNE's patents within the total "royalty stack" applicable to the relevant component, the "baseband processor" (Mr. Meyer refers to this as the Component Royalty Stack Approach), and (2) an analysis of the 15 factors set forth in *Georgia Pacific Corp. v. U.S. Plywood Corp.*, considering (among other factors) the terms of GPNE's licenses and Apple's ███ licenses.  Dkt. No. 185-3 & 186-6 (hereinafter "Meyer Report") at ¶¶ 56-57, 62, 66-88.

The Component Royalty Stack Approach calculates, using a mathematical equation with quantifiable inputs, the value attributable to the three Patents-in-Suit in the context of the market for cellular phone and tablet technologies.  The Component Royalty Stack Approach comprises the following steps:  (1) start (as the law requires) with the price of the component that most closely aligns with the functionality claimed in the Patents-in-Suit, which in this case is the baseband processor; (2) calculate the average profits for the baseband processor; (3) calculate a proportional share of the profits attributable to the Patents-in-Suit as compared to all the technology and patents covering the baseband processor using the number of patents declared essential to the relevant cellular standards;  and (4) adjust the results of the calculation to account for the specific circumstances of the particular patents.  Meyer Report at ¶¶ 66-88.

At each of the steps described above, the inputs to the Component Royalty Stack Approach are taken directly from the record in this case or from publicly available documents.  These inputs are both quantifiable and verifiable.  The price used for the

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

baseband processor is a calculated average ████████████████████████

████████     Meyer Report at ¶¶ 77-79.  The profit calculation for the baseband

processors is based on the operating margins of a chip supplier ████████████

████████████████████ *Id.* at ¶ 80.  The proportional share of the

profits attributable to the Patents-in-Suit (as compared to all the technology and patents

bound up in the baseband processor) is calculated by dividing the average profits per

processor by the number of standard essential patents declared to the relevant cellular

standards the processors support.  *Id.* at ¶¶ 82-84.  Specifically, Mr. Meyer relied on

independent studies conducted by Fairfield Resources, Inc. that estimated at least 800

unique United States patent families for the GSM and WCDMA cellular standards.  *Id.*

This number was confirmed to be a reasonable estimate by Apple's technical expert, Dr.

Wilson.  *Id.*

   In his *Georgia-Pacific* analysis, Mr. Meyer considers license agreements entered

into by both GPNE and Apple.  Meyer Report at ¶¶ 90-194, 251-63, Attachments 5-6.4.

For each agreement, Mr. Meyer considered the agreements themselves, the scope of the

licensed patents, the scope of the licensed products, the territorial scope of the license, the

term of the license, the form of the royalty payment, the comparability of the licensee

with Apple, the approximated units of the licensed products, the effective royalty

payment as compared to this case, the testimony from Apple's 30(b)(6) licensing witness,

and other facts relevant to each specific license necessary to determine whether an

agreement is comparable.  *Id.*  Mr. Meyer's mathematical calculations are transparently

shown in his report.  (*See, e.g. id.* at Attachments 9-12.)  This is in contrast to Mr.

Dansky's "black box" approach.  (Ex. E, Dansky Dep. Tr. at 39:12-15 ("████████████

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

1 ██████████████████████████████████████████

2 ███████████████████████ ”); *id.* at 39:16-40:14 (“████████████████

3 ████ ”).

## IV. LEGAL STANDARDS

Under *Daubert*, the district court acts as a "gatekeeper" to ensure that expert testimony is relevant and reliable.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. 3d 1292, 1306 (Fed. Cir. 2011).  Federal Rule of Evidence 702 requires that "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.  The *Daubert* inquiry is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (*citing Daubert*, 509 U.S. at 594, 596). "Under Daubert, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id*.  "The focus [of a *Daubert* inquiry] must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

## V.  ARGUMENT

### A.  Mr. Meyer's Use of the Component Royalty Stack Approach Is Legally Sound

#### 1.  Mr. Meyer Properly Apportions Damages According to the "Smallest Saleable Patent-Practicing Unit" Rule

##### (a) Mr. Meyer Correctly Applied the Law

There is substantial disconnect between the description of the "smallest saleable patent-practicing unit" rule offered by GPNE and relied on by GPNE's expert Mr.

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

Dansky, and the actual rule set out in the precedent and applied by Mr. Meyer.  GPNE has misunderstood and misapplied *Cornell*, *LaserDynamics*, and the numerous Federal Circuit and district court cases explaining the doctrine.  GPNE argues that the smallest saleable patent-practicing unit must be a component that the accused infringer sells—thus, for Apple, the smallest saleable patent-practicing unit would be devices like the iPhone and iPad.  *See* Dkt. No. 185 at 4, 13.  Under this logic, a plaintiff could control the component inquiry by its choice of defendants and avoid using anything less than an end product as the royalty base simply by suing only end product suppliers.

This is not the law.  A patent holder claiming to have invented a small improvement to a complex machine is not entitled to damages based on the price of the whole machine.  *Seymour v. McCormick*, 57 U.S. 480, 490-491 (1853).  "The patentee…must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features…"  *Garretson v. Clark*, 111 U.S. 120, 121 (1884).  The principle underlying both the apportionment requirement and the "smallest saleable patent practicing unit" test is that a patentee is not entitled to damages based on non-patented features of complex machines.  *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)  ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.").  Any calculation of patent damages must start with the proper royalty base and "ensure that the royalty rate applied thereto does not overreach and encompass components not covered by the patent."  *LaserDynamics*, 694 F.3d at 70.  The

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

apportionment requirement applies regardless of whether the accused infringer sells only the whole machine, or sells the whole machine and additionally component parts of that machine on a stand-alone basis. *Garretson,* 111 U.S. at 121*; Uniloc*, 632 F.3d at 1318.

*LaserDynamics* is instructive and directly applicable to the present facts.  In *LaserDynamics*, defendant QCI sold laptop computers that incorporated optical disk drives ("ODDs") that, among other features, included the disk discrimination method claimed in the asserted patents.  The Federal Circuit noted that QCI did not make or sell the ODDs in question as standalone products, although it did sell some small amount as replacements.[3]  The *LaserDynamics* court held that the ODDs were the smallest saleable patent–practicing unit.  Regardless of whether defendant QCI sold ODDs as standalone products or not, the ODDs represented the "smallest saleable patent practicing unit" because the ODDs were the nucleus of the patented functionality, and therefore any damages calculation that pulled within its scope unpatented features outside of the ODD was inappropriate.  Even though QCI was "in the business of assembling and selling complete laptop computers, not independent ODDs, and that QCI [did] not track the prices, revenues, or profits associated with individual components," the ODD was still the smallest saleable patent practicing unit, and LaserDynamics could and should have

---

[3] *LaserDynamics*, 694 F.3d at 58 ("**QCI does not manufacture ODDs**, but will install ODDs into computers as instructed by its customers."); *id.* at 60 ("Since QCI sold laptop computers **and not ODDs**, Mr. Murtha viewed the complete laptop computer as an appropriate royalty base."); *id.* at 65 ("Since **QCI does not itself make and sell standalone ODDs**, and since QCI presented no representative sales price, LaserDynamics used the average price of the replacement ODDs sold by QCI."); *id.* at 69-70 ("LaserDynamics emphasizes that QCI is in the business of assembling and selling complete laptop computers, **not independent ODDs**, and that **QCI does not track the prices, revenues, or profits associated with individual components**. … LaserDynamics concludes that the parties would have had to use the value of the entire laptop computer as the royalty base in structuring a hypothetical license agreement, **as it reflects the only true market value of anything that QCI sells**…") (emphasis added).

derived "accurate information concerning ODD values from third parties, industry practices, etc." *LaserDynamics*, 694 F.3d at 69-70.  In short, regardless of what the accused infringer sells, damages for complex, multi-component devices cannot include within the royalty base non-patented features or components.  *Id.* at 67.

 *Cornell* set forth the same rule.  *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009).  The court in *Cornell* explained that "[a]lthough the accused processors were the smallest salable units … Hewlett-Packard's primary business did not include a la carte processor sales."  *Id.* at 283.  The *Cornell* court went on to explain that "the important point is not the way that Cornell derived this royalty base, but that [Cornell] proceeded to attempt to show economic entitlement to damages based on technology beyond the scope of the claimed invention."  *Id.* at 284-85.

 Under *LaserDynamics* and *Cornell*, it is simply not relevant what combination of parts or components are sold by the accused infringer.  Whether the accused infringer sells the patented component standalone or in combination with many other non-infringing components, the task of the patentee remains the same:  to determine the price or value associated with the smallest component that practices the claimed invention.

 Second, even assuming for the sake of argument that GPNE is correct, and that the smallest saleable patent-practicing unit in this case must be a product sold by the defendant (*i.e.*, must be the entire iPhone or iPad), several courts have found that apportionment is still required ***within*** the smallest saleable patent practicing unit.

 In *AVM Tech., LLC v. Intel Corp.*, No. 10-610-RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013), the court explained that the smallest saleable patent practicing unit is

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

subject to apportionment to isolate the value associated with the claimed inventions of the

patent-in-suit:

> [T]he 'entire market value rule' can apply to a smallest saleable patent practicing unit when the smallest saleable patent practicing unit is itself made up of multiple components.…The use of a saleable unit that is greater than the patented feature is going to introduce *Uniloc* error when the patented feature is a 'date picker' whether the saleable unit is a computer loaded with 'Outlook' or simply 'Outlook.'  The *Uniloc* error will be greater with the computer loaded with 'Outlook' than with 'Outlook' alone, but the difference in error is one of degree, not of kind.

*Id.*  Similarly, *Dynetix Design Solutions Inc. v. Synopsys Inc.*, held that:

> This court sees no logical basis to depart from an apportionment requirement in a case, such as the present one, where the alleged smallest salable unit plainly is *not* closely tied to the patented feature…. Thus, *LaserDynamics* supports the premise that an apportionment is required even where there the accused product is the smallest salable unit or where whatever the smallest salable unit is it is still a multi-component product encompassing non-patent related features.

No. 5:11-cv-05973-PSG, 2013 WL 4538210, at *3 (N.D. Cal. Aug 22, 2013).[4]

Mr. Meyer properly applied the actual law.  Relying on GPNE's own

infringement contentions, Mr. Meyer isolated the broadband processor as "the component

of the device that allows for cellular connectivity."  Meyer Report at ¶ 40.  As the

patented functionality is—according to GPNE itself—contained in the baseband

processor, including any other components of the accused devices in the royalty base

would "overreach and encompass components not covered by the patent."

---

[4] The court in *Dynetix* went on to explain that "[b]ecause Dr. Black relied on the blanket assumption that, once he selected the smallest salable unit…he could end the analysis, his determination of the royalty base is fundamentally flawed.  Here, the alleged smallest salable unit is not, in fact, any smaller or any different than the entire multi-component product, but rather *is* the multi-component VCS product.  As such, 'the difficult task of determining [DLP's] value relative to all other components of [VCS] remains.'  Dr. Black improperly skipped this task of apportionment, and his opinion may be excluded on this basis alone." *Dynetix*, 2013 WL 4538210, at *4 (emphasis in original).

*LaserDynamics*, 694 F.3d at 70; *see also Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217, at *94 (W.D. Wa. Aug. 26, 2013) (accepting testimony that the proper rate "is based on the selling price of the chip, not the sale price of the end-user product into which the chip is embedded").  Using the entire price of Apple's iPhone and iPad products would have been wrong as a matter of law—and indeed, this is one reason GPNE's expert Mr. Dansky's opinions must be excluded.

### (b) To The Extent There Is Infringement, GPNE's Patents Would Be Substantially Embodied in The Baseband Chip

GPNE also argues that the baseband processor cannot be the smallest saleable patent-practicing unit in this case because the GPNE's patents cover more features than those contained in the baseband processor.  Dkt. No. 185 at 13.  This argument is flawed for two reasons.  First, as stated in Apple's motion to exclude, GPNE's infringement allegations center on functionality that resides in the baseband processor.  Dkt. No. 183 at 4 & 184-4; *see also* Ex. F (Birkett Dep. Tr.) at 24:12-16 ("███████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████); Dkt. No. 183-9 & 184-10 (Birkett Report) at 30-32, 44-48 (████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████.  These statements—by GPNE itself— alone warrant using the baseband processor as the smallest saleable patent-practicing unit.  Second, at best this is a factual argument that goes to the weight of the evidence.  As discussed above, the *methodology* of isolating the component that most closely aligns with the alleged

ActiveUS 125080663v.1

invention is required by law.  The ***conclusion*** as to the relevant component is a matter of fact that GPNE can test at trial.

### 2.   The Component Royalty Stack Approach Is Reliable Because It Is a Mathematical Calculation with Quantifiable, Verifiable Inputs

Mr. Meyer's Component Royalty Stack approach is an objective and legally supported economic methodology.  It is an approach based on a transparent mathematical calculation with clearly-defined and quantifiable inputs.  As the name implies, the Component Royalty Stack approach takes into account (1) the proper "component" for the royalty base, which, as described above, is the profit on the baseband processor, and (2) the "royalty stack" faced by manufacturers of devices that comply with cellular standards.  The hypothetical negotiation must take into account the market realities facing both parties to the negotiation.  *Uniloc*, 632 F.3d at 1318 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'").

In the context of allegedly standard essential patents, this includes a recognition of the dangers of  royalty stacking.  The concern over royalty stacking "arises because most standards implicate hundreds, if not thousands of patents, and the cumulative royalty payments to all standard-essential patent holders can quickly become excessive…" *In re Innovatio Ventures, LLC Patent Litig.*, No. 1:11-cv-09308, 2013 WL 5593609, at *17 (N.D. Ill. Oct. 3, 2013); *see also* Ex. G, Excerpts from the transcript of Jury Instructions in *Microsoft Corp. v. Motorola, Inc.*, (W.D. Wa. Aug. 26, 2013) at 107:10-25 ("Another issue with standards and standards-essential patents is called royalty stacking, which occurs when many different holders of standards-essential patents seeks

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

excessive royalty payments for a given standard.  If there are a large number of owners of standards-essential patents for a given standard, the total royalty payments might make the product too expensive to make…Complex industry standards like H.264 and 802.11 can require the use of hundreds or thousands of standards-essential patents held by dozens of patent holders… Royalty stacking can be an even bigger problem for products that must comply with multiple standards."); *see also* Ex. H, Lemley & Shapiro, Patent Holdup & Royalty Stacking, 85 TEX. L. REV. 1991, 1992 (2007) at 2029 ("The true measure of the stacking problem must take all of these patents and add in all the other patents covering other components of the end product…. This 'megastacking problem' – the need to integrate a number of different standards, each of which has multiple patents – significantly exacerbates the royalty stacking issues…").

As stated in Mr. Meyer's report, and confirmed by the admissions of Mr. Dansky and GPNE's technical expert, Dr. Dinan, the number of technologies implicated by a modern cellphone or tablet is massive.  Just the GPRS, EDGE, and LTE standards alone describe thousands of technical processes and implicate potentially thousands of patents. *See* Meyer Report at ¶¶ 37-38; Dkt. No. 183-5 & 184-7  (Dansky Dep. Tr.) at 172:6-11 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); *see also* Ex. I, (Dinan Dep. Tr.) at 25:25 ("There are thousands of processes in GPRS…");  *id.* at 28:5-8 ("Q. …Are there thousands of others processes covered by the LTE standard?  A. Yes.).

Moreover, modern cellphone and tablets, like the accused Apple devices, support many more standards than just GPRS, EDGE, and LTE.  These devices support a wide

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

range of additional cellular standards (like, for example, UMTS/WCDMA), and also include other non-cellular standardized technologies like 802.11, WiMax, MPEG-4 Visual, VC-1, AVC, MP3, AAC, and MPEG-4 Part 2 & Part 10.  Meyer Report at ¶¶ 44, 50.  The accused devices also contain many *non*-standardized technologies and Apple innovations such as the CPU; display screens; touch panels; flash memory and RAM; camera and related components; battery; GPS; Bluetooth; and various sensors.  *Id.* at ¶¶ 43, 49.

Thus, any assessment of the value of the alleged inventions contained in the GPNE patents must account for the fact that these patents represent (at best, even crediting GPNE's infringement theories) only the smallest sliver of total technology contained in the accused Apple devices.  They allegedly relate to only one small aspect of the total functionality described in the GPRS, EDGE, and LTE telecommunication standards, which are only three of the approximately 250-500 standards implicated by the accused devices, which are in turn only a fraction of the total technology – both standardized and non-standardized – contained in the accused devices.  *Id.* at ¶¶ 37-38, 207-210; Ex. J,  Expert Report of Dr. Wilson at ¶¶ 702-706;  *see also* Ex. I (Dinan Dep. Tr.) at 27:21-24 ("Q. Are any other of the thousands of the features of the GPRS standard covered by the GPNE's patents as you have studied them?  A. No, they are not."); *id.* at 28:9-13 ("Q. And is it your opinion anything other than the access process in the LTE process is covered by the GPNE patents?  A. The access process is covered by the GPNE patents and others thousand [are] not covered.").  By calculating GPNE's proportion of the total number of patents declared essential to cellular communication standards, the Component Royalty Stack Approach appropriately ties the value of GPNE's patents to

the footprint of its claimed inventions in the technology-dense market for cellular phones and tablets.

Furthermore, ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Meyer Report at

¶ 72.  ████████  Mr. Meyer has opined that any reasonable licensee would take into account the nature of the marketplace in which the hypothetical negotiation takes place, which, in this case, means taking into account the quantifiable reality that there are thousands of other pieces of technology in the space, as evidenced by the thousands of patents that have been declared essential to the relevant standards.  *Id.* at ¶¶ 66-72.

Moreover, at each step of the Component Royalty Stack Approach, Mr. Meyer explains the reasons why it is appropriate to use each individual input to his mathematical calculation.  Consistent with Federal Circuit law, the appropriate royalty base is the profit of the smallest saleable unit that practices the standards essential technology.  *Id.* at ¶¶ 68-69[5].  The price and profits for the baseband processors are documented in the record.  *Id.* at ¶¶ 77-80.  The number of standard essential patents is based on independent third party research and confirmed by Dr. Wilson.  *Id.* at ¶¶ 82-84.[6]  While

---

[5] Mr. Meyer explains that it would "be appropriate to potentially adjust the starting point amount for other factors including the number of technologies practiced on the baseband processor in addition to the telecommunications standards, the number of patents being licensed, the relative importance of the patent(s) to the standard, and consideration that not all patents are necessarily essential to a standard."  Meyer Report at ¶ 70.

[6] GPNE suggests that a supposed "relationship" between Apple's current counsel Fish & Richardson and the Fairfield Group detracts from the accuracy of the Fairfield numbers.  This is a baseless accusation and is not supported by any factual evidence whatsoever that might call into question the Fairfield numbers.  As explained by Mr. Meyer and Dr.

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

reasonable, the 800 patent-family figure is a conservative estimate for at least two

reasons: (1) the 800 patent families do not include patents essential to various other

standards supported by the baseband processors, and (2) the 800 patent families do not

include any patents declared as essential to the relevant standards since the date of the

Fairfield reports.   Finally, Mr. Meyer states that, ultimately, he uses this economic metric

to determine a ████████ amount that the parties would consider *as a starting point* for

negotiating a royalty amount at the hypothetical negotiation.  *Id.* at ¶ 76.  Mr. Meyer then

takes into account the specific circumstances surrounding the hypothetical negotiation

between Apple and GPNE and adjusts the amount upward.  *Id.* at ¶ 85.  All the inputs to

Component Royalty Stack Approach are quantified and objectively verifiable from

documented sources, and the mathematics of the calculation are completely transparent.

### 3.   The Basic Principles of the Component Royalty Stack Approach Are Known, Used, and Accepted by Courts

Contrary to GPNE's incorrect assertion that the Component Royalty Stack

Approach "appears to be something wholly created by Mr. Meyer," damages calculation

methodologies like the Component Royalty Stack Approach have been used by ████

applied by district courts, and even ████████████████

For example, a method similar to the Component Royalty Stack Approach was

approved of and applied in *In re Innovatio Ventures, LLC Patent Litigation*, a recent

royalty rate-setting decision in the specific context of wireless communications (Wi-Fi).

In that case, the district court accepted the calculation method of defendants' expert Dr.

Leonard and referred to as the "Top Down" approach to calculating a royalty rate.  *In re*

---

Wilson, and ████████████████, there are many thousands of patents implicated
by the relevant cellular standards.

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

*Innovatio Ventures,* 2013 WL 5593609, at *37-39 (accepting the Top Down approach).

The court in *In re Innovatio Ventures* explained the Top Down approach as follows:

> In summary, the Top Down approach starts with the average price of a Wi-Fi chip.  Based on that average price, Dr. Leonard then calculated the average profit that a chipmaker earns on the sale of each chip, thereby isolating the portion of the income from the sale of the chip available to the chipmaker to pay royalties on intellectual property.  Next, Dr. Leonard multiplied the available profit on a chip by a fraction calculated as the number of Innovatio's 802.11 standard-essential patents, divided by the total number of 802.11 standard-essential patents.  Dr. Leonard also provided several alternative calculations for this step by varying the denominator of the fraction to account for varying conclusions about the value of Innovatio's patents to the 802.11 standard.[7]

*Id.* at *38 (internal citations omitted); *see also* Ex. G at 107:10-25.  The court further stated that the Top Down approach has "several significant advantages" (*id.* at *38), including "that it apportions to the value of Innovatio's patented features without relying on information about other licenses that may or may not be comparable to accomplish the apportionment."  *Id.* at *39.  Ultimately, the court found that the Top Down approach was the best available method to calculate a reasonable royalty because it was based on "objective considerations and sound hypotheses, rather than on mere speculation" and because the inputs to the calculation were "verifiable data points, such as the number of 802.11 standard-essential patents, the average price of a chip, and the average profit of a chip manufacturer…"  *Id.* at *39.  The court's use of the Top Down approach in the context of RAND-encumbered patents confirms the reliability of the Component Royalty Stack Approach used by Mr. Meyer in the context of patents allegedly essential to wireless standards.

---

[7] Note that the *In re Innovatio* court determined that the patents at issue in that case were likely to be more valuable than the average 802.11 patent, and adjusted the calculation accordingly.  In this case, the record reflects that the GPNE patents are no more valuable than the average GPRS/EDGE/LTE patent.  Meyer Report at ¶ 87.

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

As an ████████████████████████████████████████████

████████████████████████████████████. Dkt. No. 186-4 & 186-8

(Maghame Dep. Tr.) at 58:13-22, 67:3-68:15, 84:13-86:2.  GPNE questions Mr. Meyer's

reliance of the testimony of Ms. Maghame as evidence of ██████████████████████

██████████████████████████████ Dkt. No. 185 at 5, 8.  GPNE

argues that ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* at 5, 8.  But again, these are factual

arguments that do not undermine Mr. Meyer's methodology and thus are not the proper

basis for a *Daubert* attack.

In summary, the Component Royalty Stack Approach is reliable and an

appropriate method for calculating damages in this case.  The approach is transparent,

based in mathematics, and all the inputs are quantifiable and verifiable.  Furthermore,████

████████████████████████████████ a similar methodology was used

by at least one district court to calculate a reasonable royalty.  As such, there is no reason

for the Court to bar Mr. Meyer's use of the approach and, accordingly, the Court should

deny GPNE's motion to exclude.

### B.  GPNE's Criticisms of Mr. Meyer's Consideration of the Parties' License Agreements Go to Weight, Not to Admissibility

GPNE claims that Mr. Meyer's *Georgia-Pacific* analysis is unreliable and must be

excluded due to a number of alleged deficiencies in Mr. Meyer's assessment of the

parties' license agreements.  None of the "flaws" alleged by GPNE is a critique of Mr.

Meyer's methodology, as is required under *Daubert*.  Instead, all these complaints go to

the weight Mr. Meyer's testimony should be afforded, not the reliability of his analysis,

and therefore none provides a basis for excluding Mr. Meyer's testimony under Fed. R.

Evid. 702.  *See, e.g.*, *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-cv-03972-LHK, 2012 WL

5835741, at *3 (N.D. Cal. Nov. 16, 2012) (holding plaintiff's criticisms of analyses

regarding lump sum agreements go largely to weight, not admissibility and denying

motion to exclude experts' calculations based on these agreements); *Sun Microsystems*

*Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1208-11 (N.D. Cal. 2009)

(holding movant failed to establish grounds for exclusion of damages expert's testimony

when its challenge to accuracy and proprietary of damages expert's analysis went to

weight, rather than admissibility, when expert actually attempted to control for market

conditions and conducted alternative methods of analysis to corroborate his conclusions).

### 1.  Mr. Meyer' Properly Considered Apple's Licenses Under *Georgia-Pacific* Factor 2

Mr. Meyer's analysis under *Georgia-Pacific* Factor 2 concerning Apple's license

agreements is both reliable and tied to facts in the case.  Meyer Report at ¶¶ 90-194, 251-

263.[8]  GPNE's motion contains two short paragraphs that, in summary, claim that the

Apple licenses relied on by Mr. Meyer are not comparable and that Mr. Meyer has failed

to account for "fundamental differences" between those licenses and a hypothetical

license between Apple and GPNE.  Dkt. No. 185 at 16-17.  GPNE's argument ignores the

sixteen pages of Mr. Meyer's report where he walks through each of the salient details of

Apple's licenses.  Meyer Report at pp. 66-82, ¶¶ 150-189.  Mr. Meyer reviewed Apple's

prior licenses and ████████████████████████████████

████████████████████████████████████████████

---

[8] *Georgia-Pacific* Factor 2 is "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

1 ████████████████████████████████

2 ████████████████████████████████████

3 ████████████████ *Id.* at ¶ 150.  Mr. Meyer found that the ██████████████

4 ████████████████████████████████████████

5 ████████████████████████████████

6 ██████████████████████████████████. *Id.* For ████████ Mr. Meyer

7 ████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████

10 ██████████████ *Id.*  Mr. Meyer concluded that██████████████████

11 ████████████████████ *Id.*  Mr. Meyer spends many pages

12 of his report doing exactly what GPNE claims he has not done – analyzing in detail the

13 various Apple agreements and determining which are, and which are not, comparable for

14 purposes of his damages calculation in this particular case.  Mr. Meyer's application of

15 *Georgia-Pacific* 2 is sound:  any concerns that GPNE may have regarding the factual

16 circumstances surrounding each individual license can be appropriately addressed by

17 cross-examination at trial.

18     GPNE's reliance on *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir.

19 2009), to question Mr. Meyer's analysis is misplaced.  Among other problems, Lucent's

20 expert's reliance on the defendant's past agreements under *Georgia-Pacific* Factor 2 was

21 problematic because it resulted in a damages award *three to four times larger than any*

22 *amount in evidence*.  *Id.* at 1328-32.  Mr. Meyer explains the basis for comparability of

23 Apple's past agreements and provides a reasonable royalty amount on par with the

ActiveUS 125080663v.1

comparable agreements of record.  In contrast, Mr. Dansky's reasonable royalty amount

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████  Meyer Report at ¶¶ 328-29.

### 2.  Mr. Meyer's Properly Considered GPNE's Licenses Under *Georgia-Pacific* Factor 1

With regard to Mr. Meyer's *Georgia-Pacific* Factor 1 analysis, GPNE again

presents a laundry list of complaints that are not tied in any way to Mr. Meyer's

principles or methodology.[9]  GPNE argues that the ████████████  of GPNE's prior

licenses is not comparable and must be ignored because they are licenses resulting from

litigation settlements.  Dkt. No. 185 at 17-19.  GPNE's argument is misplaced for two

reasons:  first, review of settlement agreements is appropriate where, as here, those

agreements are ███████████████████████████████████  and second, it is GPNE's

business model to sue first and license second – thus GPNE consciously avoided arms-

length negotiations outside of the context of a pending claim of patent infringement as

part of its litigation-licensing strategy.

GPNE's license agreements, even if precipitated by litigation, are a highly reliable

representation of GPNE's licensing behavior and are therefore properly included in Mr.

Meyer's *Georgia-Pacific* Factor 1 analysis.  *See ResQNet.com, Inc. v. Lansa, Inc*., 594

F.3d 860, 872 (Fed. Cir. 2010) ("This court observes as well that the most reliable license

in this record arose out of litigation.").  GPNE's motion conspicuously ignores the actual

---

[9] *Georgia-Pacific* Factor 1 is "the royalties received by the patentee for licensing of the [Patents-in-Suit]."  *Georgia-Pacific,* 318 F. Supp. at 1120.

APPLE'S OPPOSITION TO GPNE MOTION TO EXCLUDE
OPINIONS OF APPLE'S DAMAGES EXPERT PAUL K. MEYER
Case No.5:12-cv-02885-LHK

ActiveUS 125080663v.1

holding of *ResQNet.com*, which acknowledges that such agreements may very well be the most instructive in assessing a reasonable royalty. *See, e.g.*, *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No. C11-5973-PSG, 2013 WL 4537838, at *7 (N.D. Cal. Aug. 22, 2013) (denying motion to exclude settlement agreement relevant to damages when there was no basis to prevent defendant form using this comparable license); *CardSoft, Inc. v. Verifone Sys., Inc.*, No. 2:08-cv-98-RSP, 2012 WL 1995325, *2 (E.D. Tex. June 4, 2012) (finding concern with use of settlement agreement presented issues that go more to weight and can best be addressed through cross-examination). The GPNE settlement agreements are tied closely to the facts of this case: ████████████████████████

████████████████████████████████████████ Meyer Report at ¶¶ 91, 93-139. The settlement agreements also show that GPNE ████████████████████

████████████████████████████████████ Ex. B (Edwin Wong Dep. Tr. at 197:19-22). This is consistent with the one example of a ████████████████ GPNE's ████████████████████████████████

████████████████████████████████████ Meyer Report at ¶¶ 124-29.

       Not only are the GPNE settlement agreements the most reliable agreements in the record, they also conform with GPNE's litigation/licensing strategy. GPNE ████████

████████████████████ Ex. B (Edwin Wong Dep. Tr. at 74:5-76:16, 258:5-19). GPNE instead has an established business practice of instigating litigation to prompt

negotiation of a license.  As of the date of the hypothetical negotiation,[10] ██████████████

██████████████████████████████ *Id.* at 374:9-375:4 ███████

████████████████████████████████

██████████████████████████████████

████████████ ████████████████████

██████████████████████████████████

████████████████████.").  Furthermore, GPNE ignores the testimony of its

own CEO, who confirmed that ██████████████████████████

████████████████████████████████

████████████ *Id.* at 188:2-7, 190:20-23.  Indeed, GPNE admits in its motion that it

████████████████████. *See* Dkt. No. 185 at 20 ████████████

██████████████████████") (emphasis added).  GPNE should not

be allowed to use its sue-then-license scheme to shield from consideration the most

relevant license agreements in the record.  Mr. Meyer's consideration of these

agreements, and any factual differences claimed by GPNE, may be subject to analysis on

cross-examination, but GPNE provides no defensible position for its exclusion.[11]  *See*

*Stragent, LLC v. Intel Corp.*, No. 6:11-cv-421 (Mar. 6, 2014 E.D. Tex.) (Dkt. No. 289)

---

[10] This statement remains true despite the different hypothetical negotiation dates used by
Mr. Meyer and Mr. Dansky, where Mr. Meyer opines that the hypothetical negotiation
date is June 2010 (the date of first sale of an accused product) (Meyer Report at ¶¶ 56, 64
& Dkt. No. 108), while Mr. Dansky opines this date is June 30, 2009, when the '267
patent issued but when none of the currently accused products was on sale. (Dkt. No.
183-2 & 184-5 (Dansky Report) at 46).)

[11] The Court's treatment of the Apple-HTC agreement in *Apple Inc. v. Samsung Elecs.*
*Co.*, No. 11-cv-01846-LHK, 2013 U.S. Dist. LEXIS 160337 (N.D. Cal. Nov. 7, 2013),
does not undermine the relevance of the GPNE license agreements considered by Mr.
Meyer.  That decision concerned a broad cross license between competitors that actually
make products (as opposed to pursuing a business strategy of litigation).  *Id.* at *47.

ActiveUS 125080663v.1

(Ex. L) at 5 (Federal Circuit Judge Dyk, sitting by designation, declining to exclude expert testimony on settlement agreements that were the only licenses in the record and covered the patents-in-suit).

The last paragraph in GPNE's motion includes another laundry list of claimed deficiencies with Mr. Meyer's *Georgia-Pacific* analysis, including:

- That Mr. Meyer does not explain how he uses worldwide sales to arrive at a low royalty rate.[12]
- That Mr. Meyer assumes that foreign patents are worth the same amount as U.S. patents.
- That Mr. Meyer does not consider licensees likely did not pay extra for foreign license rights.
- That Mr. Meyers treated feature phones as equivalent to smartphones.
- That Mr. Meyers conducted a "sterile" mathematical calculation without considering the business interests of Apple vis-à-vis prior licensees.
- That Mr. Meyers did not recognize Apple's different business model.

*Id.* at 20.  Like GPNE's other complaints, none of these alleged flaws goes to the methodology employed by Mr. Meyer.  Equally significant, a number of them are directly contradicted by the record.  Mr. Meyer's report contains step-by-step calculations showing how he factor in worldwide sales.  (*See, e.g.*, Meyer Report at Attachment 9.1 & 9.1A (one of numerous examples of Mr. Meyer's use of worldwide sales).)  Mr. Meyer testified that he did not assume foreign patents were of equal value to GPNE's U.S. patents.  (*See* Ex. K (Meyer Dep. Tr. at 242:11-243:16).)  GPNE's expert, Dr. Dinan, testified that GPNE's patents are equally applicable to basic phones as they are to smartphones.  (Dkt. No. 183-7 (Dinan Dep. Tr. at 70:1-72:8).)  Interestingly, the allegation that "Mr. Meyer conducted a 'sterile' mathematical calculation" does not

---

[12] This allegation is flatly contradicted by Mr. Meyer's expert report, itself, which explains his calculation and provides over twenty attachments setting forth these calculations and sources of information.  (*See, e.g.*, Meyer Report at ¶¶ 90-134 & Attachments 9-12.)

appear to be a criticism at all.  As stated above, GPNE presents no reason that these specific criticisms impact the reliability of Mr. Meyer's principles or methodology.  Mr. Meyer's *Georgia-Pacific* included a comprehensive accounting for his calculations for each GPNE and Apple agreement based on information from reliable, public sources of information and the express terms of the agreements themselves.  (*See, e.g.*, Meyer Report at Attachments 9-12.)  Far from any lack of reliable methodology, Mr. Meyer's application of the *Georgia-Pacific* factors and detailed analyses of the same is an accepted approach for calculating damages.  *See Sun Microsystems*, 608 F. Supp. 2d at 1210 (denying motion to exclude when movant failed to demonstrate how damages expert's analysis was unreliable or otherwise totally at odds with scientific literature). Accordingly, Mr. Meyer's opinions based on his analysis of the Apple and GPNE license agreements should not be excluded.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny GPNE's motion.

Dated:  March 13, 2014

By:   */s/ Benjamin C. Elacqua*
Benjamin C. Elacqua