1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

   GPNE CORP.,                    )  C-12-02885 LHK
6                                  )
                   PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                  )
          VS.                      )  APRIL 3, 2014
8                                  )
   APPLE, INC.,                    )  PAGES 1-79
9                                  )
                   DEFENDANT.      )
10   _____ )

11

12          TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE LUCY H. KOH
13          UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:    BURNS & LEVINSON
                           BY:  HOWARD J. SUSSER
17                         125 SUMMER STREET
                           BOSTON, MASSACHUSETTS  02110
18
                           NELSON, BUMGARDNER, CASTO
19                         BY:  BARRY BUMGARDNER
                           3131 WEST 7TH STREET, SUITE 300
20                         FORT WORTH, TEXAS  76107

21

        APPEARANCES CONTINUED ON NEXT PAGE
22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

1

2    APPEARANCES (CONTINUED)

3

4    FOR THE PLAINTIFF:        KERR & WAGSTAFFE
                               BY:  PATRICIA L. PEDEN
5                              100 SPEAR STREET, 18TH FLOOR
                               SAN FRANCISCO, CALIFORNIA  94105
6

7    ALSO PRESENT:             EDWIN WONG

8

9    FOR THE DEFENDANT:        FISH & RICHARDSON
                               BY:  KATHERINE K. LUTTON
10                             500 ARGUELLO STREET, SUITE 500
                               REDWOOD CITY, CALIFORNIA  94063
11
                               BY:  CHRISTOPHER O. GREEN
12                                  AAMIR KAZI
                               1180 PEACHTREE STREET, 21ST FLOOR
13                             ATLANTA, GEORGIA  30309

14                             BY:  BENJAMIN C. ELACQUA
                               1 HOUSTON CENTER
15                             1221 MCKINNEY, 28TH FLOOR
                               HOUSTON, TEXAS  77010
16
                               WILMER, CUTLER, PICKERING, HALE & DORR
17                             BY:  JOSEPH J. MUELLER
                               60 STATE STREET
18                             BOSTON, MASSACHUSETTS  02109

19                             BY:  MATTHEW J. HAWKINSON
                               950 PAGE MILL ROAD
20                             PALO ALTO, CALIFORNIA  94304

21
     ALSO PRESENT:             NOREEN KRALL
22                             KEN MOORE

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    APRIL 3, 2014
 2                    P R O C E E D I N G S
 3        (COURT CONVENED AT 2:55 P.M.)
 4            THE CLERK:  CALLING CASE NUMBER C-12-02885 LHK, GPNE
 5    CORPORATION VERSUS APPLE, INCORPORATED.
 6            MS. LUTTON:  GOOD MORNING, YOUR HONOR.  OR AFTERNOON.
 7            THE COURT:  DID YOU CALL THE CASE, MARTHA?
 8            THE CLERK:  I DID.
 9            THE COURT:  OKAY.  PLEASE STATE YOUR APPEARANCES,
10    THEN.
11            MR. SUSSER:  HI, YOUR HONOR.  HOWARD SUSSER FOR
12    PLAINTIFF GPNE, AND WITH ME IS BARRY BUMGARDNER, CO-COUNSEL,
13    AND PATRICIA PEDEN, CO-COUNSEL.
14        AND IN THE SECOND ROW THERE IS EDWIN WONG, CEO OF GPNE,
15    AND HIS WIFE AND DAUGHTER.
16            MS. LUTTON:  AND KATHY LUTTON --
17            THE COURT:  ONE SECOND, PLEASE.  YOU HAVE
18    MR. BUMGARDNER AND WHO ELSE IS WITH YOU?
19            MR. SUSSER:  PATRICIA PEDEN FROM KERR & WAGSTAFFE
20    FIRM.  SHE MADE A NOTICE OF APPEARANCE SEVERAL WEEKS AGO.
21            THE COURT:  AH, OKAY, GREAT.  THANK YOU.  I JUST
22    NEEDED TO GET HER.
23        OKAY.  THANK YOU.
24            MS. LUTTON:  AND KATHY LUTTON ON BEHALF OF DEFENDANT
25    APPLE.  AND WITH ME ARE CHRIS GREEN, BEN ELACQUA, JOE MUELLER,
```

1      MATT HAWKINSON, AND AAMIR KAZI.

2          AND I ALSO HAVE THE CLIENT IN THE ROOM, NOREEN KRALL AND

3      KEN MOORE.

4          THE COURT:  OKAY.  GOOD AFTERNOON.  YOU HAVE

5      MR. GREEN, MR. ELACQUA, MR. MUELLER, MR. HAWKINSON, AND

6      MR. KAZI.

7          MS. LUTTON:  YES.

8          THE COURT:  OKAY.  I JUST WANTED TO MAKE SURE I GOT

9      EVERYBODY.

10         LET'S START WITH THE INVALIDITY ON THE '267 PATENT.

11         IS APPLE REQUESTING A FINDING OF INVALIDITY AS TO ALL THE

12     CLAIMS THAT DON'T RECITE DIFFERING FREQUENCIES?  OR JUST CLAIMS

13     1, 30, AND 39?

14         MS. LUTTON:  YOUR HONOR, AAMIR KAZI IS GOING TO

15     HANDLE THIS ARGUMENT.

16         THE COURT:  OKAY.

17         MS. LUTTON:  THIS IS HIS FIRST ARGUMENT IN COURT.

18         THE COURT:  OKAY, GREAT.  YOU GET MORE TIME.  THIS IS

19     YOUR FIRST ARGUMENT IN COURT, YOU GET MORE TIME.

20         MR. KAZI:  THANK YOU FOR THE TIME, YOUR HONOR.

21         SO AS TO YOUR QUESTION, I THINK WE ARE -- OUR POSITION IS

22     THAT THE CLAIMS THAT DO NOT REQUIRE DIFFERENT FREQUENCIES ARE

23     CLAIMS 1, 30 AND 39.  THOSE WOULD BE INVALID.

24         THE COURT:  OKAY.  BUT WHAT ABOUT -- I MEAN, I SEE

25     SOME OTHER CLAIMS AS WELL THAT, THAT DON'T CLAIM DIFFERING

```
 1        FREQUENCIES.  WHY WOULDN'T THOSE ALSO BE EQUALLY INVALID?  IS

 2        THERE SOMETHING DIFFERENT ABOUT CLAIMS 1, 11, 12, 18?

 3                    MR. KAZI:  WELL, THE CLAIMS WE ASSERTED --

 4                    THE COURT:  13 -- EXCUSE ME -- AS WELL.

 5                    MR. KAZI:  SORRY.

 6            THE CLAIMS THAT WE ASSERT INVALIDITY DEFENSE AGAINST WERE

 7        THE ONES THAT WERE ASSERTED AGAINST APPLE.

 8                    THE COURT:  BUT I THOUGHT THEY ALSO ASSERTED CLAIM 13

 9        AND 18.

10                    MR. KAZI:  THAT'S RIGHT, YOUR HONOR.  CLAIM 18 IS

11        DEPENDENT ON 13, WHICH WOULD BE DEPENDENT ON CLAIM 12, AND THEN

12        THAT'S DEPENDENT ON CLAIM 1.  SO IF CLAIM 1 IS INVALID, THEN

13        THAT ENTIRE GROUP OF CLAIMS SHOULD BE INVALIDATED.

14                    THE COURT:  OKAY.  SO YOU ARE THEN SAYING THAT CLAIMS

15        1, 11, 12, 13, 18 SHOULD ALSO BE -- WELL, YOUR MOTION -- YOUR

16        MOTION SPECIFICALLY CITES CLAIMS 1, 30 AND 39, BUT IT SOUNDS

17        LIKE THE SAME THEORY WOULD ALSO APPLY TO 11, 12, 13 AND 18.

18                    MR. KAZI:  I THINK THAT'S RIGHT, YOUR HONOR.  IF THE

19        INDEPENDENT-BASED CLAIM IS INVALID, THEN I THINK BY LAW THE

20        DEPENDENT CLAIMS ARE INVALIDATED AS WELL.

21                    THE COURT:  I'M NOT CLEAR ON WHY THEY WEREN'T PART OF

22        YOUR MOTION.

23                    MR. SUSSER:  YOUR HONOR, CAN I TRY TO SHED SOME LIGHT

24        ON THIS IF I MAY?

25                    THE COURT:  WELL, LET ME GET AN ANSWER FIRST.
```

1              MR. SUSSER:  OKAY.  THANK YOU, YOUR HONOR.

2              MR. KAZI:  OKAY.  I'M SORRY.  WHAT WAS THE QUESTION,

3    YOUR HONOR?

4              THE COURT:  OKAY.  YOUR MOTION MOVED ON CLAIMS 1, 30

5    AND 39, WHICH I'M INCLINED TO GRANT.  OKAY?

6         BUT THEN I LOOK AT SOME OF THESE OTHER CLAIMS, THEY ALSO

7    DON'T HAVE THE LIMITATION OF DIFFERING FREQUENCIES, SO I DON'T

8    UNDERSTAND WHY YOU DIDN'T MOVE ON THOSE, AS WELL AS YOU SAID,

9    YOU KNOW, CLAIM 11 DEPENDS FROM CLAIM 1, CLAIM 12 DEPENDS FROM

10   CLAIM 11.

11             MR. KAZI:  RIGHT.  AND, YOUR HONOR, MY UNDERSTANDING

12   IS IF THE INDEPENDENT-BASED CLAIM IS INVALIDATED, THEN THE

13   DEPENDENT CLAIMS WOULD ALSO BE INVALID.

14             THE COURT:  OKAY.  SO THAT WOULD INCLUDE 11, 12, 13,

15   18 AND 31?

16             MR. KAZI:  THAT'S RIGHT, YOUR HONOR.

17             THE COURT:  OKAY.  ALL RIGHT.

18        GO AHEAD, MR. SUSSER.

19             MR. SUSSER:  THANK YOU, YOUR HONOR.

20        THAT'S NOT THE WAY PATENT LAW WORKS.  IF YOU HAVE AN

21   INDEPENDENT CLAIM THAT'S INVALID, THE DEPENDENT CLAIM COULD

22   POSSIBLY ADD ANOTHER PATENTABLE LIMITATION THAT IS SEPARATELY

23   PATENTABLE.  IN FACT, THAT'S WHY WE DO DEPENDENT CLAIMS IS

24   BECAUSE THERE'S A CHANCE THAT THE INDEPENDENT CLAIM COULD BE

25   HELD INVALID AND YOU ADD ALL THESE BELLS AND WHISTLES IN

```
1        DEPENDENT CLAIMS TO HAVE SOMETHING IN CASE THAT HAPPENS.

2            SO MY BROTHER'S STATEMENT ABOUT IF AN INDEPENDENT CLAIM

3        BECOMES INVALID, THE DEPENDENT CLAIM IS ALSO INVALID IS

4        BACKWARDS.  IF THE DEPENDENT CLAIM IS INVALID FOR PRIOR ART,

5        THEN THE INDEPENDENT CLAIM IS INVALID BECAUSE THE DEPENDENT

6        CLAIM IS EVERYTHING IN THE INDEPENDENT CLAIM, PLUS ONE MORE

7        LIMITATION OR TWO MORE.

8            SO -- BUT MY UNDERSTANDING OF THEIR MOTION WAS THAT THEY

9        PICKED ONLY THE CLAIMS THAT WE'RE ASSERTING IN THE '267 THAT

10       ARE NON-MULTIFREQUENCY CLAIMS, THAT ALL OF THE OTHER CLAIMS

11       THAT WE'RE ASSERTING IN THE '267 STEM BACK TO SOME INDEPENDENT

12       CLAIM OR DEPENDENT CLAIM WITH MULTIFREQUENCIES.

13                   THE COURT:  ALL RIGHT.

14                   MR. SUSSER:  THAT WAS NOT --

15                   THE COURT:  LET'S TEST THAT.  GO TO CLAIM 13.  YOU

16       ARE ALLEGING CLAIM 13 OF CLAIM -- OF PATENT '267, SO TELL ME

17       WHERE IN CLAIM 13 IT HAS THE MULTIPLE FREQUENCIES.

18           I'LL JUST READ IT.  "THE FIRST NODE OF CLAIM 12 WHEREIN

19       THE RANDOM ACCESS REQUEST SIGNAL TRANSMITTED FROM THE FIRST

20       NODE INCLUDES RANDOMLY GENERATED INFORMATION CREATED BY THE

21       FIRST NODE WHEREIN THE FIRST GRANT RETURNS SAID RANDOMLY

22       GENERATED INFORMATION TO THE FIRST NODE TO ENABLE

23       IDENTIFICATION OF THE FIRST NODE AS A DESIRED RECIPIENT OF THE

24       FIRST GRANT."

25           SO WHERE IN THERE, TELL ME, DOES IT TALK ABOUT DIFFERING
```

1    FREQUENCIES, MULTIPLE FREQUENCIES?  THAT'S CLAIM 13 WHICH YOU

2    HAVE ASSERTED.

3              MR. KAZI:  YOUR HONOR, CAN I ADDRESS MR. SUSSER'S

4    COMMENT?

5              THE COURT:  NO.  LET ME GET AN ANSWER, PLEASE.

6              MR. KAZI:  SURE.

7              MR. SUSSER:  YOUR HONOR, I HAVE TO GO BACK AND LOOK

8    AT OUR -- I WANT TO JUST DOUBLE-CHECK ABOUT THE NUMBER OF THE

9    CLAIMS THAT WE -- OF THE '267, THE NUMBERS OF THE CLAIMS THAT

10   WE'RE ASSERTING AND MAKE SURE THAT WE'RE TALKING ABOUT THE SAME

11   THINGS.

12        OF COURSE THE FOCUS IN THE BRIEFING WAS ON THE SPECIFIC

13   ONES THAT WE UNDERSTOOD LACKED THE NON-MULTIFREQUENCY.

14             THE COURT:  ALL RIGHT.  YOU'VE GOT THREE LAWYERS

15   HERE.  TELL ME, IS THERE ONE THAT KNOWS WHICH CLAIMS YOU'VE

16   ASSERTED FROM THE '267 PATENT?

17             MR. SUSSER:  I JUST -- WITH THE THREE PATENTS, YOUR

18   HONOR, I APOLOGIZE, I JUST DON'T HAVE IT MEMORIZED.

19             THE COURT:  OKAY.  ARE YOU DOUBTING ME WHEN I'M

20   TELLING YOU THAT YOU'VE ASSERTED CLAIM 13?

21             MR. SUSSER:  OH, NO.

22             THE COURT:  OKAY.  SO WHAT'S THE ANSWER TO CLAIM 13?

23   I DON'T MEAN TO BE AGGRESSIVE HERE, BUT THIS IS SUMMARY

24   JUDGMENT AND I NEED AN ANSWER.  OKAY?

25             MR. SUSSER:  THANK YOU, YOUR HONOR.

```
1              THE COURT:  ALL RIGHT.  SO I'M TELLING YOU YOU'VE
2    ASSERTED CLAIM 13.
3              MR. SUSSER:  OKAY.
4              THE COURT:  IF YOU DOUBT ME, THAT'S FINE.  THEN TELL
5    ME SOMEONE ELSE ON YOUR TEAM WHO KNOWS THE ANSWER AND TELL US
6    THE RIGHT CLAIMS THAT HAVE BEEN ASSERTED, THAT YOU'VE ASSERTED.
7              MR. SUSSER:  THANK YOU, YOUR HONOR.
8         SO 13 --
9              THE COURT:  YES.
10             MR. SUSSER:  13 -- 13 DOES NOT HAVE MULTIFREQUENCY,
11   IT DEPENDS FROM 12, WHICH DOES NOT HAVE MULTIFREQUENCY, WHICH
12   DEPENDS FROM 11, AND THAT DEPENDS FROM 1.
13             AND IT SAYS, JUST AS YOU SAID --
14             THE COURT:  OKAY.  LET'S GO TO CLAIM 18.  I AM
15   REPRESENTING TO YOU THAT THAT IS WHAT YOU HAVE ASSERTED.  IF
16   SOMEONE ON YOUR TEAM TELLS ME OTHERWISE, THAT'S FINE.  THEY
17   SHOULD SPEAK UP RIGHT NOW.
18             I'M GOING TO READ YOU CLAIM 18.  "THE FIRST NODE OF CLAIM
19   11 WHEREIN A FINAL DATA PACKET FROM TOTAL NUMBER OF RELATED
20   PACKETS COMPRISES INFORMATION WHICH INDICATES THAT THE FINAL
21   DATA PACKET IS THE LAST DATA PACKET."
22             SO TELL ME WHERE IN THERE IS TALKING ABOUT MULTIPLE OR
23   DIFFERING FREQUENCIES.
24             MR. SUSSER:  I DO NOT SEE IT IN CLAIM 18 AS YOU READ
25   IT, YOUR HONOR.  THANK YOU.
```

```
1        AND THAT TRACKS BACK TO 11, WHICH ALSO DOESN'T CLAIM

2    MULTIFREQUENCIES, AND THAT GOES BACK TO 1.

3            THE COURT:  OKAY.  LET'S GO TO CLAIM 31, WHICH I'M

4    ALSO REPRESENTING TO YOU YOU'VE ASSERTED AGAINST THE

5    DEFENDANTS.  IF SOMEONE ON YOUR TEAM WANTS TO SAY THAT'S NOT A

6    CLAIM YOU'VE ASSERTED, NOW IS THE TIME TO SPEAK UP.  YOU'VE GOT

7    THREE LAWYERS HERE.  I ASSUME SOMEBODY KNOWS WHICH OF THE TEN

8    CLAIM TERMS YOU'VE ASSERTED AGAINST THE DEFENDANT.

9            HERE IS 31.  "THE FIRST NODE OF CLAIM 30 WHEREIN THE

10   RANDOM ACCESS REQUEST SIGNAL TRANSMITTED FROM THE FIRST NODE

11   INCLUDES RANDOMLY GENERATED INFORMATION CREATED BY THE FIRST

12   NODE WHEREIN THE FIRST GRANT RETURNS SAID RANDOMLY GENERATED

13   INFORMATION TO THE FIRST NODE TO ENABLE IDENTIFICATION OF THE

14   FIRST NODE AS A DESIRED RECIPIENT OF THE FIRST GRANT."

15           MR. SUSSER:  THANK YOU.

16       MR. BUMGARDNER HAS HANDED ME THE CLAIMS AS YOU --

17           THE COURT:  OKAY.  SO WHAT ARE THE CLAIMS YOU'VE

18   ASSERTED AGAINST THE '267?

19           MR. SUSSER:  I'M SORRY.  13.

20           THE COURT:  YES.

21           MR. SUSSER:  18.

22           THE COURT:  YES.

23           MR. SUSSER:  30.

24           THE COURT:  YES.

25           MR. SUSSER:  31.
```

```
1            THE COURT:  YES.

2            MR. SUSSER:  13.

3            THE COURT:  YES.

4            MR. SUSSER:  AND 42.

5            THE COURT:  THAT'S RIGHT.

6            MR. SUSSER:  OKAY.

7            THE COURT:  BUT WHERE IN 31 DOES THAT ALSO MENTION

8    MULTI OR DIFFERING FREQUENCIES?

9            MR. SUSSER:  I DON'T SEE IT IN 31.  I DON'T SEE IT IN

10   30 FROM WHICH IT DEPENDS.

11        OKAY, YOUR HONOR, THAT'S RIGHT.

12           THE COURT:  OKAY.  ALL RIGHT.  LET'S GO TO THE LAST

13   ONE.  THAT'S 39.

14           MR. SUSSER:  39, YES, AND 42 IS THE LAST.

15           THE COURT:  YES.

16           MR. SUSSER:  OKAY.

17           THE COURT:  42 DOES HAVE DIFFERING FREQUENCIES.

18   APPLE HASN'T MOVED ON 42, AND I WOULD DENY IT IF THEY DID.

19        BUT THEY HAVE MOVED ON 39, AND THAT IS ONE OF THE ASSERTED

20   CLAIMS.  "A FIRST NODE IN A DATA NETWORK, THE DATA NETWORK

21   INCLUDING A PLURALITY OF NODES, THE FIRST NODE COMPRISING," AND

22   IT'S A VERY LONG ONE, SO I'M NOT GOING TO READ THE WHOLE THING,

23   BUT LET ME JUST ASK YOU IF IT MENTIONS MULTI OR DIFFERING

24   FREQUENCIES.

25           MR. SUSSER:  NO, IT DOESN'T.  YOU'RE CORRECT.
```

```
1                    THE COURT:  OKAY.  ALL RIGHT.

2               SO NOW LET ME GO BACK TO APPLE.  WHY DIDN'T YOU MOVE ON

3       THE OTHER CLAIMS?  WHY DID YOU ONLY MOVE ON 1, 30 AND 39 AND

4       NOT ON THE OTHER CLAIMS THAT HAVE BEEN ASSERTED AGAINST YOU?

5                    MR. KAZI:  OUR POSITION IS THAT IF THE BASE

6        INDEPENDENT CLAIM IS INVALIDATED, THEN THE DEPENDENT CLAIMS ARE

7        INVALIDATED AS WELL.

8               AND I THINK MR. SUSSER, THE POINT HE RAISED WAS ABOUT THE

9       REASON FOR DEPENDENT CLAIMS AND THE WAY IT WORKS WITH

10      INVALIDATED OVER PRIOR ART.

11              BUT THIS IS NOT A PRIOR ART BASIS FOR INVALIDITY.  THIS IS

12      A 112 BASIS, AND SO UNDER 112, IF THE BASE CLAIM IS

13      INVALIDATED, THEN BY LAW I THINK THE DEPENDENT CLAIMS SHOULD BE

14      INVALIDATED AS WELL.  SO WE MOVED ONLY ON THE INDEPENDENT

15      CLAIMS THAT WERE ASSERTED AGAINST APPLE.

16              BUT IT IS OUR POSITION THAT ANY DEPENDENT CLAIMS BASED ON

17      THOSE INDEPENDENT CLAIMS, PARTICULARLY THE ONES THAT DO NOT

18      HAVE THE DIFFERING FREQUENCY REQUIREMENTS, ARE ALSO INVALID.

19                   THE COURT:  WELL, IT WOULD HAVE BEEN BETTER IF YOU

20       HAD EXPLICITLY REQUESTED IT.

21                   MR. KAZI:  I -- THAT'S PROBABLY RIGHT, YOUR HONOR.

22                   THE COURT:  ALL RIGHT.  BUT YOU AGREE THAT CLAIM 42,

23       WHICH HAS BEEN ASSERTED AGAINST YOU BY THE PLAINTIFF, DOES HAVE

24       DIFFERING FREQUENCIES; CORRECT?

25                   MR. KAZI:  YES, YOUR HONOR, I AGREE THAT CLAIM 42
```

1      DOES HAVE DIFFERING FREQUENCIES.

2          BUT WE BELIEVE IT'S STILL INVALID BECAUSE IT'S DEPENDENT

3      ON AN INDEPENDENT-BASED CLAIM THAT DOESN'T HAVE DIFFERING

4      FREQUENCIES.

5              THE COURT:  OKAY.  YOU DIDN'T ARGUE THAT IN YOUR

6      MOTION.  YOU DIDN'T ARGUE IT IN YOUR MOTION AND YOU DIDN'T

7      ARGUE THAT IN YOUR REPLY BRIEF.  WHY SHOULD I LET YOU SANDBAG

8      RIGHT HERE AT THE HEARING?

9              MR. SUSSER:  AND IF -- IF THAT DEPENDENT CLAIM ADDS A

10     LIMITATION OF MULTIFREQUENCIES, THEN NOT ONLY IS IT NOT RAISED

11     IN THEIR BRIEF, BUT THERE'S NO BASIS TO CHALLENGE THE VALIDITY

12     OF IT, EVEN IF IT WAS RAISED IN THEIR BRIEF, BECAUSE THEIR

13     BRIEF IS ABOUT THE LACK OF MULTIFREQUENCIES.

14             MR. KAZI:  OKAY.  I UNDERSTAND, YOUR HONOR, I THINK.

15         SO AT THIS TIME OUR POSITION IS THAT THE CLAIMS THAT DO

16     NOT HAVE THE DIFFERING FREQUENCIES LIMITATION ARE INVALID, SO

17     YOU'RE RIGHT, CLAIM 42 WOULD NOT BE ONE OF THOSE CLAIMS.

18             THE COURT:  SO YOU'RE NOT CHALLENGING THE VALIDITY OF

19     CLAIM 42?

20             MR. KAZI:  THAT'S CORRECT, YOUR HONOR.

21             THE COURT:  OKAY.  I HAVE A QUESTION FOR MR. SUSSER.

22         WHAT EVIDENCE HAS GPNE SUBMITTED THAT SUPPORTS YOUR CLAIM

23     THAT LTE PRODUCTS INFRINGE THE NODE LIMITATION?

24             MR. SUSSER:  THANK YOU, YOUR HONOR.

25         THE EXPERT REPORTS OF DR. ESMAEL DINAN HAVE EXTENSIVE

1    DISCLOSURE OF CLAIM CHARTS AND OTHER DESCRIPTION OF LTE, HOW IT

2    WORKS AND HOW IT MAPS TO THE CLAIMS OF THE, OF ALL THREE

3    PATENTS, IN PARTICULAR WITH RESPECT TO THE TERM "NODE."

4         AND THAT'S NOT --

5              THE COURT:  BUT HE DIDN'T TEST LTE.  HE ONLY TESTED

6    3G; RIGHT?

7              MR. SUSSER:  THAT'S RIGHT.  IN -- IN THE CASE OF --

8    I'M SORRY.  GPRS 3G, YES.

9         THE LTE TESTING EQUIPMENT WAS SOME EXTRAORDINARY, SEVERAL

10   HUNDREDS OF THOUSANDS OF DOLLARS OR MILLIONS OF DOLLARS, I

11   DON'T KNOW, AND WAS UNAVAILABLE TO DR. DINAN FOR THIS CASE.

12        HIS OPINION IS THAT --

13             THE COURT:  OH, WAIT.  I'M SORRY.  I DIDN'T

14   UNDERSTAND THAT.  YOU'RE SAYING HE HAD THE EQUIPMENT TO TEST

15   GPRS, BUT HE DIDN'T HAVE THE EQUIPMENT, BECAUSE IT WAS TOO

16   EXPENSIVE, TO TEST LTE?  IS THAT YOU JUST SAID?

17             MR. SUSSER:  THAT'S RIGHT.  HE WAS ONLY ABLE -- WE

18   WERE ONLY ABLE TO RENT, ON A TEMPORARY BASIS, THE AGILENT

19   EQUIPMENT THAT'S THE SUBJECT OF THOSE OTHER MOTIONS THAT WOULD

20   ENABLE THE GPRS PROTOCOL TESTING.

21        THE LTE, THE 4G EQUIPMENT, WAS AN ASTRONOMICAL PRICE THAT

22   WE COULD NOT ACCESS, OR HE COULD NOT ACCESS.

23             THE COURT:  LIKE HOW MUCH?

24             MR. SUSSER:  I THOUGHT IT WAS HUNDREDS OF THOUSANDS

25   OF DOLLARS.  IT COSTS MILLIONS TO BUY THEM.  IT'S A DIFFERENT

```
 1          MACHINE.

 2                AND HIS OPINION IN, IN HIS EXPERT REPORTS, AND THIS COVERS

 3          MANY, MANY PAGES, IS THAT LTE --

 4                    THE COURT:  YOUR DAMAGES ARE ASKING FOR A HUNDRED

 5          MILLION.  YOU'RE NOT WILLING TO SPEND A COUPLE HUNDRED THOUSAND

 6          TO --

 7                    MR. SUSSER:  MY UNDERSTANDING IS YOU HAVE TO --

 8                    THE COURT:  -- INVEST IN PROVING INFRINGEMENT?

 9                    MR. SUSSER:  WELL, WE HAVE OTHER BASES TO PROVE

10          INFRINGEMENT.  THE DECISION WAS MADE THAT IT WAS SEVERAL

11          HUNDRED THOUSAND DOLLARS TO BUY A MACHINE AND THAT WAS NOT IN

12          THE BUDGET OF THIS COMPANY TO DO THAT.

13                BUT REGARDLESS, HIS OPINIONS WITH RESPECT TO LTE ARE --

14          FOR THE FULL RANGE OF THE CLAIM ELEMENTS IS THAT LTE, BY ITS

15          NATURE, ALWAYS INFRINGES.  IT'S NOT SOMETHING THAT HAS

16          DIFFERENT MODES OF OPERATION.

17                IT HAS TO DO WITH THE MULTIFREQUENCY CHANNELS THAT ARE

18          ALWAYS USED IN LTE.  IT'S A PART -- IT'S A VERY TECHNICAL ISSUE

19          WE CAN GET INTO, BUT WHAT HAPPENS IS IT'S ALWAYS USING MULTIPLE

20          FREQUENCIES.  IT'S NOT A COMMAND THAT'S A PART OF A PROTOCOL

21          THAT ALLOWS FOR MULTIFREQUENCIES.

22                AND SO WHAT WAS CONCLUDED WAS THAT FOR LTE, FOR LTE, THE

23          CASE FOR INFRINGEMENT WAS VERY STRONG, CONCLUSIVE TO US, JUST

24          BASED ON HOW LTE WORKS, BASED ON THAT THE APPLE DEVICES HAVE

25          PASSED CONFORMANCE TESTING PROVING THAT THEY DO THE LTE
```

1  PROTOCOL AS MAPPED IN HIS CHARTS WHERE HE TAKES ALL OF THE

2  CLAIM ELEMENTS AND PUTS THEM AGAINST THE LTE PROTOCOL STEPS, AS

3  CONFIRMED BY APPLE'S OWN CONFORMANCE TESTING, AND THAT FOR LTE,

4  WE WENT WITH THAT OUT OF -- FOR THOSE REASONS.

5          THE COURT:  OKAY.  SO YOUR EVIDENCE ON THIS POINT ARE

6  DR. DINAN'S CLAIM CHARTS?  THAT'S YOUR EVIDENCE?

7          MR. SUSSER:  AND THE CONFORMANCE TESTING BY APPLE,

8  YOUR HONOR.

9      AND WE'VE HAD DEPOSITIONS OF THEM AS WELL, OF THEIR

10  30(B)(6) WITNESSES.

11      THERE WERE ALSO THE ISSUE OF THE BASEBAND LOGS.

12      AND WHEN I SAY THE APPLE CONFORMANCE TESTING, WHAT I'M

13  REFERRING TO, YOUR HONOR, IS THAT APPLE, LIKE ALL OF THE

14  MANUFACTURERS OF THESE DEVICES, HAS TO SEND OUT TO THIRD PARTY

15  COMPANIES, INCLUDING ONE MOST PROMINENTLY CALLED CETECOM,

16  C-E-T-E-C-O-M, AND THEY HAVE PRODUCED DOZENS AND DOZENS OF

17  THESE REPORTS FROM CETECOM CONFIRMING THAT ALL OF THE PHONES,

18  ALL OF THE SMARTPHONES ACCUSED PASSED VERY SPECIFIC PARTS OF

19  THE LTE STANDARD COMPLIANCE.

20      AND OUR EXPERTS HAVE SAID THAT THIS TESTING THAT WAS DONE

21  FOR APPLE BY ITS THIRD PARTY CERTIFICATION COMPANY CONFIRMS

22  THESE ELEMENTS ARE MET IN OUR CLAIM CHART.

23      SO IT'S A COMBINATION OF ALL OF THESE THINGS THAT GPNE

24  WOULD REPLY UPON AT TRIAL AS TO THE LTE.

25          THE COURT:  DO YOU WANT TO RESPOND TO THAT?

```
1            MR. GREEN:  YES, YOUR HONOR.  CHRISTOPHER GREEN,
2       FIRST OF ALL, FROM FISH & RICHARDSON ON BEHALF OF APPLE.  THANK
3       YOU FOR YOUR TIME TODAY.
4            THERE'S A LOT THERE, SO LET ME TRY TO UNWIND THAT.
5            WHAT I HEAR MR. SUSSER DOING IS BASICALLY DRAFTING AN
6       OPPOSITION AS HE STANDS AT THE PODIUM, BECAUSE NONE OF THAT WAS
7       IN THE OPPOSITION BRIEF THAT WE RECEIVED IN RESPONSE TO OUR
8       MOTION FOR SUMMARY JUDGMENT.
9            THE COURT:  ALL RIGHT.  WELL THEN, WHY DON'T I ASK
10      MR. SUSSER, JUST POINT ME TO THE RELEVANT PAGE NUMBERS AND LINE
11      NUMBERS.  WHERE IS WHAT YOU JUST SAID IN YOUR OPPOSITION?
12           MR. SUSSER:  OKAY.  THANK YOU, YOUR HONOR.
13           SO THE MOTION FOR SUMMARY JUDGMENT WAS JUST ABOUT THE TERM
14      "NODE," RIGHT, NOT ABOUT WHETHER ALL OF THE DOZEN OR SO
15      ELEMENTS OF, OF THE ASSERTED CLAIMS MAP TO LTE.
16           SO IF WE'RE TALKING ABOUT JUST THE TERM "NODE," MR. --
17           THE COURT:  I'M TALKING ABOUT WHAT EVIDENCE YOU HAVE
18      OF INFRINGEMENT AS TO LTE ACCUSED PRODUCTS.  IS THAT NOT IN
19      YOUR OPPOSITION TO THE SUMMARY JUDGMENT MOTION ON INFRINGEMENT?
20           MR. SUSSER:  I'M SORRY, YOUR HONOR.
21           MR. GREEN:  IT'S NOT THERE.
22           MR. SUSSER:  NO -- WELL, WE ATTACHED DR. DINAN'S
23      EXPERT REPORTS.
24           BUT THE SUMMARY JUDGMENT WAS ONLY AS TO ONE ELEMENT, YOUR
25      HONOR, SO I'M NOT REALLY -- I'M NOT UNDERSTANDING YOUR HONOR --
```

```
 1    LIKE WE DON'T HAVE -- WE DON'T HAVE AN ARGUMENT ABOUT WHETHER

 2    THERE'S A RANDOM GENERATED INFORMATION --

 3              THE COURT:  WELL, THERE IS AN ARGUMENT ABOUT OPERATE

 4    INDEPENDENTLY OF THE TELEPHONE NETWORK.

 5              MR. GREEN:  ABSOLUTELY, YOUR HONOR.

 6              THE COURT:  LET ME -- MR. SUSSER, I'M HEARING FROM

 7    YOU IT'S NOT IN YOUR OPPOSITION, BUT YOU THINK IT'S IN

 8    DR. DINAN'S REPORT.

 9              MR. SUSSER:  OH, SURE IT'S IN DR. DINAN'S REPORT.

10              THE COURT:  ALL RIGHT.  GIVE ME A COPY AND TELL ME

11    WHAT ARE THE PARAGRAPH NUMBERS.

12              MR. SUSSER:  OH, SURE.

13              THE COURT:  I'M PREPARING AN ORDER.  I NEED TO KNOW

14    PARAGRAPH NUMBERS THAT I CAN CITE, SO --

15         (PAUSE IN PROCEEDINGS.)

16              MR. SUSSER:  THIS IS THE EXPERT REPORT OF DR. DINAN.

17    I HAVE A CLEAN COPY.

18              THE COURT:  AND I WANT YOU TO POINT TO WHAT EVIDENCE

19    THERE IS THAT LTE ACCUSED PRODUCTS INFRINGE, AND I'M --

20              MR. SUSSER:  THANK YOU, YOUR HONOR.

21              THE COURT:  I SHOULD REALLY JUST SAY OPERATE

22    INDEPENDENTLY OF A TELEPHONE NETWORK ISSUE IF THE NODE ISSUE IS

23    CONFUSING FOR YOU.

24         SO LET'S TALK ABOUT OPERATING INDEPENDENTLY OF A TELEPHONE

25    NETWORK.  WHAT DO YOU HAVE THAT'S LTE SPECIFIC AND NOT 3G OR
```

1    GPRS?

2              MR. SUSSER:  OKAY, YOUR HONOR.

3              THE COURT:  YEAH.

4              MR. SUSSER:  OKAY, YOUR HONOR.  THERE'S A SECTION IN

5    THIS EXPERT REPORT THAT STARTS AT PAGE 99 -- AND I CAN HAND

6    THIS UP TO YOU.

7              THE COURT:  SURE, WHY DON'T YOU?

8              MR. SUSSER:  THANK YOU, YOUR HONOR.

9              THE COURT:  UNFORTUNATELY, ALL OF MY STICKY NOTES ARE

10   UPSTAIRS, SO I'M GOING TO ASK MS. PARKER BROWN IF YOU HAVE ANY

11   HERE.

12             THE CLERK:  I DO.  SMALL?

13             THE COURT:  THAT'S PERFECT.  THAT'S GREAT.

14             MR. SUSSER:  MAY I APPROACH, YOUR HONOR?

15             THE COURT:  YES, PLEASE.  THANK YOU.

16             MR. SUSSER:  I'M SORRY.  WE MAY HAVE ANOTHER COPY.

17             THE COURT:  OKAY.  SO -- YOU'RE AT 92?

18             MR. SUSSER:  THIS IS WHERE IT STARTS THE DISCUSSION

19   OF LTE.

20             THE COURT:  OKAY.

21             MR. SUSSER:  AND HE HAS FULL CLAIM CHARTS OF LTE

22   MAPPING ALL OF THE ELEMENTS, INCLUDING NODE, PER YOUR HONOR'S

23   CLAIM CONSTRUCTION.

24             THE COURT:  OKAY.  SO WHAT PARAGRAPH SPECIFICALLY DO

25   YOU WANT ME TO LOOK AT?  BECAUSE I'LL JUST READ THEM RIGHT NOW.

```
 1              MR. SUSSER:  THANK YOU, YOUR HONOR.

 2              THE COURT:  DO YOU WANT TO START AT 90?

 3              MR. SUSSER:  IF YOU GO TO 105, PAGE 105, THAT APPEARS

 4    TO BE -- THERE'S A -- THIS IS CLAIM 39, AND THERE'S A CLAIM

 5    ELEMENT, A FIRST NODE, AND DR. DINAN STATES HIS OPINION BASED

 6    ON HIS REVIEW OF --

 7              THE COURT:  THE STANDARD.

 8              MR. SUSSER:  -- THE STANDARD AND THAT THE

 9    ESTABLISHMENT OF CONFORMANCE TESTING BY THIRD PARTIES --

10              THE COURT:  WHERE IS THAT IN PARAGRAPH 105?

11              MR. SUSSER:  OKAY.  IF -- I'M SORRY, YOUR HONOR.

12    I -- IF YOU START BACK UP AT PAGE 99 --

13              THE COURT:  OKAY.

14              MR. SUSSER:  -- AND WE CAN READ DOWN TO -- WE SEE

15    REFERENCES TO -- IN FACT, AT PARAGRAPH 97, HE SAYS "APPLE LTE

16    DEVICES WERE TESTED AND PASSED CONFORMANCE TESTS ACCORDING TO

17    SECTION 7.1.2.4," AND THAT'S A REFERENCE TO THE CONFORMANCE

18    TESTS.

19              MR. GREEN:  YOUR HONOR --

20              MR. SUSSER:  THERE'S -- PARAGRAPH 99 IS A REFERENCE

21    TO THE CONFORMANCE TESTS.

22         I -- I WILL SAY THIS, YOUR HONOR, THAT THE ISSUE OF NODE,

23    AS IT RELATES TO LTE, IS NOT ONE THAT THERE'S A CONFORMANCE

24    TEST.  IT'S THE SIGNALLING THAT THE DEVICES DO THAT ARE

25    PERFORMED.
```

```
 1            IN OTHER WORDS, AND WHEN -- YOUR HONOR, WHEN THESE DEVICES

 2     ARE TESTED ON --

 3            THE COURT:  WHY DOES HE SAY LTE ACCUSED DEVICES WERE

 4     ASSUMED TO HAVE PASSED --

 5            MR. SUSSER:  CONFORMANCE --

 6            THE COURT:  -- CONFORMANCE TESTS IN PARAGRAPH 99 AND

 7     100?  WHY ARE THEY ASSUMED TO HAVE PASSED?

 8            MR. SUSSER:  YOUR HONOR, THAT'S BECAUSE DR. DINAN,

 9     WHO FROM TIME TO TIME DOES PATENT PROSECUTION FOR HIMSELF, WAS

10     NOT ALLOWED UNDER THE PROTECTIVE ORDER IN THIS CASE.

11            AND SO WHAT GPNE DID WAS TO HIRE ANOTHER EXPERT BY THE

12     NAME OF NEIL BIRKETT AND NEIL BIRKETT WAS ALLOWED, UNDER THE

13     PROTECTIVE ORDER, AND HE DID REVIEW THE CETECOM TESTS AND HE

14     GAVE AN OPINION --

15            THE COURT:  THEN WHY DID DR. DINAN, ON PARAGRAPH 97,

16     SAY "APPLE LTE DEVICES WERE TESTED AND PASSED CONFORMANCE

17     TESTS"?  SO SOME CONFORMANCE TESTS HE WAS ALLOWED TO SEE AND

18     SOME HE WAS NOT?

19            MR. SUSSER:  NO.  WE TOLD HIM THAT -- HE -- I BELIEVE

20     HE SPOKE TO DR. BIRKETT AND SAID "I'M GOING TO RELY ON THE FACT

21     THAT THESE HAVE BEEN DONE AND PASSED, EVEN THOUGH I CAN'T SEE

22     THE DOCUMENTS."  SO HE'S AN EXPERT RELYING ON ANOTHER EXPERT

23     WHO WAS ALLOWED TO SEE THIS.

24            AND YOUR HONOR MAY NOT KNOW THIS, BUT WE HAD SEVERAL

25     MONTHS OF BATTLE WITH APPLE TO TRY TO GET TWO OTHER EXPERTS IN
```

1    THE CASE WHO WOULD HAVE PASSED AND APPLE OBJECTED TO THOSE, AND

2    SO WE WENT WITH WHAT WE COULD GET.

3         BECAUSE DR. DINAN COULD NOT SEE THESE, BUT HE WAS ABLE TO

4    LOOK AT THE CONFORMANCE TESTS THAT ACTUALLY PUBLICLY AVAILABLE,

5    WHAT THEY ARE, WHAT THEY DO.  SO IF I'M TOLD THIS DEVICE PASSED

6    TEST 123, I CAN GO LOOK AT 123 AND MAKE A CONCLUSION THAT IT

7    ACTUALLY DOES THESE THINGS, EVEN THOUGH I DON'T SEE THE

8    SPECIFIC TEST RESULTS.

9         THE COURT:  SO I GUESS I WAS CURIOUS WHY, ON

10   PARAGRAPH 97, HE SAYS THAT APPLE LTE DEVICES WERE TESTED AND

11   PASSED CONFORMANCE TESTS, BUT IN 99, 100, 101, LIKE WHAT -- WHY

12   WAS HE ALLOWED TO SEE THE TESTS IN PARAGRAPH 97, BUT NOT

13   ALLOWED TO SEE THE CONFORMANCE TESTS IN 99, 100 --

14        MR. SUSSER:  HE WAS NOT ALLOWED TO SEE ANY

15   CONFORMANCE -- ANY ACTUAL REPORTS FROM CETECOM.  THEY WERE

16   MARKED ATTORNEYS' EYES ONLY.  WE DISCUSSED THIS WITH COUNSEL

17   AND MR. GREEN AND MYSELF AT ONE POINT TO TRY TO SEE IF WE COULD

18   WORK OUT ALLOWING HIM TO JUST SEE THE PASS/FAILS AND THEY

19   WOULDN'T LET US TO DO THAT, SO WE HIRED ANOTHER EXPERT TO SAY,

20   "GIVE US A LIST OF THE CETECOM CONFORMANCE TESTING THAT, BY

21   NUMBERS, WHICH ONES WERE PASSED," AND WE GAVE THAT INFORMATION

22   TO DR. DINAN AND SAID "ASSUME THESE TESTS WERE PASSED BECAUSE

23   WE HAVE ANOTHER EXPERT WHO SAID THEY DID."

24        AND SO WHEREVER, WHEREVER DR. DINAN'S EXPERT REPORT

25   IDENTIFIES A CONFORMANCE TEST, HE'S RELYING ON THE EXPERT

1    REPORT OF DR. BIRKETT WHO'S CONCLUDED THAT FROM READING THE

2    VERY DOCUMENTS THEMSELVES.

3            MR. GREEN:  YOUR HONOR, I APPRECIATE THAT YOU'RE

4    TRYING TO GET SOME VERY SPECIFIC INFORMATION FROM MR. SUSSER,

5    BUT IF I MAY, I THINK I CAN SHORT CIRCUIT THIS LINE OF

6    QUESTIONING.  I DON'T WANT TO INTERRUPT THE CONVERSATION WITH

7    MR. SUSSER, BUT I'D LIKE TO OFFER SOMETHING THAT I THINK WOULD

8    BE HELPFUL.

9            THE COURT:  OKAY.  GO AHEAD, PLEASE.

10            MR. GREEN:  ALL RIGHT.  CETECOM TEST REPORTS HAVE

11   NOTHING TO DO WITH THE OPERATING INDEPENDENTLY OF A TELEPHONE

12   NETWORK LIMITATION.  ABSOLUTELY NOTHING.

13            THAT'S WHY NONE OF THESE PARAGRAPHS THAT MR. SUSSER HAS

14   IDENTIFIED CONTAIN THE PHRASING "OPERATE INDEPENDENTLY OF A

15   TELEPHONE NETWORK," AND THE REASON CETECOM TEST REPORTS HAVE

16   NOTHING TO DO WITH THAT LIMITATION IS BECAUSE THEY ARE

17   INTEROPERABILITY TESTS FOR CELLULAR TELEPHONE NETWORKS.  THEY

18   ARE MANDATED BY THE CARRIERS.  AT&T, FOR EXAMPLE, WOULD REQUIRE

19   THAT AN APPLE PRODUCT GO TO ONE OF THESE THIRD PARTY

20   LABORATORIES AND BE TESTED FOR INTEROPERABILITY.

21            IT HAS NOTHING TO DO WITH PAGING SYSTEMS THAT OPERATE

22   INDEPENDENTLY OF A TELEPHONE NETWORK.  IT IS THE EXACT

23   OPPOSITE.  IT TESTS OPERABILITY WITH THE TELEPHONE NETWORK.

24   THAT'S WHY IT'S NOT THERE.

25            MR. SUSSER:  YOUR HONOR, IF I CAN RESPOND TO THAT?

1    MY UNDERSTANDING FROM THE CETECOM REPORTS, THEY EXPLICITLY

2    STATE THAT THE TESTING IS DONE ON NETWORK EMULATORS, LIKE THE

3    EQUIPMENT THAT DR. DINAN USED TO TEST GPRS, WHICH HAVE NO

4    TELEPHONES WHATSOEVER CONNECTED TO THEM, NO TELEPHONE SYSTEM,

5    NO TELEPHONE NETWORK.  THEY ARE -- THEY ARE BASED -- THEY ARE A

6    NETWORK EMULATOR JUST MEANT TO SHOW THE LTE SIGNAL PROTOCOL.

7    SO GPNE'S POSITION WOULD BE THAT THE VERY FACT THAT THESE

8    DEVICES, THE VERY FACT THAT THESE DEVICES ARE TESTED BY APPLE'S

9    THIRD PARTY, CETECOM, ON NETWORK EMULATION MACHINES THAT DO NOT

10   HAVE ANY CONNECTION TO A TELEPHONE NETWORK OF ANY KIND IS PROOF

11   POSITIVE THAT THEY'RE OPERATING INDEPENDENTLY, OR THEY ARE

12   PROGRAMMED WITH THE CAPABILITY TO OPERATE INDEPENDENTLY AND

13   SIMILAR TO AND PARALLEL TO WHAT WE ACTUALLY ESTABLISHED WITH

14   ACTUAL TESTS IN THE GPRS EMULATOR WE WERE ABLE TO OBTAIN.

15   MR. GREEN:  YOUR HONOR, THAT'S JUST INCORRECT.

16   I'LL -- I'LL ASK FOR YOU TO INDULGE ME TO EXPLAIN WHY, BUT

17   THAT'S WRONG.

18   THE COURT:  WHY IS THAT WRONG?

19   MR. GREEN:  IT'S WRONG BECAUSE THE THING THAT IS

20   EMULATED IS A CELLULAR TELEPHONE NETWORK BASE STATION.  THAT'S

21   THE POINT.  THESE THINGS ARE BEING TESTED FOR INTEROPERABILITY

22   WITH A CELLULAR TELEPHONE NETWORK BY MIMICKING CERTAIN FEATURES

23   AND FUNCTIONS OF THAT CELLULAR TELEPHONE NETWORK.

24   IT'S NOT THE ACTUAL PRODUCTION ENVIRONMENT.  IF YOU TOOK A

25   PHONE FROM A CETECOM TEST ENVIRONMENT AND ACTUALLY MEASURED ITS

1    PERFORMANCE IN A TELECOM ENVIRONMENT VERSUS WHAT YOU SEE IN AN

2    ACTUAL PRODUCTION IN A COMMERCIAL NETWORK CARRIER ENVIRONMENT,

3    YOU WILL SEE SOME DIFFERENCES PERHAPS.

4        BUT THEY ARE INTENDED TO EMULATE THE SAME THING THAT AN

5    ACTUAL TELEPHONE NETWORK WOULD DO.

6        THIS -- WHAT WE'VE GOTTEN TO HERE VERY EARLY IS THE THEME

7    FOR THE DAY, AND THAT'S REARGUING CLAIM CONSTRUCTION.  ALL OF

8    THIS DISCUSSION ABOUT DISABLING TELEPHONE CALL FUNCTIONALITY,

9    TELEPHONE NETWORK FUNCTIONALITY, WE WENT THROUGH ALL THIS IN

10   CLAIM CONSTRUCTION.

11       THE THEORY, THE UNDERLYING THEORY HERE IS THAT IF YOU'RE

12   NOT PICKING UP THE PHONE AND MAKING A PHONE CALL, THEN YOU'RE

13   INDEPENDENT OF A TELEPHONE NETWORK.

14       THAT'S NOT THE CLAIM CONSTRUCTION.  WE SPENT A SIGNIFICANT

15   AMOUNT OF TIME AND RESOURCES COMBING THROUGH THE SPECIFICATION,

16   THE FILE HISTORY.  THIS IS ADDRESSED AT LENGTH IN YOUR HONOR'S

17   CLAIM CONSTRUCTION ORDER ISSUED LAST AUGUST.

18       THIS IS A COMPLETE REWORK AND REWRITE AND REIMAGINING OF

19   WHAT THE CLAIM CONSTRUCTION IS AND WHAT THE CLAIMS REQUIRE.

20       IT'S SIMPLY -- AS A MATTER OF LOGIC, YOUR HONOR, IT IS

21   IMPOSSIBLE TO PROVE THAT ANY DEVICE OPERATES INDEPENDENTLY FROM

22   A TELEPHONE NETWORK BY TAKING THIS TEST EQUIPMENT THAT EMULATES

23   PARTS, BUT NOT ALL, OF THE TELEPHONE NETWORK AND THEN BEING

24   ABLE TO TRADE SOME SIGNALS WHICH AREN'T EVEN THE SAME SIGNALS

25   THAT YOU WOULD TRADE ON ALL THE TELEPHONE NETWORKS.

1      IT JUST IS AN ALPHABET SOUP OF POINTS THAT REALLY DON'T

2    ADD UP TO THE CONCLUSION.

3          THE COURT:  ALL RIGHT.  AND WOULD THAT SAME ARGUMENT

4    APPLY TO DR. DINAN'S EMULATION TESTS WITH RESPECT TO GPRS?

5          MR. GREEN:  ABSOLUTELY, AND IT IS ADDRESSED IN THE

6    DAUBERT MOTION AND THE MOTION TO STRIKE, YOUR HONOR.  THAT IS A

7    PROBLEM OF, A FUNDAMENTAL AND THRESHOLD PROBLEM WITH THAT

8    EVIDENCE THAT GPNE WANTS TO OFFER.

9          AND I JUST -- IT JUST DOESN'T MAKE ANY SENSE, AGAIN, THAT

10   DR. DINAN IS GOING TO DO THIS FOR GPRS AND NOT LTE.  I CAN

11   ASSURE YOU THAT THERE IS NO EVIDENCE IN THE RECORD THAT TESTING

12   LTE EQUIPMENT COSTS A MILLION DOLLARS.  I THINK IT'S MORE LIKE

13   12 OR 15.  THAT'S -- ONE OF OUR ASSOCIATES LOOKED THAT UP THIS

14   MORNING AND FOUND IT, FROM THE VERY SAME COMPANY THAT GPNE USED

15   TO RENT THE OTHER TEST EQUIPMENT, FOR $14,000.

16          MR. SUSSER:  I --

17          THE COURT:  HOW MUCH DID IT COST TO RENT THE

18   EQUIPMENT TO TEST THE GPRS?

19          MR. SUSSER:  IT WAS 20, 25, SOMETHING LIKE THAT.  WE

20   SPECIFICALLY LOOKED FOR THIS, AND THERE'S NO REASON WHY WE

21   WOULDN'T DO IT IF IT WAS AVAILABLE FOR THAT PRICE, YOUR HONOR.

22          BUT REALLY QUICKLY, WHAT -- MR. GREEN'S ARGUMENT IS THAT A

23   SINGLE BOX THAT'S THIS BIG THAT'S NOT CONNECTED TO ANY

24   TELEPHONE PSTN, HARD LINE OR RADIO FREQUENCY LINE THAT HAS NO

25   TELEPHONE, NO VOICE, HE'S SAYING THAT'S NOT A DATA NETWORK

1    BECAUSE IT EMULATES THE ACTUAL GPRS OR LTE NETWORK WHICH THEY

2    SAY IS A TELEPHONE NETWORK.

3         THE TESTS THEMSELVES ARE NOT ON A TELEPHONE NETWORK.

4         HE'S JUST SAYING THIS DOESN'T COUNT BECAUSE IT EMULATES

5    THE LARGER COMMERCIAL NETWORK.  SO THIS IS JUST HIS ARGUMENT

6    THAT THE COMMERCIAL NETWORK IS NOT A SEPARATE DATA NETWORK FROM

7    A SEPARATE -- OPERATING INDEPENDENTLY FROM A TELEPHONE NETWORK.

8         THE EMULATION TESTS, WHETHER THE ONES DR. DINAN DID OR THE

9    ONES APPLE DID WITH CETECOM, ARE ALL ON A BOX, A COMPUTER BOX

10   THAT HAS NOTHING TO DO WITH TELEPHONES.  THERE'S NO TELEPHONES

11   HOOKED UP.  YOU CAN'T MAKE A PHONE CALL ON IT.  IT EMULATES THE

12   REAL NETWORK, AND THE FACT THAT YOU CAN RUN DATA COMMUNICATIONS

13   ON THESE BOXES, ON THESE EMULATORS, DO ALL OF THIS SIGNALLING

14   IN GPRS AND LTE WITHOUT ANY TELEPHONE NEARBY THAT'S WORKING,

15   CONNECTING, NO VOICE, SHOWS THAT WHEN YOU -- THAT IN THE REAL

16   NETWORK, YOU'RE DOING THE SAME THING.

17        YOU'RE DOING DATA COMMUNICATIONS, YOU'RE SENDING BACK AND

18   FORTH SIGNALS, BUT YOU'RE NOT RELYING ON ANY PURE TELEPHONE

19   NETWORK RESOURCES.

20        AND THIS IS WHAT WE'VE BRIEFED.  THERE'S A SHARING OF

21   CERTAIN RESOURCES BETWEEN THE TWO NETWORKS, THE GPRS NETWORK

22   THAT'S ON TOP OF -- THAT CAME AFTER THE GSM NETWORK, BUT WHEN

23   THE GPRS NETWORK IS WORKING, JUST LIKE WHEN THE LTE NETWORK IS

24   WORKING, WHEN IT'S OPERATING, TO USE YOUR TERM IN THE MARKMAN,

25   OPERATIONALLY, IT'S NOT USING ANY RESOURCES THAT ARE DEDICATED

```
1    TO TELEPHONES.

2         IT'S NOT MERELY THAT IT'S NOT MAKING A TELEPHONE CALL.  WE

3    KNOW THAT THAT'S NOT WHAT YOU MEANT, THAT SOMEBODY IS PICKING

4    UP A TELEPHONE AND MAKING A CALL.

5         IT'S NOT USING ANY RESOURCES THAT ARE PURELY TECHNICAL TO

6    TELEPHONE LINES.

7         THE FACT THAT YOU CAN DO ALL OF THIS GPRS PROTOCOL AND ALL

8    OF THIS LTE PROTOCOL ON AN EMULATION MACHINE THAT APPLE AND ITS

9    CERTIFIERS USE PROVES THAT WHEN THE SAME THING IS HAPPENING ON

10   THE REAL NETWORKS, IT'S DOING THE SAME THING.  IT'S NOT

11   COMMUNICATING ON SOMETHING THAT'S PURELY A TELEPHONE NETWORK.

12         MR. GREEN:  YOUR HONOR, IF I MAY, I'D LIKE TO GO BACK

13   AND NOT, YOU KNOW, PARAPHRASE WHAT YOUR CONSTRUCTION IS AND NOT

14   SPECULATE ABOUT WHAT YOUR CONSTRUCTION WAS AND WHAT'S DESCRIBED

15   IN YOUR ORDER.  THE ACTUAL CONSTRUCTION IS, "PAGER WITH TWO-WAY

16   DATA COMMUNICATIONS CAPABILITY THAT TRANSMITS WIRELESS DATA

17   COMMUNICATIONS ON A PAGING SYSTEM THAT OPERATES INDEPENDENTLY

18   FROM A TELEPHONE NETWORK."

19         IF MR. SUSSER OR GPNE HAD COME OUT WITH AN EMULATOR OF A

20   PAGING SYSTEM AND THE VERY SAME STANDARDS ORGANIZATION, THE

21   GOVERNMENTAL ENTITIES THAT REGULATE TELECOMMUNICATIONS IN

22   GENERAL, THEY TELL US WHAT PAGING NETWORKS ARE, HOW THEY WORK,

23   WHAT KINDS OF ARCHITECTURE, WHAT FREQUENCY BAND, WHAT

24   THROUGHPUT YOU HAVE FOR PAGING SYSTEMS, IF MR. SUSSER AND HIS

25   EXPERT HAD EMULATED ONE OF THOSE PAGING NETWORKS, ONE OF THOSE
```

1    PAGING SYSTEMS, THEN WE MIGHT HAVE SOMETHING TO TALK ABOUT.

2         BUT I'M AT A LOSS TO EXPLAIN HOW AN EMULATOR AND A PIECE

3    OF EQUIPMENT THAT IS DESIGNED TO MIMIC AN ACTUAL CELLULAR

4    TELEPHONE NETWORK, INCLUDING THE RESOURCES THAT THE GPRS

5    PROTOCOL -- AND IT'S A PROTOCOL, IT'S A PIECE OF FUNCTIONALITY,

6    IT'S NOT A FREE-STANDING NETWORK -- IF I AM MIMICKING THAT WITH

7    THIS PIECE OF TEST EQUIPMENT, THAT DOES NOTHING TO PROVE THE

8    REQUIREMENT THAT IS IN YOUR HONOR'S CONSTRUCTION THAT YOU

9    ARRIVED AT AFTER MUCH DEBATE, PAGING SYSTEM, PAGING SYSTEM,

10   THAT OPERATES INDEPENDENTLY FROM A TELEPHONE NETWORK.

11        MR. SUSSER:  YOUR HONOR --

12        MR. GREEN:  NOT NO PHONE CALL, NOT ABSENCE OF A

13   TELEPHONE CALL, NOT TELEPHONE NETWORK RESOURCE THAT'S NOT BEING

14   USED AT THIS TIME.  NONE OF THAT IS IN THE CLAIM CONSTRUCTION

15   ORDER, YOUR HONOR.

16        MR. SUSSER:  SO MR. GREEN IS MAKING THE ARGUMENT THAT

17   HE'S MADE IN HIS BRIEF THAT PAGING SYSTEMS OUT IN THE WORLD ARE

18   DISTINGUISHED FROM TELEPHONE CELLULAR NETWORKS, SO IF YOU LOOK

19   CLOSELY AT EVERYTHING THEY SAY IN THEIR BRIEF, THERE'S THE

20   HURRICANE KATRINA FCC PAPER, THIS BAND IN THE EUROPEAN SYSTEM,

21   AND THIS ETSI DOCUMENT, ALL OF THESE DOCUMENTS DISTINGUISH

22   PAGING SYSTEMS AT DIFFERENT TIMES FROM CELLULAR NETWORKS, NOT

23   FROM TELEPHONES, FROM CELLULAR NETWORKS.

24        BUT WHAT APPLE DOESN'T SHOW YOU IS THAT FIGURE 9 OF THE

25   GPNE PATENT SHOWS THAT THIS IS A CELLULAR NETWORK.  THEY'RE

1      TRYING TO READ OUT OF THE GPNE PATENT CLAIMS, AS YOU'VE

2      CONSTRUED THEM, THE POSSIBILITY THAT THIS DEVICE CAN WORK ON A

3      CELLULAR NETWORK.  YOU HEAR HIM SAYING IT OVER AND OVER AGAIN,

4      THAT THE NETWORK EMULATION MACHINES --

5                  MR. GREEN:  NO.

6                  MR. SUSSER:  -- EMULATE A CELLULAR NETWORK.

7                  MR. GREEN:  NO.

8                  MR. SUSSER:  NOW, YOUR HONOR, JUST REAL QUICK --

9      CHRIS, I'LL BE DONE IN A SECOND.

10                  MR. GREEN:  THAT'S ALL RIGHT.  THANK YOU.

11                  MR. SUSSER:  YOUR HONOR MADE IT VERY CLEAR OVER AND

12     OVER AGAIN, THE NODE CAN BE A TELEPHONE.  THE NODE CAN

13     COMMUNICATE OVER A TELEPHONE SYSTEM.  THE NODE CAN USE A PAGING

14     SYSTEM THAT CAN INTERACT WITH A TELEPHONE SYSTEM.  THE NODE CAN

15     SEND DATA OVER A TELEPHONE SYSTEM.

16        THE PATENT, FIGURE 9 AND THE ASSOCIATED TEXT, SPECIFICALLY

17     SAY THAT THE INVENTORS ENVISIONED A CELLULAR SYSTEM WITH

18     MULTIPLE CELLS AND THERE'S CELL SWITCHING.

19        SO IF YOU LOOK AT ALL OF THE DISTINGUISHING

20     CHARACTERISTICS THAT APPLE'S BRIEF DID, THEY'RE TRYING TO UNDO

21     ALL OF THAT WORK YOU DID BY SAYING, NO, IF THERE'S ANY

22     TELEPHONE CELLULAR SYSTEM INVOLVED ANYWHERE, IT'S OUTSIDE THE

23     CLAIMS.

24        BUT THAT'S NOT TRUE BECAUSE WHAT THEY INVENTED WAS A

25     CELLULAR SYSTEM, AND WE DO KNOW THAT A PAGE -- THAT WHAT YOU

1    HAVE CALLED AS A PAGER, WHAT YOU'VE DEFINED AS A PAGER ITSELF

2    IS NOT A TELEPHONE.

3         BUT YOU'VE EXPRESSLY ALLOWED INTERACTION BETWEEN THE

4    SYSTEMS, AND WHAT I THINK -- GETTING BACK TO WHERE WE REALLY

5    ARE, IT'S A SUMMARY JUDGMENT MOTION AND A RULE 56, WE HAVE,

6    THROUGH DR. DINAN AND THROUGH TENS OF THOUSANDS OF PAGES OF

7    DATA AND EVIDENCE, SHOWN THERE'S AT LEAST A GENUINE ISSUE OF

8    MATERIAL FACT AS TO WHETHER THE SHARING OF SOME RESOURCES, BUT

9    HAVING A TON OF DIFFERENT HARDWARE AND SOFTWARE BETWEEN THESE

10   NETWORKS, IS ENOUGH TO SAY THAT THEY OPERATE INDEPENDENTLY.

11        YOU SAID THAT THEY COULD HAVE INTERACTION AND THE PATENT

12   SAYS THEY HAVE AN INTERACTION.

13        WHAT WE SAY IS THAT -- AND THIS IS WHAT THE EMULATIONS

14   PROVE -- WHEN IT'S OPERATING, WHEN IT'S DOING ONE THE THINGS OF

15   THE PATENT CLAIMS, IT'S NOT USING TELEPHONE RESOURCES, AND SO

16   IT OPERATES INDEPENDENTLY, AND THAT'S THE THRUST OF OUR

17   INFRINGEMENT CASE.

18        AND I THINK, UNDER THE CONSTRUCTION, WE'VE MADE MORE THAN

19   A COMPELLING SHOWING THAT THERE'S AT LEAST A GENUINE ISSUE OF

20   MATERIAL FACT FOR THE JURY TO DECIDE WHETHER THEY'RE

21   INDEPENDENT ENOUGH.

22        AND THAT'S WHERE WE THINK THIS SHOULD BE DENIED.

23             MR. GREEN:  YOUR HONOR, IF I MAY, I'M GOING TO GO

24   BACK TO FIRST PRINCIPLES, AND THAT IS WHEN WE STARTED DOWN THIS

25   ROAD OF CONSTRUING THE TERM "NODE," BOTH PARTIES AGREED THAT IT

1    WAS CASE DISPOSITIVE.  IT WAS A CASE DISPOSITIVE TERM.

2         WE CAME OUT WITH A CONSTRUCTION THAT I JUST READ TO YOUR

3    HONOR WHICH REQUIRES A PAGER, A PARTICULAR KIND OF DEVICE ON A

4    PARTICULAR KIND OF NETWORK, A PAGING SYSTEM, AND THAT THE

5    PARTICULAR SYSTEM, THE PAGING SYSTEM, OPERATE INDEPENDENTLY

6    FROM A TELEPHONE NETWORK.

7         AND AGAIN, YOUR HONOR, I'M NOT GOING TO DO MY BEST

8    PARAPHRASING OF YOUR ORDER, I'M GOING TO READ EXACTLY FROM

9    PAGE 12 OF YOUR CLAIM CONSTRUCTION ORDER.  IT TELLS US THE

10   FOLLOWING:  "THUS, THE SPECIFICATION SUPPORTS THE CONCLUSION

11   THAT THE TERM 'PAGER' DOES NOT SIMPLY REFER TO A DEVICE IN A

12   NETWORK, BUT RATHER TO A DEVICE DESIGNED TO OPERATE IN A

13   PARTICULAR KIND OF SYSTEM.  CONSEQUENTLY, AN ACCURATE

14   CONSTRUCTION OF NODE SHOULD DISCLOSE THAT THE NODE IS A TYPE OF

15   PAGER AND NOT MERELY A DEVICE IN A NETWORK."

16        AND THERE ARE STILL MORE AND NUMEROUS OTHER STATEMENTS OF

17   THAT KIND AFTER YOUR HONOR GAVE THOROUGH CONSIDERATION TO THE

18   INVENTOR'S STATEMENTS AND PROSECUTION HISTORY, THE

19   SPECIFICATION, THE TESTIMONY OF GPNE'S OWN EXPERT, DR. DINAN,

20   THE VERY SAME EXPERT WHO'S NOW OFFERING THE OPINION THAT GPNE

21   IS HAVING A LITTLE TROUBLE LOCATING, HE OFFERED TESTIMONY THAT

22   CONFIRMED THAT PAGERS AND OTHER DEVICES, NOT JUST CELLULAR

23   TELEPHONES, PAGERS AND OTHER DEVICES ARE DIFFERENT, PAGING

24   SYSTEMS AND OTHER NETWORKS ARE DIFFERENT.

25        AGAIN RETURNING TO YOUR HONOR'S CLAIM CONSTRUCTION,

1    DR. DINAN'S TESTIMONY CONFIRMED THAT THE NODE IS A TYPE OF

2    PAGER.  THE COURT IS NOT PERSUADED THAT THE ADDITION OF

3    TRANSMITTING FUNCTIONALITY, THE ADDITION OF TRANSMITTING

4    FUNCTIONALITY, MEANING CHANGING THIS FROM A ONE-WAY PAGER TO A

5    PAGER THAT COMMUNICATES IN TWO DIRECTIONS, SOMEHOW MAKES IT

6    SOMETHING OTHER THAN A PAGER.  IT'S STILL A PAGER.

7        IF GPNE HAS INVENTED ANYTHING, THAT'S WHAT IT IS, THIS

8    ENHANCED PAGER DEVICE THAT OPERATES ON PAGING SYSTEMS, PAGING

9    SYSTEMS BEING INDEPENDENT OF A TELEPHONE NETWORK.

10       AND THERE'S NO EVIDENCE IN THIS OPPOSITION, THERE'S NO

11   EVIDENCE IN THE RECORD TO SHOW THAT APPLE DEVICES OPERATE ON A

12   PAGING SYSTEM, THE PAGING SYSTEM BEING DEFINED AS A NETWORK

13   THAT CAN OPERATE INDEPENDENTLY OF A TELEPHONE NETWORK.

14       GPNE ADMITS THIS THROUGHOUT.  THERE ARE SHARED RESOURCES.

15   WHEN YOU HAVE THE GPRS FUNCTIONALITY OR THE LTE FUNCTIONALITY

16   THAT IS ACCUSED OF INFRINGEMENT IN THIS CASE, THEY DO NOT WORK,

17   THEY DON'T WORK WITHOUT THOSE UNDERLYING TELEPHONE NETWORK

18   COMPONENTS BECAUSE THEY'RE NOT FREESTANDING.  THEY ARE

19   EXTENSIONS OF THE TELEPHONE NETWORK.  THEY'RE NOT SEPARATE.

20   THEY'RE NOT INDEPENDENT.  THERE'S NO DEBATE ABOUT THAT.

21       I APPRECIATE WHAT MR. SUSSER IS TRYING TO DO.  HE'S TRYING

22   TO, VERY AGGRESSIVELY, PURSUE THIS NOTION THAT WE CAN BACK AWAY

23   FROM THE CONSTRUCTION, HE -- THAT WE CAN JUST RECONFIGURE WHAT

24   THE PAGER MEANS, WE CAN REIMAGINE WHAT A PAGING SYSTEM IS

25   BECAUSE THEY HAVE TO DO SOMETHING.

1          THIS CLAIM CONSTRUCTION IS CASE DISPOSITIVE AND WE'VE BEEN

2     UP FRONT ABOUT THAT WITH YOUR HONOR FROM THE BEGINNING.

3          MR. SUSSER:  IT WAS CASE DISPOSITIVE, YOUR HONOR,

4     FROM --

5          THE COURT:  I'D LIKE TO MOVE ON.

6          MR. SUSSER:  THANK YOU, YOUR HONOR.

7          THE COURT:  SO IS THE IDENTITY OF THE SMALLEST

8     SALEABLE PATENT PRACTICING UNIT, IS THAT A QUESTION OF LAW OR A

9     QUESTION OF FACT?

10          MR. SUSSER:  YOUR HONOR, MS. PEDEN IS GOING TO ARGUE

11     THAT.

12          THANK YOU, YOUR HONOR.

13          THE COURT:  CAN I JUST ASK, WHY DO THE PLAINTIFFS

14     HAVE FIVE LAW FIRMS, OR SIX LAW FIRMS NOW?

15          MR. SUSSER:  DO WE HAVE FIVE?  WELL, MS. PEDEN AND

16     HER FIRM ARE TAKING OVER AS LOCAL AND CO-COUNSEL, SO

17     GARTEISER HONEA FIRM ARE LEAVING.  IS THERE ANOTHER ONE THAT

18     I'M MISSING?

19          THE COURT:  SO GARTEISER HONEA NO LONGER IS GOING TO

20     BE YOUR LOCAL COUNSEL?

21          MR. SUSSER:  THEY WERE OUR LOCAL AND NOW PATTY IS OUR

22     LOCAL AND CO-COUNSEL.  SHE'S A PATENT LITIGATOR.  SHE'S GOING

23     TO HELP US.

24          THE COURT:  I SEE.  ARE THEY GOING TO WITHDRAW?

25          MR. SUSSER:  THEY CAN.  I DIDN'T ASK THEM TO YET, BUT

```
 1        I CAN IF YOUR HONOR WANTS ME TO.

 2             THE COURT:  NO, NO, I DON'T HAVE ANY PREFERENCE.  I

 3   WAS JUST CURIOUS.  THAT'S ALL.

 4             MR. SUSSER:  THEY'VE BEEN INVOLVED IN THE CASE.  HE

 5   WANTED TO KEEP TRACK OF WHAT'S GOING ON.

 6        THE OTHER LAWYER -- THE OTHER FIRM, I GUESS, IS THE HAWAII

 7   FIRM THAT WAS INVOLVED WHEN WE WERE STILL IN HAWAII.

 8             THE COURT:  I SEE.

 9             MR. SUSSER:  THE LOCAL COUNSEL IN HAWAII, YOUR HONOR.

10             THE COURT:  OKAY.

11             MR. SUSSER:  THANK YOU, YOUR HONOR.

12             THE COURT:  NO, I THINK THE LOCAL COUNSEL IN HAWAII,

13   THEY'VE ALREADY LONG WITHDRAWN FROM THE CASE.  I DON'T THINK

14   THEY EVER -- I DON'T THINK THEY EVER MADE AN APPEARANCE HERE,

15   THE HAWAII COUNSEL DIDN'T.  IT'S JUST BEEN THE FOUR.

16        OKAY.

17             MS. PEDEN:  GOOD AFTERNOON, YOUR HONOR.

18   PATRICIA PEDEN REPRESENTING GPNE.

19        AND AS TO YOUR HONOR'S QUESTION ABOUT WHETHER OR NOT THE

20   SMALLEST SALEABLE PATENT PRACTICING UNIT IS A QUESTION OF LAW

21   OR FACT, IT IS A QUESTION OF FACT.  THE CASE SUPPORT FOR THAT

22   IS THE BROADCOM CORP. CASE, AS WELL AS STRYKER CORP., AND BOTH

23   OF THOSE CASES ARE CITED IN OUR BRIEF.

24             MR. MUELLER:  YOUR HONOR, IF I MAY RESPOND?

25             THE COURT:  MAYBE MY QUESTION WAS NOT PRECISE.  ARE
```

```
1        YOU -- IS IT A QUESTION OF LAW WHETHER THAT'S EVEN -- WELL, GO

2     AHEAD.

3              MR. MUELLER:  SURE, YOUR HONOR.  JOE MUELLER ON

4     BEHALF OF APPLE.

5         THERE'S A QUESTION OF LAW AND A QUESTION OF METHODOLOGY,

6     AND ALSO A QUESTION OF FACT, AND IF I COULD DISTINGUISH THE

7     TWO.

8         THE PARTIES ARE DIVIDED ON A QUESTION OF LAW THAT RELATES

9     TO HOW TO CONDUCT AN ANALYSIS OF THE SMALLEST SALEABLE PATENT

10     PRACTICING UNIT, AND IT'S A FUNDAMENTAL QUESTION THAT GOES TO

11     THE METHODOLOGIES USED BY THE RESPECTIVE DAMAGES EXPERTS.

12         I THINK THAT ON THAT QUESTION OF LAW, AND I'LL GET TO THAT

13     IN JUST A MOMENT, IT CLEARLY IS ONE OF LAW.

14         BUT ONCE DECIDED, THERE'S THE FURTHER FACTUAL QUESTION AS

15     TO WHAT DOES THAT MEAN IN THE CONTEXT OF TECHNOLOGY IN THIS

16     CASE, AND THAT'S A QUESTION OF FACT.

17         BUT THE FIRST PLACE TO BEGIN, THE THRESHOLD QUESTION IS,

18     HOW DOES ONE CONDUCT AN INQUIRY LIKE THIS?

19         AND THERE'S A DISAGREEMENT ON THAT ISSUE.  THE CASE LAW IS

20     QUITE CLEAR.  THE CASE LAW SAYS THAT A DAMAGES EXPERT MUST LOOK

21     TO THE COMPONENT THAT IS MOST CLOSELY TIED TO THE ALLEGED

22     INVENTION.

23         AND THERE'S A STRING OF CASES THAT WE CITED TO YOUR HONOR

24     OVER THE LAST FEW YEARS FROM THE FEDERAL CIRCUIT THAT MAKE

25     QUITE CLEAR THAT THERE'S A RIGOROUS REQUIREMENT THAT THE
```

1    CLOSEST COMPONENT TO THE ALLEGED INVENTION IS THE PLACE TO

2    FOCUS.

3        NOW, THAT COMPONENT MAY BE OVERINCLUSIVE.  THERE MAY BE

4    PARTS IN THAT COMPONENT THAT HAVE NOTHING TO DO WITH THAT

5    INVENTION AND YOU HAVE TO APPORTION THAT COMPONENT TO ARRIVE

6    MORE PRECISELY AT THE VALUE OF THE ALLEGED INVENTION.

7        BUT THE PURPOSE OF THE SMALLEST SALEABLE COMPONENT TEST IS

8    TO BRING US CLOSER TO THE VALUE OF THE ALLEGED INVENTION.

9        AND SO THAT'S WHAT THE CASES SAY.  IT SAYS YOU TAKE THE

10    PRODUCTS AT ISSUE IN THE CASE AND THEN YOU LOOK WITHIN THEM TO

11    FIND THE COMPONENT THAT IS MOST CLOSELY TIED TO THE ALLEGED

12    INVENTION.  THAT'S WHAT THE LAW REQUIRES.

13        NOW, GPNE AND ITS EXPERT HAVE INTERPRETED THIS LAW IN A

14    WAY THAT IS, RESPECTFULLY, INCORRECT, AND THEY HAVE SAID THAT

15    THE SMALLEST SALEABLE COMPONENT TEST IS LIMITED TO THE SET OF

16    PRODUCTS THAT ARE SOLD BY THE DEFENDANT.

17        SO IN A CASE WHERE THE PRODUCTS ARE APPLE PRODUCTS, WHAT

18    THAT WOULD MEAN IS THE SMALLEST SALEABLE COMPONENT COULD ONLY

19    BE THE IPHONE, THE IPAD, OR OTHER PRODUCTS SOLD BY APPLE

20    BECAUSE APPLE DOESN'T SELL, FOR EXAMPLE, CHIPS.  APPLE DOESN'T

21    SELL CAMERA COMPONENTS THAT GO INTO PHONES.  APPLE SELLS THE

22    END DEVICE.

23        AND THAT'S JUST WRONG.  YOU'RE NOT LIMITED TO THE SET OF

24    PRODUCTS THAT ARE SOLD BY THE DEFENDANT.  THE WHOLE POINT OF

25    THESE CASES THAT THE FEDERAL CIRCUIT HAS ISSUED IS THAT YOU

1    HAVE TO GO FURTHER AND LOOK WITHIN THOSE PRODUCTS, ESPECIALLY

2    IN COMPLICATED ELECTRONICS DEVICES, TO IDENTIFY THE COMPONENT

3    THAT IS MOST CLOSELY TIED TO THE ALLEGED INVENTION.

4         AND AS I MENTIONED, YOU MAY NEED TO GO EVEN FURTHER AND

5    APPORTION THE VALUE OF THAT COMPONENT TO ARRIVE AT THE, AT A

6    MORE PRECISE APPROXIMATION OF THE VALUE OF THE PARTICULAR

7    INVENTION.

8         BUT THE FIRST STEP IS TO GO WITHIN THE DEVICE AND DEFINE

9    THE COMPONENT THAT'S MOST CLOSELY TIED, AND THAT ISSUE AS TO

10   WHO IS RIGHT AND WHO IS WRONG AS TO HOW THIS SORT OF INQUIRY

11   SHOULD BE CONDUCTED IS A QUESTION OF LAW.

12        AND GPNE'S DAMAGES EXPERT HAS USED AN INCORRECT CONCEPTION

13   OF THE LAW AND HAS TAKEN THE VIEW THAT THE INQUIRY ENDS AT THE

14   SET OF PRODUCTS SOLD BY THE DEFENDANT, IN THIS CASE THE IPAD

15   AND THE IPHONE.

16        THAT'S WRONG, AND THAT'S A METHODOLOGICAL PROBLEM WITH HIS

17   REPORT.  IT'S ONE OF THE TWO GROUNDS FOR OUR OWN DAUBERT

18   MOTION.

19        SO THE ANSWER TO YOUR HONOR'S QUESTION IS THERE'S AN ISSUE

20   OF LAW ON WHICH THE PARTIES DISAGREE; AND THEN ONCE THAT'S

21   RESOLVED, THERE COULD BE A FURTHER FACTUAL QUESTION, BUT WE

22   THINK THE DAMAGES ISSUES IN THIS CASE ACTUALLY CAN BE DECIDED

23   AT THE FIRST STAGE, THE ISSUE OF LAW.

24             THE COURT:  LET ME ASK MS. PEDEN -- DID I PRONOUNCE

25    THAT CORRECTLY?

1          MS. PEDEN:  YES, YOUR HONOR.

2          THE COURT:  -- IF YOU ALWAYS LIMIT IT TO THE PRODUCT

3     THAT THE DEFENDANT SELLS, THEN WOULDN'T WE ALWAYS BE GETTING

4     INTO TENSION WITH THE ENTIRE MARKET VALUE RULE AND THE WHOLE

5     PRODUCT IN THIS CASE?  THEY'RE SAYING DEFENDANT ONLY SELLS THE

6     FINAL PHONE OR TABLET.

7          MS. PEDEN:  WELL, I THINK THAT ARGUMENT EVIDENCES A

8     MISUNDERSTANDING OF THE APPROACH THAT MR. DANSKI USED.  APPLE'S

9     POSITION HAS -- IS BASED ON THE ANALYSIS THAT WOULD GO INTO A

10    MORE TRADITIONAL DAMAGES ASSESSMENT WHERE YOU HAVE -- YOU

11    DETERMINE A ROYALTY BASE AND THEN YOU APPLY A ROYALTY RATE TO

12    THAT BASE.

13         THAT IS NOT THE ONLY DAMAGES METHODOLOGY THAT IS

14    ACCEPTABLE, AND IN FACT, THE FEDERAL CIRCUIT HAS REPEATEDLY,

15    SINCE 1986, APPROVED OF AN ANALYTICAL APPROACH TO DAMAGES.

16         SO THE WAY MR. DANSKI GOES ABOUT IDENTIFYING AND ISOLATING

17    AND APPORTIONING THE THING THAT IS COVERED BY THE PATENTS IS

18    DIFFERENT THAN THE WAY APPLE WOULD PREFER THAT IT BE DONE.

19         THE WAY MR. DANSKI DOES IT IS HE STARTS BY TAKING TWO

20    COMPARABLE PRODUCTS THAT DIFFER ONLY IN THE FUNCTIONALITY THAT

21    IS COVERED BY THE PATENTS, SO HE TAKES AN IPAD THAT HAS WI-FI

22    AND HE COMPARES IT TO AN IPAD THAT HAS WI-FI AND CELLULAR.

23         HE TAKES THOSE TWO PRODUCTS AND DETERMINES WHAT THE PROFIT

24    PREMIUM APPLE GETS FROM SELLING THE IPAD WITH THE CELLULAR

25    FUNCTIONALITY IS, AND HE SAYS THAT THAT PRICE PREMIUM IS $168.

1          THEN HE DEDUCTS OUT THE COST FOR PRODUCING THE IPAD AND HE

2     COMES UP WITH AN INCREMENTAL MARGIN OF $94.

3          FROM THE $94, HE DEDUCTS THE $8.20 THAT APPLE HAS TO PAY

4     FOR CURRENT ROYALTY OBLIGATIONS, AND HE COMES TO A PRICE OF

5     $86.  $86 IS THE END PROFIT THAT APPLE MAKES BY HAVING CELLULAR

6     FUNCTIONALITY IN THESE TWO DIFFERENT PRODUCTS.

7          SO BECAUSE HE HAS DONE THIS ANALYTICAL METHOD AND HAS

8     FILTERED OUT EVERYTHING BUT THE PATENTED TECHNOLOGY, HE HAS

9     ALREADY ISOLATED THE VALUE OF THAT.

10          THERE IS NO -- AND I THINK THE CASE LAW IS CLEAR ON THIS

11     POINT.  WHEN YOU DO THIS PER UNIT APPORTIONMENT THIS WAY, YOU

12     DON'T EVEN GET TO THE ENTIRE MARKET VALUE RULE.  IT DOESN'T

13     APPLY.

14               MR. MUELLER:  TWO RESPONSES, YOUR HONOR.

15               THE COURT:  OKAY.

16               MR. MUELLER:  FIRST, I DON'T THINK I HEARD AN ANSWER

17      TO YOUR QUESTION.  IT WOULD, IN FACT, VITIATE THE ENTIRE MARKET

18       VALUE CASE LAW IF GPNE'S POSITION WERE CORRECT.

19          IF YOU WERE ALWAYS LIMITED TO THE SET OF PRODUCTS SOLD BY

20     THE DEFENDANT, THOSE CASES WOULDN'T MAKE ANY SENSE.

21          AND JUST TO BE CLEAR, THIS IS A DIRECT QUOTE, IT'S AT

22     PAGE 5 FROM OUR OPENING BRIEF, A DIRECT QUOTE FROM THE DAMAGES

23     EXPERT'S DEPOSITION.

24          "QUESTION:  YOUR VIEW OF THE SMALLEST SALEABLE UNIT CASE

25     LAW IS THAT THE RELEVANT UNIT MUST BE SOMETHING SOLD BY THE

1    DEFENDANT IN THAT CASE?

2         "ANSWER:  THAT'S CORRECT.  FOR IT TO BE THE ROYALTY BASE,

3    IT HAS TO BE SOMETHING THAT THE COMPANY -- THAT THE DEFENDANT

4    ACTUALLY SOLD."

5         THAT'S WRONG.

6              MS. PEDEN:  YOUR HONOR --

7              MR. MUELLER:  THAT'S NOT THE LAW, THAT'S AN INCORRECT

8    CONCEPTION OF LAW, AND IT CREATES A METHODOLOGICAL PROBLEM WITH

9    THE ANALYSIS CONDUCTED BY THE EXPERT.  SO THAT'S POINT ONE.

10        POINT TWO:  THAT ANALYTICAL APPROACH HAS A SEPARATE

11   INDEPENDENT DEFECT, AND THIS IS THE SECOND ARGUMENT IN OUR

12   BRIEF, YOUR HONOR, THIS ISOLATION, SO-CALLED, OF THE DIFFERENCE

13   BETWEEN THE CELLULAR IPADS AND THE NON-CELLULAR IPADS THAT WAS

14   CONDUCTED BY GPNE'S EXPERT HAS A MATH ERROR IN IT, THAT'S THE

15   FIRST POINT, AND THAT ALONE MIGHT BE GROUNDS FOR

16   CROSS-EXAMINATION AS TO A DAUBERT CHALLENGE.

17        BUT HERE'S THE DAUBERT PROBLEM:  THIS DIFFERENCE THAT HAS

18   BEEN ALLUDED TO, THIS $86 DIFFERENCE AS CALCULATED BY THE

19   EXPERT IS NOT THE ROYALTY REQUEST.  THE ROYALTY REQUEST IS A

20   DOLLAR.

21        AND THE QUESTION IS WHAT --

22             THE COURT:  DO YOU ALL NOT WANT ME TO SEAL THIS?

23             MR. MUELLER:  I'M SORRY?

24             THE COURT:  EVERYONE IS THROWING OUT THE $86 NUMBER

25   AND THE $1.

```
 1              MR. MUELLER:  THIS IS JUST THEIR DAMAGES REQUEST.

 2     YOU TELL ME.

 3              MS. PEDEN:  WE'RE FINE.

 4              MR. SUSSER:  WE DON'T GET TO THE TOTAL PRICE AT THIS

 5     POINT.

 6              THE COURT:  OKAY.  BUT I THOUGHT THAT THE 86 WAS THE

 7     PROFIT.

 8              MR. MUELLER:  NO, YOUR HONOR.  THAT'S NOT WHAT APPLE

 9     WOULD AGREE IS ANY SORT OF PROFIT MARGIN.

10          TO BE CLEAR, THIS IS THE ANALYSIS OF THE EXPERT WHICH WE

11     THINK IS WRONG.

12              THE COURT:  ALL RIGHT.  BUT THAT'S NOT --

13              MR. MUELLER:  SO ALL THIS MEANS IS THIS IS THE GPNE

14     DAMAGES EXPERT FIGURE.  WE DON'T ENDORSE IT IN ANY WAY.  WE

15     DON'T THINK IT REFLECTS ANY CONFIDENTIAL APPLE INFORMATION.

16              THE COURT:  OKAY.  I THOUGHT THAT'S WHAT THE GPNE

17     EXPERT SAYS IS THE PROFIT WAS $86, AND THEN FROM THAT HE GETS A

18     DOLLAR.

19              MS. PEDEN:  RIGHT, AND THAT'S ABSOLUTELY RIGHT.  AND

20     SO HE DOESN'T EVER AT ANY POINT USE THE ENTIRE SALES PRICE OF

21     AN IPAD TO GET TO HIS PROFIT PREMIUM.  IF HE DID, IF HE USED

22     THE ENTIRE PRICE OF THE IPAD, HE MAY RUN AFOUL OF THE ENTIRE

23     MARKET VALUE RULE.  BUT HE DOESN'T.

24              THE COURT:  SO I DON'T NEED TO REDACT THE $86?

25              MR. MUELLER:  NO.  AGAIN, THIS IS NOT AN APPLE
```

```
 1        FIGURE.

 2              THE COURT:  OKAY.

 3              MR. MUELLER:  JUST TO BE VERY, VERY CLEAR, THIS IS

 4   THE GPNE DAMAGES EXPERT'S DETERMINATION AS TO WHAT HE SAYS THIS

 5   IS WORTH.

 6              THE COURT:  OKAY.

 7              MR. MUELLER:  IT HAS NOTHING TO DO WITH ANY FIGURES

 8   THAT APPLE HAS ENDORSED OR TAKEN ANY POSITIONS ON.

 9              THE COURT:  OKAY.

10              MR. MUELLER:  SO THIS $86 FIGURE, TO BE VERY CLEAR,

11   IS THE GPNE EXPERT'S FIGURE THAT THEY'VE COME UP WITH FOR THE

12   VALUE OF CELLULAR.

13        THEY THEN GO TO A DOLLAR A UNIT FROM $86, AND THERE'S NO

14   EXPLANATION.  AND AT HIS DEPOSITION, AGAIN, I ASKED THIS

15   EXPERT, "SHOW ME THE MATH.  HOW DO YOU GET FROM $86 TO $1?"

16        AND THE ANSWER WAS, AND THIS IS IN OUR BRIEF, "THERE IS NO

17   MATH."

18        THERE'S NO EXPLANATION, THERE'S NO TRANSPARENCY, AND

19   THERE'S NO RIGOR.  HE'S TAKING A CLASSIC BLACK BOX APPROACH

20   WHERE HE'S IDENTIFIED WHAT HE SAYS -- AGAIN, THIS IS HIS

21   OPINION -- IS THE VALUE OF CELLULAR FUNCTIONALITY AND THEN

22   HE'S, FROM THAT, ASKING FOR A ROYALTY OF A DOLLAR A UNIT AND

23   IT'S REALLY PULLED OUT OF THIN AIR.

24        AND THIS IS WHAT THE FEDERAL CIRCUIT HAS SAID IS

25   IMPERMISSIBLE, AND ONE EXAMPLE OF A CASE IN WHICH THEY'VE SAID
```

 1      THAT IS THE LASER DYNAMICS CASE, AND IN THAT CASE THE FEDERAL

 2      CIRCUIT SAID IT IS IMPERMISSIBLE FOR AN EXPERT TO, IN THE

 3      COURT'S WORDS, PLUCK FROM THIN AIR A NUMBER BASED ON

 4      QUALITATIVE FACTORS AND VAGUE NOTIONS ON VALUE.

 5           AND THAT'S EXACTLY WHAT WE HAVE HERE.  WE HAVE THIS

 6      ANALYSIS THAT RESULTS IN THE $86.  WE THINK IT'S WRONG, BUT

 7      LET'S SET THAT ASIDE.

 8           FROM THERE TO A DOLLAR, THERE'S NO EXPLANATION.  IT'S

 9      UTTERLY OPAQUE, AND YOU CAN'T DO THAT.  YOU NEED TO SHOW YOUR

10      MATH.  YOU NEED TO BE MORE TRANSPARENT.

11           SO REALLY AT THE END OF THE DAY, YOUR HONOR, THERE'S TWO

12      INDEPENDENT PROBLEMS WITH THE DAMAGES EXPERT'S OPINIONS.

13      FIRST, HE DIDN'T EVEN TRY TO IDENTIFY THE RELEVANT COMPONENT

14      WITHIN THE PRODUCTS THAT MOST CLOSELY TIES TO THE INVENTION,

15      AND HE DIDN'T DO THAT BECAUSE HE HAD AN INCORRECT VIEW OF THE

16      LAW.

17           SECOND, EVEN AS TO THIS ANALYTICAL APPROACH, AS THEY CALL

18      IT, THERE'S NO EXPLANATION AS TO HOW THAT APPROACH WAS

19      CONDUCTED.  IT'S SIMPLY BECAUSE HE SAYS IT.

20           AND THAT IS NOT ENOUGH.  YOU NEED TO SHOW YOUR MATH.  YOU

21      NEED TO BE MORE RIGOROUS METHODOLOGICALLY.

22                THE COURT:  ALL RIGHT.  THIS IS WHAT I WOULD LIKE TO

23      DO.  I WOULD LIKE TO GIVE YOU MY TENTATIVE RULINGS AND THOUGHTS

24      ON THE VARIOUS MOTIONS THAT HAVE BEEN FILED, AND THEN I THINK

25      WE NEED TO DO A LITTLE BIT OF CASE MANAGEMENT BECAUSE WE ARE

1    OTHERWISE MARCHING TOWARDS TRIAL AND I THINK SOME OF THESE

2    RULINGS ARE GOING TO REQUIRE US TO SCHEDULE SOME NEW DATES.

3         OKAY?  SO WHY DON'T WE JUST -- I'LL JUST START FROM THE

4    SUMMARY JUDGMENT MOTION.

5         I THINK THE QUESTION OF WHETHER THE ACCUSED DEVICES ARE

6    PAGERS, I DO THINK THAT THERE IS A MATERIAL FACTUAL DISPUTE

7    HERE, SO I'M GOING TO MOST LIKELY DENY SUMMARY JUDGMENT ON THAT

8    ISSUE.

9         SIMILARLY, WHETHER THE ACCUSED DEVICES HAVE THE CAPABILITY

10   TO COMMUNICATE ON A PAGING SYSTEM THAT IS INDEPENDENT OF A

11   TELEPHONE SYSTEM, I WAS PLANNING TO DENY IT ON GPRS.

12        I THINK ON LTE, SINCE I DIDN'T SEE EVIDENCE WITH REGARD TO

13   LTE, I'M GOING TO TAKE THAT ONE UNDER SUBMISSION.

14        BUT I THINK THERE ARE SOME FACTUAL ISSUES HERE THAT ARE

15   MATERIAL AND THAT THOSE QUESTIONS SHOULD GO TO A JURY, AT LEAST

16   WITH REGARD TO GPRS, AND I'LL -- WITH LTE, I'LL HAVE TO TAKE A

17   LOOK AT THAT FURTHER.

18        INDIRECT INFRINGEMENT, GPNE HAS WITHDRAWN THAT, SO THAT'S

19   GOING TO BE A GRANT.

20        WITH REGARD TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF

21   INVALIDITY, AS YOU COULD PROBABLY TELL FROM THE QUESTIONS, I'M

22   GOING TO GRANT THAT AND IT'S NOT GOING TO BE LIMITED JUST TO

23   CLAIMS 1, 30 AND 39 THAT WERE MORE EXPLICITLY REQUESTED IN THE

24   MOTION.  I THINK IT ALSO APPLIES TO OTHER CLAIMS THAT HAVE BEEN

25   ASSERTED, LIKE CLAIM 13, CLAIM 18 AND CLAIM 31.  SO IT WOULD BE

1    A GRANT AS TO 13, 18, 30, 31 AND 39.

2         I THINK WITH REGARD TO 42, SINCE IT EXPLICITLY DOES CALL

3    OUT DIFFERING FREQUENCIES, APPLE DIDN'T ASK FOR AN INVALIDITY

4    JUDGMENT ON THAT AND I WOULD HAVE DENIED ONE ANYWAY, SO THAT

5    PATENT IS STILL GOING TO GO FORWARD, AT LEAST WITH REGARD TO

6    CLAIM 42.

7         SO THAT -- IT'LL BE A GRANT ON INVALIDITY, A GRANT ON

8    INDIRECT INFRINGEMENT, A DENIAL ON PAGER AND OPERATING

9    INDEPENDENTLY OF A TELEPHONE NETWORK.  OKAY?

10         NOW, WITH REGARD TO THE VOLUMINOUS DAUBERTS AND MOTION TO

11    STRIKE, WITH REGARD TO MR. DANSKI -- WITH REGARD TO MR. DANSKI,

12    I'M GOING TO GRANT THAT MOTION, AND LET ME TELL YOU WHAT SOME

13    OF MY THOUGHTS ARE WITH REGARD TO THAT.

14         I DO THINK IT'S A BLACK BOX.  THERE REALLY IS NO

15    EXPLANATION FOR HOW HE GOES FROM $86 TO $1, AND THE FACT THAT

16    HE TRIES TO SAY, YOU KNOW, THIS IS MORE LIKE, YOU KNOW, A

17    CROSS-LICENSE WITH NOKIA OR ERICSSON FOR ENTIRE PATENT

18    PORTFOLIOS ON CELLULAR TECHNOLOGY, I'M SORRY, THAT'S JUST NOT

19    REALLY CREDIBLE.

20         SO -- AND THE FACT THAT HE DISCOUNTS THE OTHER LICENSES --

21    NOW, I'M NOT SAYING HE NEEDS TO RELY ON THOSE OTHER LICENSES,

22    BUT I WAS NOT PERSUADED THAT HE DID A THOROUGH DISTINCTION OF

23    WHY THOSE OTHER LICENSES WERE NOT PROBATIVE.

24         BUT, YOU KNOW, MAINLY JUST QUOTING A BUNCH OF THINGS

25    SAYING 3G AND 4G LTE CAPABILITY IS REALLY IMPORTANT, THAT'S

1        JUST NOT ENOUGH TO COME UP WITH A DOLLAR FIGURE.

2            SO THAT'S GOING TO BE A GRANT.

3            SO WE'RE GOING TO HAVE TO FIGURE OUT A SCHEDULE, BECAUSE I

4    WILL GIVE YOU TIME TO PREPARE A NEW DAMAGES REPORT; APPLE WILL

5    WANT TO DO A REBUTTAL REPORT; YOU'LL HAVE TO DO, AGAIN,

6    DEPOSITIONS OF EXPERTS.

7            NOW, WITH REGARD TO MR. MEYER, I'M GOING TO DENY THE

8    MOTION WITH REGARD TO LICENSES AND SETTLEMENT AGREEMENTS.

9            THE COMPONENT ROYALTY STACK IS A LITTLE TRICKY, BUT I'M

10   INCLINED TO DENY THAT AS WELL, AND ALSO TO DENY AS TO SMALLEST

11   SALEABLE UNIT.

12           SO THE MOTION WITH REGARD TO MR. MEYER'S TESTIMONY IS

13   GOING TO BE A DENIAL.

14               MS. PEDEN:  YOUR HONOR, CAN I BE HEARD FOR JUST ONE

15    MINUTE ON MR. MEYER?

16               THE COURT:  THAT'S FINE.

17               MS. PEDEN:  I THINK FUNDAMENTALLY, AT A VERY HIGH

18    LEVEL, THE PROBLEM WITH MR. MEYER'S PROPOSED EXPERT TESTIMONY

19    IS THAT IT ALL STEMS FROM THIS PREMISE THAT THERE IS A RAND

20    OBLIGATION IN THIS CASE.

21               THE COURT:  I DON'T THINK SO.  HE DOESN'T ACTUALLY

22    SAY THAT.  WHAT HE SAYS IS THAT EVEN THOUGH THERE ISN'T A RAND

23    OBLIGATION HERE, APPLE, IN ITS LICENSING PRACTICES, WOULD

24    CONSIDER AND THINK OF THAT AS A FACTOR AND USE THAT IN

25    DETERMINING WHETHER WHAT THEY WOULD BE WILLING TO PAY WOULD BE

```
 1        CONSISTENT WITH THAT.

 2            SO I DISAGREE.  I DON'T THINK HE SAYS THIS IS A RAND

 3        OBLIGATION, THEY HAVE TO DO IT THIS WAY.  I THINK HE'S JUST

 4        SAYING AS PART OF A HYPOTHETICAL NEGOTIATION, THEY WOULD BE

 5        THINKING THEY SHOULD BE ENTITLED TO GET A RAND LICENSE FOR

 6        THAT.  SO I ACTUALLY DISAGREE ON THAT POINT.

 7            BUT I INTERRUPTED YOU, SO IF YOU WANT TO FINISH ON THAT,

 8        GO AHEAD.

 9            MS. PEDEN:  I BELIEVE THAT READING THE EXPERT REPORT,

10        THAT BECAUSE HE IMPOSES HIS VIEW OF -- THAT THERE IS A RAND

11        OBLIGATION --

12            THE COURT:  OKAY.

13            MS. PEDEN:  -- THAT THEN HE MODIFIES THE

14        GEORGIA-PACIFIC FACTORS IN A WAY THAT CONTINUALLY, THROUGHOUT

15        THE REPORT, NOT ONLY SHAPE AND CHANGE THOSE FACTORS TO FIT

16        WITHIN THE RAND CASE LAW, BUT HE ALSO MAKES NO ROOM FOR GPNE AT

17        THE HYPOTHETICAL NEGOTIATION BECAUSE HE ASSUMES THAT THEY'VE

18        GIVEN UP THEIR BARGAINING POWER, THEIR ABILITY TO EXCLUDE, AND

19        THAT THEY MUST TAKE INTO ACCOUNT ROYALTY STACKING, ALL OF WHICH

20        COMES DIRECTLY FROM THE RAND CASE LAW.

21            AND IN ORDER TO HAVE THAT KIND OF A RAND LIMITATION ON

22        DAMAGES -- RAND RESTS IN CONTRACT -- APPLE WOULD HAVE HAD TO

23        PLEAD A CONTRACT CLAIM AND THERE WOULD HAVE HAD TO BE SOME

24        EVIDENCE THAT THERE IS A CONTRACT THAT CHANGES THE

25        GEORGIA-PACIFIC ANALYSIS.
```

1    HERE THEY'VE SKIPPED THE PLEADING REQUIREMENT.  THEY'VE

2    SKIPPED THE REQUIREMENT THAT YOU HAVE TO SHOW THAT THERE WOULD

3    BE THIS OBLIGATION.

4    BUT THEY IMPOSE ON GPNE ALL OF THE DOWN SIDES OF THE QUID

5    PRO QUO THAT WOULD GO ON IN A RAND SCENARIO.

6    MR. MUELLER:  THREE POINTS, YOUR HONOR.

7    FIRST, THE DAMAGES EXPERT DIDN'T, AS YOU SAID, RELY ON THE

8    RAND COMMITMENT.  THAT'S NOT PART OF THE ANALYSIS AT ALL.

9    SECOND, AS TO ROYALTY BASE AND THE ROYALTY STACK ANALYSIS,

10   IT'S DRIVEN BY BLACK LETTER DAMAGES LAW.  UNILOC, LASER

11   DYNAMICS, THOSE ARE NOT STANDARDS OR RAND CASES.  THOSE ARE

12   PATENT DAMAGES CASES AND THOSE ARE THE -- THAT'S THE PRINCIPLES

13   THAT MR. MEYER APPLIED IN CALCULATING OR IN DETERMINING THE

14   APPROPRIATE ROYALTY BASE.

15   THERE'S NO NOTION OF FRAND REQUIRING THAT IN HIS REPORT.

16   IT'S PATENT DAMAGES LAW REQUIRING THAT.

17   THIRD, ROYALTY STACKING IS A CONSIDERATION THAT A

18   REASONABLE LICENSEE WOULD TAKE INTO ACCOUNT IN A HYPOTHETICAL

19   NEGOTIATION WITH OR WITHOUT REGARD TO FRAND.

20   ONE WOULD CONSIDER, AS A REASONABLE LICENSEE, HOW MANY

21   OTHER PATENTS OR HOW MANY OTHER CLAIMS COULD BE MADE ON THOSE

22   SAME PRODUCTS.  IT'S AN ECONOMICALLY RATIONAL THING TO DO.

23   AND FINALLY, YOUR HONOR, THERE ARE PLACES WHERE THE FRAND

24   COMMITMENT MAKES A REAL DIFFERENCE, INJUNCTIVE RELIEF, FOR

25   EXAMPLE.  THIS IS NOT AN INJUNCTION CASE.

```
 1          ON THE QUESTIONS THAT ARE BEFORE THE COURT AND ON THE

 2    QUESTIONS THAT WERE ADDRESSED BY MR. MEYER, BASIC PATENT

 3    DAMAGES LAW COMPELS EXACTLY THE SAME RESULT, AND THAT'S WHAT HE

 4    RELIED ON.

 5          MS. PEDEN:  YOUR HONOR, HE COMES UP WITH HIS OWN

 6    TEST, HE CALLS IT A COMPONENT ROYALTY STACKING APPROACH, WHICH

 7    HAS NEVER BEEN USED ANYWHERE.  HE WHOLLY MAKES IT UP OUT OF

 8    THIN AIR.  HE APPLIES IT AS IF HE'S FOLLOWING THE MICROSOFT

 9    VERSUS MOTOROLA CASE OR THE INOVAGEO CASE, AND ALTHOUGH HE MAY

10    HEDGE BY SAYING THAT HE CAN'T PROVE THAT THERE'S A CONTRACTUAL

11    RELATIONSHIP HERE BECAUSE, IN FACT, HE CANNOT, HE APPLIES ALL

12    OF THE LIMITATIONS THAT WOULD COME WITH A RAND COMMITMENT IN

13    HIS ANALYSIS.

14          IF ANYTHING, IT'S EVEN MORE FLAWED BECAUSE HE'S APPLYING

15    AN ANALYSIS BASED ON A CONTRACT PRINCIPLE THAT DOESN'T APPLY

16    HERE.  IT'S JUST WRONG AS A MATTER OF LAW.

17          MR. MUELLER:  AGAIN, YOUR HONOR, I THINK I'VE ALREADY

18    SAID THE REASONS WHY THAT'S INCORRECT.

19          THE COURT:  ALL RIGHT.  ALL RIGHT.  WELL, I'M

20    INCLINED TO DENY THE MOTION WITH REGARD TO MR. MEYER.

21          I'M ALSO INCLINED TO DENY THE MOTION TO EXCLUDE

22    DR. DINAN'S TESTIMONY, AND ALSO TO STRIKE HIS EMULATION TEST

23    RESULTS.

24          I THINK THAT THE FACT THAT GPNE HAS PROVIDED THE SERIAL

25    NUMBERS OF THE EQUIPMENT THAT WAS RENTED, ALONG WITH ALL OF THE
```

1    CONFIGURATION SETTINGS THAT WERE NOT DEFAULT SETTINGS IS

2    SUFFICIENT THAT APPLE SHOULD BE ABLE TO DO ITS OWN SIMULATION

3    OR EMULATION.

4        SO THE MOTION TO STRIKE IS GOING TO BE DENIED, AND THE

5    MOTION TO EXCLUDE HIS TESTIMONY.

6        NOW, I DO WANT TO TAKE A LOOK AT THE LTE ISSUE A LITTLE

7    BIT MORE CLOSELY.

8        BUT THAT'S THE TENTATIVE AS TO DR. DINAN.

9        I'M ALSO GOING TO DENY APPLE'S MOTION TO STRIKE THE

10   INFRINGEMENT CONTENTIONS.

11       AND SO THAT'S THE SORT OF TENTATIVE RULINGS ON EVERYTHING.

12       I WOULD LIKE TO TALK ABOUT WHERE WE GO FROM HERE,

13   UNDERSTANDING THAT THAT'S LIKELY TO BE ALL THE RULINGS.

14       WHERE DO WE GO FROM HERE?  I MEAN, WE DEFINITELY NEED TO

15   SET A SCHEDULE FOR A NEW PLAINTIFF'S DAMAGES EXPERT REPORT, A

16   REBUTTAL REPORT, AND DEPOSITIONS.

17       I ALSO WANT TO TALK ABOUT MOTIONS IN LIMINE.  I AM

18   COMPLETELY PREPARED TO TRY THIS CASE.  I LIKE TRIALS MUCH MORE

19   THAN LAW AND MOTION, SO WE CAN CERTAINLY DO THIS.

20       ACTUALLY, I REALLY DISLIKE LAW AND MOTION.

21       BUT THE QUESTION IS, IF YOU ARE GOING TO SETTLE, I WANT

22   YOU TO DO IT SOONER BEFORE I INVEST MORE TIME AND RESOURCES IN

23   THIS CASE, AND SO I WANTED TO TALK ABOUT IF YOU ARE AMENABLE TO

24   HAVING ANOTHER SESSION.  I KNOW YOU'VE ALREADY HAD AN ADR

25   SESSION PREVIOUSLY, AND IF YOU DON'T WANT TO HAVE ONE, I WILL

```
 1     NOT FORCE IT BECAUSE I DON'T WANT TO WASTE YOUR TIME AND YOUR

 2     CLIENT'S TIME AND MONEY.

 3          BLESS YOU.

 4          BUT IF YOU ARE WILLING TO DO ONE, I WOULD LIKE TO SCHEDULE

 5     THAT AS WELL BEFORE, YOU KNOW, WE ALL SPEND MUCH MORE TIME.

 6          SO THOSE ARE THE THINGS THAT I WOULD LIKE TO TALK ABOUT.

 7          I HAVE SPECIFIC PROPOSALS.  I CAN LAY THOSE OUT OR I CAN

 8     HEAR FROM YOU ALL.

 9              MR. SUSSER:  THANK YOU, YOUR HONOR, AND THANK YOU FOR

10      HANDLING ALL OF THESE LARGE MOTIONS TODAY.

11          YOUR HONOR, GPNE REMAINS WILLING TO MEDIATE AND/OR DO

12     OTHER TYPES OF ADR, BUT WE DO HAVE A DISAGREEMENT ABOUT WHETHER

13     THAT CAN BE DONE BECAUSE OF A PENDING CASE THAT GPNE IS

14     BRINGING IN CHINA AGAINST APPLE.  APPLE HAS SAID THAT THEY WANT

15     TO SETTLE THE WORLD OR NOTHING, AND WE DON'T HAVE THE CONTROL

16     OVER THE CHINESE LAWYERS AND THEIR CASE UNFORTUNATELY.

17              THE COURT:  ALL RIGHT.  WELL, THEN, LET'S GO TO

18      TRIAL.

19          LET ME ASK YOU A QUESTION.  SO I'M GOING TO SLICE OFF --

20     HOW MANY? -- ONE, TWO, THREE, FOUR, FIVE OF THE SIX CLAIMS THAT

21     YOU'RE ASSERTING FOR THE '267.  I HAD ONLY ALLOWED YOU TO

22     IDENTIFY TEN CLAIMS, SO YOU'RE DOWN TO FIVE.  I'M NOT ALLOWING

23     YOU TO THEN SWAP IN NEW ONES, SO YOU'D BE LEFT WITH CLAIMS 19

24     AND 22 OF THE '954, CLAIM 42 OF THE '267, AND CLAIMS 37 AND 44

25     OF THE '492.
```

1          I HAD ORIGINALLY SET THIS TRIAL FOR SEVEN DAYS.  TELL ME,

2     IF YOU'RE ONLY DOING THOSE FIVE CLAIMS OF THESE THREE PATENTS,

3     HOW MUCH TIME DO YOU NEED?  13, 18, 30, 31 AND 39 ARE NOT GOING

4     TO TRIAL.

5               MR. SUSSER:  I NEVER THOUGHT THAT THE NUMBER OF

6     CLAIMS WAS REALLY GOING TO BE A BIG FACTOR BECAUSE A LOT OF

7     THESE CLAIMS OVERLAP.  YOU'RE NOW FAMILIAR WITH THEM.  A LOT OF

8     THEM SAY THE SAME THING IN VERY SLIGHTLY DIFFERENT WAYS.

9               THE COURT:  YEAH.

10              MR. SUSSER:  SO WE THOUGHT THAT THE SEVEN DAYS, WITH

11    THE WAY THE COURT HANDLES THE TRIAL DAYS, AND THE FACT THAT WE

12    HAVE TECHNICAL EXPERTS AND DAMAGES EXPERTS AND A HANDFUL OF

13    FACT WITNESSES, WE THOUGHT SEVEN DAYS WAS RIGHT.  WE COULD GO

14    LOWER AND JUST TRY TO FORCE IT IN IF YOU WANT.

15              MS. LUTTON:  I AGREE, YOUR HONOR.  I THINK SEVEN DAYS

16    IS STILL AN APPROPRIATE AMOUNT OF TIME.

17              THE COURT:  OKAY.

18              MS. LUTTON:  I ALSO -- YOU HAD MENTIONED THAT YOU

19    WERE INCLINED TO DENY THE DINAN DAUBERT AND MOTION TO STRIKE.

20              THE COURT:  YES.

21              MS. LUTTON:  AND YOU HAD MENTIONED A NUMBER OF FACTS

22    THAT SUPPORTED YOUR DENIAL.  I WANTED TO ADDRESS ONE OF THEM.

23    I DON'T KNOW IF NOW IS A GOOD TIME.

24              THE COURT:  NOW IS FINE.

25              MS. PEDEN:  OKAY.  YOU HAD MENTIONED THAT APPLE WAS

1     AWARE OF ALL THE PARAMETERS THAT WERE SET IN THE TEST

2     EQUIPMENT, AND THAT'S NOT ACCURATE.  DR. DINAN ACTUALLY HAS

3     SAID IN HIS TESTIMONY THAT IF THE PARAMETERS WERE NOT IN HIS

4     REPORT, THEN HE COULDN'T TELL APPLE WHAT THE PARAMETERS WERE.

5          THE COURT:  I THOUGHT HE SAID THEY WERE DEFAULTS IF

6     HE DIDN'T PROVIDE CONFIGURATION SETTINGS.

7          MS. LUTTON:  AT ONE POINT HE DID, BUT HE SAID HE TOOK

8     SCREEN SHOTS SO HE WOULD REMEMBER THEM.  HE DOESN'T HAVE THE

9     SCREEN SHOTS.  HE CANNOT PRODUCE THOSE SCREEN SHOTS TO APPLE.

10         AND IN HIS TESTIMONY AT 50, LINES 4 TO 11, HE SAID, AS TO

11    HIS SETTINGS, "IF IT'S NOT IN MY REPORT, I CAN'T TELL YOU.  IF

12    IT'S NOT IN MY REPORT, I DON'T REMEMBER THAT.  I WORK WITH SO

13    MANY DEVICES AND SO MANY PROJECTS, I CAN'T REALLY RECOLLECT MY

14    PARAMETERS."

15         MR. BUMGARDNER:  WHAT DR. DINAN WAS REFERRING TO,

16    YOUR HONOR -- AND THIS IS BARRY BUMGARDNER FOR GPNE -- WHAT

17    DR. DINAN WAS REFERRING TO, HE COULDN'T REMEMBER A NUMBER, THAT

18    THERE'S THESE DEFAULT PARAMETERS TO RECALL THE SPECIFIC VALUE

19    OF A SPECIFIC NUMBER, THAT JUST AT THE DEPOSITION WITH THE

20    NUMBER OF PARAMETERS TO SAY, "WELL, THIS KNOB WAS SET TO THIS,

21    THIS, OR THIS VALUE," HE DIDN'T RECALL THAT.

22         BUT WHAT HE DID TESTIFY TO AFFIRMATIVELY, AFFIRMATIVELY

23    WAS JUST AS YOU SAID, "IF IT'S NOT IN MY REPORT, I USED THE

24    DEFAULT PARAMETERS."

25         SO AS TO WHATEVER SETTINGS THE DEFAULTS WERE, WHEN YOU

1    TURN THIS DEVICE ON, IT COMES UP AND THE PARAMETERS HAVE A

2    STATE, THAT'S WHAT DR. DINAN TESTIFIED TO AND THAT'S WHAT HE

3    USED.

4            MS. LUTTON:  YOUR HONOR, THE REFERENCE TO DEFAULT

5    PARAMETERS IS NOWHERE IN HIS REPORT, AND THIS IS NOT A TEST

6    THAT APPLE CAN RECREATE AND THAT'S A HALLMARK OF SCIENTIFIC

7    EVIDENCE, THAT THE TEST IS ACTUALLY SOMETHING THAT CAN BE

8    RECREATED AND TESTED.

9            THE COURT:  IS IT IN HIS REPORT?

10           MR. BUMGARDNER:  IS WHAT IN HIS REPORT, YOUR HONOR?

11           THE COURT:  I THINK I HAVE HIS REPORT.  WHY DON'T YOU

12   GIVE ME THE PAGE AND LINE NUMBERS AND PARAGRAPH NUMBERS SO I

13   CAN VERIFY THIS?

14           MR. BUMGARDNER:  OF?

15           THE COURT:  WHAT DID HE SAY?  I MEAN, I AGREE WITH

16   APPLE THAT IT HAS TO BE A REPEATABLE EXPERIMENT, THAT THEY HAVE

17   TO BE ABLE TO DO THE SAME EMULATION.

18           MS. LUTTON:  AND YOUR HONOR, THERE'S ALSO A TIMING

19   ISSUE BECAUSE WE WERE, YOU KNOW, FIRST TOLD ABOUT THE TEST SIX

20   OR SEVEN MONTHS AFTER THEY WERE PERFORMED RIGHT WHEN WE

21   RECEIVED THE EXPERT REPORT, SO THERE'S ALSO A TIMING ISSUE.

22           BUT MORE IMPORTANTLY, THERE'S A RECREATION ISSUE THAT

23   WE'RE FACED WITH.

24           MR. BUMGARDNER:  WELL, YOUR HONOR, THE ONLY EVIDENCE

25   THAT APPLE HAS ABOUT THIS RECREATION IS FROM DR. WILSON, THEIR

1    EXPERT.  THAT'S THE EVIDENCE ABOUT THIS RECREATION.

2    DR. WILSON, FIRST, HAS NEVER USED THIS DEVICE, THE AGILENT TEST

3    MACHINE THAT DR. DINAN USED.  SHE TESTIFIED IN HER DEPOSITION

4    SHE'D NEVER USED IT.

5         AND WHEN I ASKED HER, "WHAT ABOUT WHAT DR. DINAN HAS

6    DISCLOSED, WHY COULDN'T YOU REPEAT THIS TEST?" I'LL NOTE

7    MS. LUTTON OBJECTED AS, "OBJECTION, CALLS FOR SPECULATION."

8         AND THAT'S WHAT WE HAVE, YOUR HONOR, THAT APPLE'S EVIDENCE

9    THAT THIS TEST ISN'T RECREATABLE IS FROM A PERSON THAT'S NEVER

10   USED THIS DEVICE AND NEVER TRIED TO USE IT.

11        WHAT I'M PREPARED TO HAND UP, YOUR HONOR, IS DR. DINAN

12   ACHIEVED THE SAME SIGNALLING THAT CETECOM HAD.  SO APPLE --

13   THIS THIRD PARTY TEST LAB THAT APPLE USES TO CERTIFY THESE

14   DEVICES, DR. DINAN, THE SIGNALLING HE REPRODUCED WAS THE SAME

15   SIGNALLING THAT CETECOM GETS.

16        SO AS TO RELIABILITY, I THINK YOU HAVE IT RIGHT THERE,

17   THAT HE, DR. DINAN, ACHIEVED THE SAME SIGNALS THAT CETECOM

18   ACHIEVED, AND IF YOUR HONOR WOULD LIKE TO LOOK AT THEM, I'M

19   HAPPY TO HAND THESE UP, A SIDE-BY-SIDE COMPARISON SHOWING THAT

20   HE GOT THE SAME RESULTS THAT CETECOM GOT.

21        MS. LUTTON:  YOUR HONOR, DR. WILSON IS A STANFORD

22   PH.D. WHO'S A FORMER AGILENT EMPLOYEE.  IF SHE HASN'T USED THE

23   EQUIPMENT BEFORE, SHE CERTAINLY COULD FIGURE IT OUT IF SHE HAD

24   ALL THE PARAMETERS.  IN HER TESTIMONY SHE SAID THAT SHE DIDN'T

25   HAVE ALL THE PARAMETERS.  IT WASN'T A TEST THAT SHE COULD

1    RECREATE.

2         SHE DID ADDITIONALLY SAY THAT IT WOULDN'T BE HELPFUL TO

3    RECREATE IT BECAUSE IT IS SIMULATING A CELL PHONE ENVIRONMENT

4    AND NOT A PAGING SYSTEM, SO SHE HAD ADDITIONAL OPINIONS ON THAT

5    AS TO THE RELEVANCE OF THE TEST, WHICH IS ANOTHER OF THE

6    DAUBERT PRONGS.

7         BUT IN TERMS OF RELIABILITY, HER TESTIMONY WAS THAT SHE

8    DIDN'T HAVE ALL THE DIFFERENT PARAMETERS AND SETTINGS, SHE

9    DIDN'T NOW HOW THE TEST SETUP WAS CONFIGURED, SO IT WOULD BE

10   IMPOSSIBLE TO RECREATE THE TEST.

11         MR. BUMGARDNER:  AGAIN, YOUR HONOR, DR. DINAN USED

12   THE SAME BOX THAT THE CETECOM THIRD PARTY USES.  SO HE USED THE

13   SAME EQUIPMENT, DR. DINAN DID, THAT THIS THIRD PARTY

14   CERTIFICATION LAB USES, SAME MODEL NUMBER, SAME BOX.  HE

15   ACHIEVED THE SAME RESULT.

16         AND I WOULD NOTE THAT APPLE HAS THESE, HAS THIS EQUIPMENT

17   IN-HOUSE.  THERE'S NO TESTIMONY IN THE RECORD FROM ANY OF THE

18   DOZENS OF APPLE ENGINEERS THAT USE THIS EQUIPMENT THAT THEY

19   COULDN'T DO IT.

20         THE ONLY EVIDENCE APPLE HAS IS THAT A PERSON WHO'S NEVER

21   USED THIS MACHINE THEORETICALLY COULDN'T DO IT EVEN THOUGH SHE

22   DID NOT EVEN TRY TO.

23         MS. LUTTON:  YOUR HONOR, THE ISSUE IS NOT THE

24   EQUIPMENT ITSELF.  IT'S A MATTER OF FIT.  AND THIS IS -- AND

25   DAUBERT SPEAKS TO THIS ISSUE DIRECTLY.

```
1          A TEST FOR ONE PURPOSE IS NOT NECESSARILY RELEVANT FOR

2     ANOTHER PURPOSE, AND HERE IT'S A FIT ISSUE.  THE CETECOM

3     TESTING IS TESTING THAT'S DONE TO SHOW COMPATIBILITY WITH PHONE

4     NETWORKS.  THAT'S THE ENTIRE PURPOSE.

5          AND THE TESTS THAT WERE ACTUALLY PERFORMED BY THE EXPERT

6     FROM GPNE, ALTHOUGH THEY USED THE SAME EQUIPMENT, WE'RE NOT

7     DISPUTING THAT'S PROPER EQUIPMENT IF YOU WANT TO TEST

8     COMPATIBILITY WITH CELL PHONE NETWORKS, THERE'S NO SHOWING

9     WHATSOEVER, AND GPNE HAS NOT PROVEN, THAT THAT'S APPROPRIATE

10    EQUIPMENT TO USE TO TEST COMPATIBILITY WITH PAGER NETWORKS.

11          MR. BUMGARDNER:  WELL, NOW WE'RE KIND OF MOVING ON,

12    YOUR HONOR.  WHAT DR. DINAN -- THE PURPOSE OF THIS TEST --

13          THE COURT:  HOW LONG WOULD IT TAKE HIM TO RECREATE

14    THE SYSTEM?

15          MR. BUMGARDNER:  I DON'T THINK IT WOULD TAKE VERY

16    LONG, YOUR HONOR.  HE DOESN'T HAVE THE EQUIPMENT.

17          THE COURT:  RIGHT.  YOU'D HAVE TO RENT IT AGAIN FOR,

18    WHAT, $20,000, $22,000?

19          MR. BUMGARDNER:  IT WAS SOMETHING LIKE THAT.

20          AND I WOULD NOTE APPLE HAS THIS EQUIPMENT.

21          THE COURT:  WOULD YOU JUST HAVE HIM SET IT UP ON YOUR

22    EQUIPMENT?  THAT WAY YOU CAN SEE EXACTLY WHAT HE DID AND

23    COMPARE THE RESULTS.

24          MR. BUMGARDNER:  IT'S -- I DON'T THINK THAT'S

25    NECESSARY, YOUR HONOR.  WE PROVIDED 15,000 PAGES OF TEST
```

1    RESULTS TO APPLE.  THEY'VE CRITICIZED NONE OF THE ACTUAL

2    RESULTS THEMSELVES.  THERE'S NO CRITICISM OF THE RESULTS.

3         AND, YOUR HONOR, MAY I APPROACH JUST BRIEFLY?  AND I'LL

4    KEEP THIS SHORT.

5         THE COURT:  ALL RIGHT.  WHAT IS IT THAT YOU HAVE?

6    SHOW MS. LUTTON FIRST, PLEASE.

7         MR. BUMGARDNER:  IT'S ON PAGE 6 I'M REFERRING TO.

8         YOUR HONOR, I WOULD JUST -- I CAN SHOW YOU.  THESE ARE THE

9    RESULTS CETECOM RUNS ON THE RIGHT.  WE GET A CHANNEL REQUEST,

10   IMMEDIATE ASSIGNMENT, A PACKET RESOURCE REQUEST, AND A PACKET

11   UPLINK ASSIGNMENT MESSAGE.

12        CETECOM, APPLE'S THIRD PARTY TEST HOUSE, RUNS TESTS AND

13   SEES THAT THE PHONE CAN SEND AND RECEIVE THESE SIGNALS.

14        DR. DINAN'S RESULTS ARE ON THE RIGHT.  HERE'S A RANDOM

15   ACCESS WHICH MATCHES UP WITH THE CHANNEL REQUEST.  THERE'S

16   IMMEDIATE ASSIGNMENT, JUST LIKE CETECOM DID.  THERE'S A PACKET

17   RESOURCE REQUEST THAT CETECOM GETS, AND A PACKET UPLINK

18   ASSIGNMENT MESSAGE.

19        HE ACHIEVED -- CETECOM CAN SOMEHOW RUN THESE TESTS AND GET

20   THESE RESULTS.  DR. DINAN GOT THE SAME RESULTS, BUT CAPTURED

21   MORE DETAIL AND, YOU KNOW, THE ABILITY FOR THE PHONES TO SEND

22   AND RECEIVE THESE MESSAGES ON DIFFERENT FREQUENCIES.

23        THE COURT:  UM-HUM.

24        MR. BUMGARDNER:  BUT HE GOT THE SAME RESULTS CETECOM

25   GOT, SO THIS ISN'T SOME VOODOO CRAZY STUFF GOING ON.  HE

1    JUST -- I WON'T SAY HE REPLICATED WHAT CETECOM DID, BUT HE GOT

2    THE SAME RESULTS AS TO THE SENDING AND RECEIVING OF THESE

3    MESSAGES WHICH HAVE BEEN AT THE HEART OF GPNE'S INFRINGEMENT

4    CASE FOR TWO YEARS NOW.

5          MS. LUTTON:  YOUR HONOR, EVEN THOUGH HE GOT THE SAME

6    RESULTS AND THE SAME EQUIPMENT, WE DON'T KNOW WHAT HE DID TO

7    GET THESE RESULTS.

8          AND AS TO WHETHER APPLE HAS CONCERNS OR ISSUES WITH THE

9    RESULTS, IF YOU LOOK AT THE ACTUAL RESULTS HE RELIES ON, HE

10   RELIES ON EMTEL MESSAGES, WHICH IT'S NOT EVEN CLEAR WHAT THESE

11   MESSAGES ARE.

12         I MEAN, OVER AND OVER AGAIN IN THE RESPONSIVE BRIEF BY

13   GPNE, GPNE HAS CHARACTERIZED THESE EMTEL MESSAGES AS,

14   ALTERNATIVELY, ARTIFACTS OF THE AGILENT TEST SOFTWARE, A FORMAT

15   OF SAVING FILES, A TOOL THAT HELPS ANALYZE DATA, AND

16   INFORMATION IN THE TEST DATA.

17         SO IF YOU ACTUALLY LOOK AT WHAT DR. DINAN RELIED UPON --

18   AND WE HAVE SLIDES WE CAN HAND OUT IF IT WOULD BE HELPFUL --

19   BUT WHAT HE RELIES UPON IS IN SOME INSTANCES EMTEL MESSAGES

20   COMBINED WITH OTHER MESSAGES, AND IN SOME INSTANCES JUST THESE

21   EMTEL MESSAGES AND NOT ANY TYPE OF MESSAGE THAT WOULD BE RELIED

22   UPON DURING THE CETECOM TESTING.

23         SO APPLE DOES INDEED HAVE CONCERNS AND ISSUES NOT ONLY

24   WITH WHATEVER METHODOLOGY WAS USED ON THE MACHINE, BUT ALSO THE

25   RESULTS THAT THE EXPERT RELIES ON FROM THE MACHINE.

```
 1              MR. BUMGARDNER:  BRIEFLY --

 2              THE COURT:  BUT, YOU KNOW, APPLE'S EXPERT,

 3     DR. WILSON, HASN'T TRIED TO REPEAT THIS TEST, DOESN'T THINK

 4     IT'S A RELEVANT TEST, HAS NOT BOTHERED TO GO GET THE SAME

 5     EQUIPMENT EVEN THOUGH THEY HAVE THE SERIAL NUMBERS.

 6              MS. LUTTON:  YOUR HONOR, SHE DOESN'T HAVE ALL THE

 7     PARAMETERS.  IT'S IMPOSSIBLE TO RECREATE THE TEST.  IT WOULD

 8     HAVE BEEN FRUITLESS FOR HER TO GET THE SAME EQUIPMENT AND NOT

 9     BE ABLE TO SET IT UP IN ORDER FOR HER TO PERFORM THE TEST.

10              MR. BUMGARDNER:  AND AGAIN, YOUR HONOR, THAT'S

11     DISPUTED.

12              THE COURT:  WELL, I'M NOT SATISFIED WITH DR. DINAN'S

13     ANSWERS OF, "OH, YOU CAN CHANGE THE PARAMETERS, IT'LL ALL BE

14     THE SAME THING ANYWAY.  WHATEVER I CAN'T REMEMBER, I'M SURE IT

15     WAS JUST DEFAULT SETTINGS."  THAT'S NOT SATISFACTORY.

16         ON THE OTHER HAND, APPLE HAS NOT GONE AND TRIED TO

17     ACTUALLY REPLICATE THE TEST ITSELF.  IT IS POSSIBLE THAT WITH

18     THE DEFAULT SETTINGS AND THE FEW CONFIGURATION SETTINGS THAT

19     DR. DINAN DID PROVIDE THAT YOU COULD REPLICATE THE SAME THING.

20         ON THIS FACTUAL ISSUE OF WHAT PARAMETERS WOULD BE NEEDED

21     BEYOND THE DEFAULT SETTINGS --

22              MR. BUMGARDNER:  BEYOND THE DEFAULT SETTINGS, YOUR

23     HONOR, THOSE WE -- THOSE ARE IN HIS REPORT, WHAT HE CHANGED

24     FROM THE DEFAULT.  THAT'S WHAT HE TESTIFIED TO.

25              MS. LUTTON:  HE TESTIFIED THAT HE DID SCREEN SHOTS
```

```
 1    BECAUSE HE WOULDN'T BE ABLE TO REMEMBER WHAT SETTINGS HE
 2    ACTUALLY USED, AND HE DOESN'T HAVE THOSE SCREEN SHOTS AND HE'S
 3    NOT PROVIDED THOSE SCREEN SHOTS.  HE WOULDN'T HAVE HAD TO DO
 4    SCREEN SHOTS IF HE WAS SELECTING ALL THE DEFAULT SETTINGS.
 5                MR. BUMGARDNER:  I DISAGREE WITH THAT.
 6           I'LL PROPOSE A SOLUTION, YOUR HONOR.
 7                THE COURT:  WHAT'S THAT?
 8                MR. BUMGARDNER:  IF APPLE WOULD LIKE TO TRY AND
 9    RECREATE THESE TESTS USING THE DEFAULT PARAMETERS AND THERE'S
10    SOME PROBLEM WITH THAT, PERHAPS DR. DINAN COULD, I MEAN, ASSIST
11    APPLE IN RECREATING HIS TEST.
12           I THINK IT'S INCUMBENT UPON APPLE, IF THEY'RE GOING TO
13    COME IN AND COMPLAIN, TO TRY WHAT DR. DINAN SAID, TRY THE
14    DEFAULT PARAMETERS WITH THE -- WITH THESE SETTINGS HE DESCRIBES
15    IN HIS REPORT.
16           IF THERE'S A PROBLEM, THEN PERHAPS -- YOU KNOW, AGAIN, WE
17    THINK THE TEST RESULTS ARE WHAT THEY ARE AND THEY'RE
18    REPEATABLE.
19           SO IF APPLE'S UNABLE TO RECREATE THIS, THEN PERHAPS WE CAN
20    GET DR. DINAN AND APPLE TO SAY, "HERE'S HOW I ACHIEVED MY
21    RESULTS."  BUT I THINK APPLE OUGHT TO AT LEAST TRY FIRST BEFORE
22    GPNE HAS TO, HAS TO GET INVOLVED AND INCUR ADDITIONAL TIME AND
23    EXPENSE.
24                MS. LUTTON:  BUT GPNE SHOULD HAVE ALLOWED INSPECTION
25    OF THESE TESTS WHEN THEY PERFORMED THE TESTS, AND PART OF THE
```

1    REASON THEY DIDN'T IS BECAUSE THEY PERFORMED THESE TESTS BEFORE

2    THE COURT ISSUED ITS CLAIM CONSTRUCTION, SO THESE TESTS WEREN'T

3    IN LIGHT OF TRYING TO TEST THIS NODE ISSUE.  THESE WERE TESTS

4    THAT WERE DONE ON A CELL PHONE SYSTEM TO TEST SIGNALS ON A CELL

5    PHONE SYSTEM.  IT GETS BACK TO THE RELEVANCE ISSUE.

6        BUT IF THIS WAS A TEST WHICH GPNE PLANNED TO USE, WHICH

7    THEIR TESTIMONY REFLECTS, IF AT THE TIME THEY WERE DOING THE

8    TESTING WITH THIS EXPERT THEY FULLY INTENDED TO USE THESE TESTS

9    AT TRIAL, THEY SHOULD HAVE ALLOWED INSPECTION OF THESE TESTS.

10        THE COURT:  ALL RIGHT.  WHY DON'T WE DO THIS:  I

11    WOULD LIKE APPLE TO TRY TO EMULATE THIS TEST WITH THE

12    PARAMETERS THAT DR. DINAN HAS PROVIDED, AND IF YOU CANNOT

13    REPLICATE THE TEST, THEN I WANT YOU TO RERAISE THIS ISSUE WITH

14    ME.

15        MS. LUTTON:  YOUR HONOR, I THINK IT WOULD BE

16    DIFFICULT TO DETERMINE WHETHER WE COULD REPLICATE IT BECAUSE

17    WE'RE NOT GOING TO KNOW IF THE RESULTS WE'RE GETTING ARE -- IF

18    WE'RE PERFORMING THE EXACT SAME STEPS THAT THE EXPERT DID.

19        SO I'M -- AND THIS IS SOMETHING THAT WE'VE DISCUSSED WITH

20    THE EXPERT AND SHE FINDS THIS VERY CHALLENGING.  I MEAN, THIS

21    IS WHAT WE'RE UP AGAINST.  IT'S THE PARAMETERS, IT'S THE ACTUAL

22    PROCEDURE THAT WAS FOLLOWED WITH THE TEST EQUIPMENT.

23        MR. BUMGARDNER:  AND, AGAIN, WE PROVIDED OUR RESULTS.

24    I WOULD THINK APPLE, IF THEY RUN THE TEST, THEY CAN COMPARE THE

25    RESULTS THEY GET TO THE RESULTS THAT WE DISCLOSED TO THEM IN

```
1      DR. DINAN'S RESULTS AND MAKE AN ASSESSMENT, ARE WE GETTING THE

2      SAME RESULTS OR NOT?

3              THE COURT:  OKAY.  DID DR. DINAN PROVIDE THE STEPS OF

4      WHAT HE DID?  OR HE JUST GAVE RESULTS?

5              MR. BUMGARDNER:  HE WALKED THROUGH, IN HIS REPORT,

6      THE SETUP, THE PARAMETERS HE CHANGED AND WHAT HE DID, YES,

7      THERE IS A DESCRIPTION OF THAT IN HIS REPORT.

8              THE COURT:  ALL RIGHT.  THE MOTION IS GOING TO BE

9      DENIED.  IF YOU TRY IT AND YOU HAVE DIFFICULTY, THEN YOU CAN

10     RERAISE IT AT THAT POINT.

11         OKAY.  SO LET'S TALK ABOUT -- FOR THE MOTIONS IN LIMINE,

12     THERE'S ONLY GOING TO BE FIVE FOR EACH SIDE AND THE MAX IS 15

13     PAGES; SAME FOR THE REPLY; FOR THE OPPOSITIONS, 15 PAGES, NO

14     REPLIES.

15         AND WITH THE OTHER DEADLINES, YOU CAN FOLLOW THE DEADLINES

16     THAT ARE IN MY STANDING ORDER ON CIVIL JURY TRIALS.

17         BUT AS FAR AS THE MOTIONS IN LIMINE, I'D LIKE A LITTLE

18     MORE TIME WITH THEM.  SO THE MOTION IN LIMINE MOTIONS ARE GOING

19     TO BE FILED BY MAY 29TH, AND THE OP -- WELL, I'D LIKE YOU TO

20     GIVE ME TWO WEEKS.  CAN YOU DO THAT?

21             MR. BUMGARDNER:  CERTAINLY, YOUR HONOR.

22             MS. LUTTON:  YES, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  SO I'D LIKE THE OPPOSITIONS

24     BY MAY 22ND AND THE MOTIONS BY MAY 8TH.

25         NOW, THE ONLY DIFFICULTY IS WE NEED TO FIGURE OUT THE
```

1    DAMAGES EXPERT REPORT.  THAT HAS TO BE DONE IN TIME FOR YOU TO

2    BE ABLE TO DO MOTIONS IN LIMINE BY MAY 8TH.

3         SO TODAY IS THE 3RD.  WHAT ABOUT APRIL 17TH -- WELL, I'M

4    SORRY.  THAT'S NOT GOING TO BE ENOUGH TIME.

5         WHAT ABOUT APRIL 11TH AND APRIL 18TH?

6              MR. BUMGARDNER:  AND THAT'S APRIL 11TH FOR WHAT, YOUR

7    HONOR?

8              THE COURT:  FOR YOUR DAMAGES REPORT.

9              MR. BUMGARDNER:  OKAY.

10             THE COURT:  APRIL 18TH WOULD BE FOR THE REBUTTAL, AND

11   THEN BY APRIL 25TH FINISH THE DEPOSITIONS OF THE TWO EXPERTS,

12   MR. MEYER AND MR. DANSKI.  THAT WAY YOU CAN FILE YOUR MOTIONS

13   IN LIMINE BY MAY 8 AND HAVE THE OPPOSITIONS FILED BY MAY 22ND.

14        NOW, I'M NOT INVITING ONE, BUT I ASSUME THERE COULD

15   POTENTIALLY BE ANOTHER DAUBERT WHICH I WOULD DECIDE AT THE

16   PRETRIAL CONFERENCE ON JUNE 12TH AT 1:30.

17        WE'RE GOING TO KEEP THE JURY TRIAL DATE OF JULY 14TH.  YOU

18   STILL THINK IT'S SEVEN DAYS, RIGHT?

19             MS. LUTTON:  YES, YOUR HONOR.

20             THE COURT:  OKAY.

21             MS. LUTTON:  YOUR HONOR, IN TERMS OF THE TIMING, ONE

22   WEEK TO RESPOND TO THE NEW DAUBERT MOTION, THAT'S NOT MUCH TIME

23   TO REVIEW IT AND ANALYZE IT AND HAVE AN EXPERT COMMENT ON THAT.

24   IS IT POSSIBLE TO GET MORE TIME THERE?

25             THE COURT:  YOU MEAN ON THE DAUBERT?

1          MS. LUTTON:  ON THE DAUBERT.

2      NO, I'M SORRY, ON THE REPORT.

3          THE COURT:  OH, OKAY.  WELL, HOW MUCH TIME DO YOU

4  NEED?  JUST GIVE ME A SCHEDULE, A PROPOSAL THAT WOULD GIVE YOU

5  TIME TO FILE THE MOTIONS IN LIMINE BY MAY 8TH.

6          MR. ELACQUA:  YOUR HONOR, THIS IS BEN ELACQUA FOR

7  APPLE.

8      SO ONE THING I JUST WANT TO CONFIRM, IF THEY'RE FILING

9  THEIR NEW REPORT ON APRIL 11, OBVIOUSLY WE DON'T KNOW WHAT

10 THEIR NEW THEORY IS GOING TO BE AND WE PRESUME THAT THERE'S NO

11 REOPENING OF DISCOVERY OR FACTUAL DISCOVERY.

12         THE COURT:  OH, NO.

13         MR. ELACQUA:  WE'RE NOT GOING TO SEE SOME SURVEY OR

14 SOMETHING.  I JUST WANT TO CONFIRM THAT.

15         THE COURT:  OH, NO.  DISCOVERY IS LONG CLOSED.

16         MR. ELACQUA:  I UNDERSTAND.  SO IF WE GET THE NEW

17 REPORT, OBVIOUSLY WE DON'T KNOW WHAT THE THEORY IS AND WHAT THE

18 EVIDENCE AND THEIR NEW THEORY WILL BE.

19     I THINK IF WE HAD -- YOU PROPOSED A WEEK.  I THINK IF WE

20 HAD A LITTLE BIT LONGER, TWO WEEKS, THAT WOULD BE SUFFICIENT

21 TIME FOR OUR EXPERT TO RESPOND TO THAT; AND THEN WE, I THINK

22 AFTER THAT, WILL NEED A WEEK, A WEEK TO TEN DAYS, JUST DEPENDS

23 ON SCHEDULES, OBVIOUSLY, OF THE EXPERTS FOR DEPOSITIONS, AND

24 THEN WE CAN FILE A DAUBERT MOTION SHORTLY AFTER THAT.

25         SO APRIL 11TH -- APRIL 11TH WOULD BE THE OPENING REPORT

1    AND TWO WEEKS AFTER THAT, WHICH WOULD BE APRIL 25TH, WOULD BE

2    REBUTTAL.

3         WE'D NEED, I WOULD ESTIMATE, SEVEN TO TEN DAYS TO DO

4    DEPOSITIONS, WHICH PUTS US RIGHT INTO THE FIRST OF MAY.

5              THE COURT:  ALL RIGHT.  THIS IS WHAT I'M GOING TO DO:

6    I'M GOING TO EAT INTO MY OWN TIME, WHICH IS GOING TO MAKE IT

7    MORE DIFFICULT FOR MY STAFF AND ME, BUT WE CAN HAVE OPPOSITIONS

8    ON MAY 29TH -- LET'S SEE.  JUNE 12TH.  JUNE 12TH, OPPOSITIONS

9    TO MOTIONS IN LIMINE.

10        DO YOU NEED ONE WEEK OR TWO WEEKS FOR OPPOSITIONS?  CAN

11   YOU JUST DO ONE WEEK?

12             MR. ELACQUA:  YES, YOUR HONOR, FOR APPLE WE CAN.

13             MS. PEDEN:  YES, YOUR HONOR.

14             THE COURT:  ALL RIGHT.  SO IF YOU FILE MOTIONS IN

15   LIMINE MAY 22ND, HAVE OPPOSITIONS FILED MAY 29TH.

16        HOW MUCH TIME DO YOU NEED BETWEEN THE CLOSE OF EXPERT

17   DISCOVERY AND WHEN YOU FILE?  YOU WANT THE DAUBERTS TO BE ON

18   THE SAME SCHEDULE AS THE MOTIONS IN LIMINE?

19             MR. ELACQUA:  I THINK THAT'S A FAIR -- THAT'S A FAIR

20   SCHEDULE, YOUR HONOR.

21        AND, YOUR HONOR, I WILL NOTE FOR THE RECORD, YOUR ORIGINAL

22   PRETRIAL DATE WAS JUNE 12TH.  OBVIOUSLY IT'S AT YOUR HONOR'S

23   DISCRETION, BUT WE DID MOVE -- THAT WAS BECAUSE THE ORIGINAL

24   TRIAL DATE WAS JUNE 30TH.  WE DID MOVE THE TRIAL DATE BACK TO

25   JULY 14TH, SO WE DO HAVE SOME ADDITIONAL TIME THERE IN CASE --

```
1        I'M JUST POINTING THAT OUT.

2                THE COURT:  YEAH.

3                MR. ELAQUA:  WE DON'T WANT TO BURDEN THE COURT.

4                THE COURT:  I HAVE APPLE V. SAMSUNG POST-TRIAL

5    MOTIONS ON JULY 10TH.  I'VE GMAIL SUMMARY JUDGMENT JULY 17TH.

6    SO IF YOU WANT TO GO INTO THAT ZONE, YOU'RE WELCOME TO.

7                MR. ELACQUA:  NO, YOUR HONOR.

8        (LAUGHTER.)

9                THE COURT:  OKAY.  I DON'T THINK WE HAVE ANY OTHER

10   DATES IN JUNE THAT ARE OPEN.  WE CAN TAKE A LOOK.  WE'RE PRETTY

11   FULL, AREN'T WE?

12       (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

13   CLERK.)

14               THE COURT:  YOU'RE WELCOME TO GO INTO DANGEROUS ZONE.

15   THAT'S UP TO YOU.  I'M JUST NOT GOING TO HAVE TIME NECESSARILY

16   FOR YOUR CASE.

17               MR. ELACQUA:  THAT IS NOT OUR INTENT, YOUR HONOR.  WE

18   WANT TO STAY AWAY FROM DANGER ZONES.

19               THE COURT:  I HAVE CLAIM CONSTRUCTION ON JUNE 12TH

20   EVEN.

21               THE CLERK:  JUNE 5 AND 12TH IS TAKEDA.

22               THE COURT:  YEAH.

23       (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

24   CLERK.)

25               THE COURT:  I CAN MOVE THIS TO JUNE 26TH.  DO YOU
```

1    WANT ME TO MOVE THE PRETRIAL TO JUNE 26TH?  IS THAT BETTER?

2              MR. ELACQUA:  YOUR HONOR, I THINK THAT GIVES

3    EVERYBODY MORE TIME, YES, YOUR HONOR.

4              THE COURT:  IS THAT BETTER?

5              MR. BUMGARDNER:  I THINK SO, YOUR HONOR.

6              THE COURT:  OKAY.

7              MR. BUMGARDNER:  IF I COULD ASK, ARE WE -- IS THE

8    COURT STILL ANTICIPATING THAT WE WOULD SUBMIT A NEW DAMAGES

9    REPORT ON APRIL 11?

10             THE COURT:  WELL, NO.  I THINK IF WE BUMP THIS TO

11   JUNE 26TH, I CAN GIVE EVERYBODY A LITTLE MORE TIME.

12             MR. BUMGARDNER:  OKAY.  THAT'S --

13             THE COURT:  OKAY.  SO WHY DON'T WE MOVE -- AND THIS

14   IS BETTER ANYWAY, UNLESS YOU WANT TO BE WITH AN ACID REFLUX

15   CLAIM CONSTRUCTION ON JUNE 12TH.

16             MR. BUMGARDNER:  I WANT TO STAY WAY OUT OF THE DANGER

17   ZONE, YOUR HONOR.

18             THE COURT:  OKAY.  SO LET'S MOVE THE PTC TO

19   JUNE 26TH, THAT'LL ALSO BE THE DATE FOR ANY DAUBERTS, AND I

20   WANT REALLY STRAIGHT -- I MEAN, YOU ALL BRIEFED 250 PAGES WORTH

21   JUST FOR TODAY.  THAT WAS TOO MUCH AND THERE WAS SO MUCH

22   DUPLICATION WHERE THE SAME ISSUES WERE BRIEFED IN AT LEAST TWO

23   DIFFERENT MOTIONS ON A NUMBER OF INSTANCES.

24        SO I'M GOING TO ASK YOU, I REALLY NEED TIGHT TIME LIMITS.

25   I -- JUST TO TELL YOU, WHEN YOU USE MORE TIME, I SPEND LESS

```
1    TIME READING EACH PAGE.  SO YOU GET THE VOLUME, BUT YOU GET
2    MUCH LESS DEPTH.  SO IT'S UP TO YOU ALL.  IF YOU WANT TO DO
3    VERBAL DIARRHEA FOR 3,000 PAGES, YOU CAN DO IT, BUT YOU'RE
4    GOING TO GET THE SAME AMOUNT OF TIME READING THAT DOCUMENT.
5              MR. BUMGARDNER:  I'M HAPPY WITH -- WHATEVER THE COURT
6    WOULD LIKE TO PUT IN THE WAY OF PAGE LIMITS, I'M FINE WITH
7    THAT.
8              THE COURT:  I'M NOT SAYING ANY OF THESE BRIEFS WERE
9    VERBAL DIARRHEA, OF COURSE, BUT I'M JUST SAYING THE MORE TIGHT,
10   CONCISE, AND FOCUSSED, IT REALLY HELPS TO BE ABLE TO GIVE YOU
11   REALLY CLOSE ATTENTION TO YOUR BEST ARGUMENTS AND I CAN'T DO
12   THAT WHEN I'M DESPERATELY TRYING TO READ 250 PAGES FOR THIS
13   AFTERNOON.  SO I REALLY DON'T WANT THAT TO HAPPEN AGAIN,
14   PLEASE.
15        SO IF WE HAVE JUNE 26TH, THEN -- ALL RIGHT.  THEN YOU WANT
16   TO DO OPPOSITIONS -- WELL, HOW MUCH TIME CAN YOU GIVE ME?  IF
17   IT'S ONLY TWO WEEKS, THAT'S OKAY.  A LITTLE BIT MORE TIME MIGHT
18   BE GOOD, BUT I THINK TWO WEEKS IS OKAY IF IT'S REALLY KIND OF
19   NARROW ISSUES, BUT OTHERWISE I WOULD LOVE THREE.
20             MR. ELACQUA:  I THINK THREE WEEKS, YOUR HONOR -- AND
21   WE'RE TALKING ABOUT OPPOSITIONS TO MOTIONS IN LIMINE AND THE
22   DAUBERTS?
23             THE COURT:  AND DAUBERTS, YEAH.  SO IF WE HAVE
24   JUNE 26TH AS THE NEW HEARING DATE -- ONE, TWO, THREE -- THAT
25   WOULD BE JUNE 5 FOR OPPOSITIONS.
```

1        OKAY.  SO HOW MUCH TIME DO YOU NEED FOR OPPOSITIONS TO

2   DAUBERTS AND MOTIONS IN LIMINE?  DO YOU NEED ONE WEEK OR TWO

3   WEEKS?

4        MR. ELACQUA:  I THINK, YOUR HONOR, ONE WEEK WOULD BE

5   SUFFICIENT TO OPPOSE.

6        THE COURT:  OKAY.  ALL RIGHT.  SO THEN YOU'D HAVE

7   MAY 29TH AS THE DUE DATE.

8        I WOULD LIKE -- SO YOUR MOTION IN LIMINE IS 15 PAGES MAX,

9   FIVE MOTIONS MAX.

10       I'D LIKE TO PUT SOME LIMITS ON THE DAUBERTS.

11       MR. ELACQUA:  YOUR HONOR, I AGREE, AND I HAVE A -- I

12   GUESS A QUESTION REALLY FOR THE COURT.

13       WE'VE MOVED ON MR. DANSKI AND YOU'VE TENTATIVELY GRANTED

14   THAT.

15       THE COURT:  SURE.

16       MR. ELACQUA:  THEY'VE MOVED ON MR. MEYER AND YOU'VE

17   TENTATIVELY DENIED THAT.

18       THE COURT:  YES.

19       MR. ELACQUA:  I PRESUME WE'RE TALKING ONLY ABOUT A

20   DAUBERT MOTION AS TO MR. DANSKI'S NEW REPORT.  THEY'RE NOT -- I

21   GUESS THAT'S THE QUESTION TO THE COURT.  GPNE IS NOT GOING TO

22   FILE A NEW DAUBERT MOTION AS TO MR. MEYER WITH THE COURT, AND

23   WE DON'T KNOW WHAT HE'S GOING TO HAVE TO REBUT, BUT --

24       THE COURT:  I REALLY HOPE THERE'S NO NEW DAUBERTS.

25   YOU KNOW, I'M HOPING THAT THESE ORDERS WOULD GIVE ENOUGH

```
1    GUIDANCE THAT WE WOULDN'T HAVE TO BE RETREADING THE SAME

2    ISSUES --

3              MR. BUMGARDNER:  WE'RE --

4              THE COURT:  -- AS THE CASE LAW.

5              MR. ELACQUA:  I THINK OUR OPINIONS ARE PRETTY LAID

6    OUT THERE, AND OBVIOUSLY THERE WILL BE REBUTTAL OPINIONS TO

7    WHAT MR. DANSKI'S NEW APPROACH IS.

8              THE COURT:  SURE.

9              MR. ELACQUA:  BUT WE DON'T KNOW WHAT THAT'S GOING TO

10   BE.

11             THE COURT:  CAN WE SAY FOUR PAGES MAX?

12             MR. ELACQUA:  TO A DAUBERT MOTION?

13             THE COURT:  UM-HUM.

14             MR. BUMGARDNER:  THAT'S FINE WITH US, YOUR HONOR.

15             MR. ELACQUA:  IF YOUR HONOR WANTS FOUR, WE'LL DO IT

16   IN FOUR.

17             THE COURT:  OKAY.  I MEAN, I REALLY DON'T WANT WHOLE

18   BRIEFS AND LITIGATION --

19             MR. ELACQUA:  WE UNDERSTAND.  YOU KNOW THE LAW, YOUR

20   HONOR.

21             THE COURT:  AND, YOU KNOW, EVERYTHING YOU ALL FILE,

22   EVERY WORD GETS READ, SO, YOU KNOW, WE'RE FAMILIAR WITH THE

23   ARGUMENTS YOU'VE RAISED ALREADY SO THERE'S NO NEED TO RETREAD A

24   LOT OF OLD GROUND.

25        SO LET'S SAY FOUR PAGES EACH.  I MEAN, I'D BE HAPPY WITH
```

```
 1          THREE.
 2                  MR. ELACQUA:  WE'LL TRY AND MAKE IT THREE.
 3                  THE COURT:  ALL RIGHT.  THANK YOU.  SO THREE PAGES
 4          EACH.
 5              OKAY.  SO THEN UNDERSTANDING YOUR DATES FOR MOTIONS IS
 6          MAY 29, HOW MUCH TIME DO YOU NEED BETWEEN THE CLOSE OF DAMAGES
 7          EXPERT DISCOVERY AND THE NEW MOTION DEADLINE?
 8                  MR. ELACQUA:  WELL, YOUR HONOR, WE'LL NEED SOME TIME
 9          TO TAKE A DEPOSITION OF MR. DANSKI AND MR. MEYER.  ADMITTEDLY,
10          I'M NOT -- I HAVE NOT CHECKED WITH THEIR SCHEDULES ON THIS.
11                  THE COURT:  YEAH.
12                  MR. ELACQUA:  SO I'D ASK THE COURT FOR A LITTLE
13          FLEXIBILITY.  I'M HOPING WE COULD DO IT IN A WEEK, OBVIOUSLY
14          THERE'S ONLY TWO DEPOSITIONS, BUT I DON'T KNOW IF THEY'LL BE
15          ON -- IF THERE'S SOME PRESCHEDULED VACATION OR SOMETHING DURING
16          THAT SEVEN TO TEN DAYS.
17                  THE COURT:  I'M FINE IF YOU ALL WANT TO WORK THIS
18          SCHEDULE OUT.  THE ONLY QUESTION IS IF YOU CAN'T REACH AN
19          AGREEMENT AND THEN I'M GOING TO HAVE TO DECIDE SOME DISPUTE,
20          THAT'S THE ONLY REASON WHY I THOUGHT, YOU KNOW, WE COULD JUST
21          TAKE CARE OF IT TODAY.
22                  MR. BUMGARDNER:  AND I WOULD MAKE THAT PROPOSAL, YOUR
23          HONOR, THAT IF WE COULD GET WITH APPLE AND JUST -- BECAUSE I'M
24          NOT SURE OF WHAT MR. DANSKI'S SCHEDULE IS, IF HE'S -- I JUST
25          HATE TO VOUCH FOR SOMEBODY'S SCHEDULE THAT I DON'T KNOW.
```

```
 1          I'M GOING TO TAKE IT BACK THAT THE COURT HAS INSTRUCTED US

 2     NOT TO COME BACK TO THE COURT, THAT WE'RE GOING TO WORK OUT A

 3     SCHEDULE AND NOT BOTHER THE COURT WITH THIS, AND CERTAINLY, ON

 4     BEHALF OF GPNE, WE WILL DO OUR UTMOST TO WORK WITH APPLE TO DO

 5     SOMETHING THAT MAKES SENSE FOR ALL THE ATTORNEYS, THE EXPERTS,

 6     AND EVERYTHING IF THAT WOULD BE ACCEPTABLE TO THE COURT AND

 7     APPLE.

 8          MR. ELACQUA:  I'M OKAY WORKING OUT THE EXPERT

 9     DISCOVERY, ALTHOUGH I THINK IT'S IMPORTANT THAT WE SET THE

10     DATES FOR THEIR OPENING REPORT AND OUR REBUTTAL REPORT AND THE

11     DATE TO FILE THE MOTIONS.

12          THE COURT:  WELL, WE HAVE EIGHT WEEKS.  WE HAVE EIGHT

13     WEEKS BETWEEN TODAY AND MAY 29TH, SO WE COULD JUST DO TWO, TWO,

14     TWO, TWO, TWO IF YOU WANTED TO DO THAT.  IF IT'S TWO, TWO, TWO,

15     TWO, TWO, THEN YOUR REPORT WOULD BE DUE, WHAT, APRIL 17TH; THE

16     REBUTTALS WOULD BE DUE MAY 1ST; AND YOU WOULD HAVE TO FINISH

17     DEPOSITIONS BY MAY 15TH SUCH THAT YOU WOULD HAVE TWO WEEKS TO

18     PREPARE YOUR MOTIONS.

19          NOW, IF YOU WANTED TO CUT IT CLOSER AND YOU NEEDED MORE

20     TIME, YOU COULD, YOU KNOW, JUST PREPARE YOUR MOTIONS IN A WEEK

21     AND SAY THE CLOSE OF EXPERT DISCOVERY IS MAY 22ND.

22          MR. BUMGARDNER:  AND THOSE DATES ARE FINE I THINK,

23     YOUR HONOR.  WE JUST OBVIOUSLY WANT TO GET THE TRANSCRIPT FROM

24     TODAY'S HEARING SO WE CAN VERY CLOSELY FOCUS ON THE

25     INSTRUCTIONS AND COMMENTS YOUR HONOR MADE ABOUT, YOU KNOW, WHAT
```

```
 1    NEEDS TO BE IN THIS NEW REPORT.  SO THAT WOULD BE ALL I WOULD

 2    ASK.

 3            AND, AGAIN, IF -- IT SOUNDS LIKE THE COURT IS OPEN -- IF

 4    THE PARTIES NEED TO SHIFT THESE DATES WITH AGREEMENT AMONG THE

 5    PARTIES, THE COURT IS OKAY WITH THAT AS LONG AS WE'RE GETTING

 6    OUR MOTIONS FILED TIMELY AS DIRECTED BY YOUR HONOR?

 7            THE COURT:  THAT'S FINE.  THE SCHEDULE I'M PROPOSING

 8    IS GPNE'S REPORT IN TWO WEEKS, APRIL 17TH; APPLE'S RESPONSE,

 9    TWO WEEKS, DUE MAY 1; COMPLETE THE DEPOSITIONS OF THE TWO

10    EXPERTS BY MAY 15TH; AND THEN HAVE TWO WEEKS TO PREPARE YOUR

11    MOTIONS.

12        BUT IF YOU WANT TO DEVIATE FROM THAT, YOU CAN, BUT IT HAS

13    TO BE BY STIPULATION.  I DON'T WANT TO SEE IT.

14            MR. BUMGARDNER:  UNDERSTOOD.

15            MR. ELACQUA:  UNDERSTOOD, AND THAT SCHEDULE SEEMS

16    FINE.

17            THE COURT:  ALL RIGHT.

18            MR. ELACQUA:  YOUR HONOR, THE LAST POINT I WANT TO

19    MAKE IS AS TO YOUR POINT ON THE TESTING OF THE AGILENT --

20            THE COURT:  YES, OKAY.

21            MR. ELACQUA:  TO THE EXTENT WE NEED TO DO SOME

22    ADDITIONAL SUPPLEMENTATION WITH DR. WILSON ON THAT --

23            THE COURT:  UM-HUM.

24            MR. ELACQUA:  -- WE'D PROPOSE IT BE ON THE SAME

25    SCHEDULE.
```

```
 1              THE COURT:  OKAY.  WHAT DOES THAT MEAN?  THAT YOU

 2    WOULD DO A NEW REPORT?  WHAT DO YOU -- WHEN YOU SAY

 3    SUPPLEMENTAL --

 4              MR. ELACQUA:  TO THE EXTENT SHE WOULD NEED TO PUT IN,

 5    I DON'T WANT TO CLASSIFY IT AS A NEW REPORT, IT WOULD BE

 6    SUPPLEMENTING HER PRIOR REPORT, WHETHER THERE'S SOME NEW

 7    PARAGRAPHS TO SAY WHAT SHE DID.  WE WOULD PROPOSE IT BE ON THE

 8    SAME SCHEDULE AS YOU JUST LAID OUT.

 9              MR. BUMGARDNER:  AND LET ME EXPRESS --

10              MR. ELACQUA:  ASSUMING WE CAN DO THAT WITHIN TWO

11    WEEKS AS FAR AS THE PARAMETERS AND WHAT WE DISCUSSED EARLIER.

12              MR. BUMGARDNER:  I WOULD EXPRESS A LITTLE BIT OF

13    HESITANCY THERE, YOUR HONOR.  APPLE HAS HAD A CHANCE TO DO THIS

14    TEST AND THEY CHOSE NOT TO.  DR. WILSON TESTIFIED THAT SHE

15    THOUGHT IT WAS IRRELEVANT.

16         FOR HER TO NOW COME IN AND LOAD UP HER REPORT WITH SOME

17    NEW TESTING THAT APPLE HAS ALREADY HAD A CHANCE TO DO AND

18    DIDN'T ATTEMPT TO --

19              MR. ELACQUA:  I DON'T THINK I'M TALKING ABOUT LOADING

20    ANYTHING UP, YOUR HONOR.  IF THEY'RE NOT GOING TO CHALLENGE HER

21    REBUTTAL OPINIONS AS TO HER TESTIMONY AT TRIAL -- AND YOUR

22    HONOR JUST GAVE AN ORDER TO GO DO SOME ADDITIONAL LOOKING INTO

23    THIS ISSUE, IF SHE DOES THAT AND SHE GETS ON THE WITNESS STAND

24    AND STARTS TALKING ABOUT IT, I PRESUME COUNSEL IS NOT GOING TO

25    GET UP AND SAY "MOVE TO STRIKE THAT, SHE DIDN'T OFFER AN
```

```
 1        OPINION ON THAT IN HER REPORT."

 2           IF THAT'S THEIR STANCE, I THINK WE'RE OKAY AND SHE

 3        PROBABLY DOESN'T NEED A REPORT.  WE CAN'T HAVE THAT SITUATION

 4        COME UP.

 5              THE COURT:  WELL, YOU KNOW, THIS ISSUE OF THE

 6        EMULATION TEST WAS DISCLOSED A LONG TIME AGO, AND DR. WILSON

 7        CHOSE NOT TO DO HER OWN TEST BECAUSE SHE THOUGHT IT WAS

 8        IRRELEVANT.  SO I THINK IT'S NOT FAIR AT THIS TIME TO NOW DO

 9        SOMETHING SHE SHOULD HAVE DONE BEFORE.  SO I'M NOT GOING TO

10        ALLOW -- YOU KNOW, MAYBE I'LL JUST SCRATCH THAT.

11           I'M GOING TO DENY THE MOTION TO STRIKE DR. DINAN'S

12        EMULATION TEST RESULTS, AND I THINK, YOU KNOW, THE DOOR IS

13        CLOSED.  I DON'T THINK APPLE GETS A DO-OVER ON THIS.

14              MR. ELACQUA:  YOUR HONOR, IF I COULD MAKE ONE LAST

15        POINT ON THAT?

16              THE COURT:  WHAT'S THAT?

17              MR. ELACQUA:  I DON'T THINK WE'RE ASKING FOR A

18        DO-OVER, YOUR HONOR.  I THINK WE'RE ASKING TO GO LOOK AT IT,

19        AND ALL WE'RE ASKING TO DO -- ALL WE'RE REQUESTING OF THE COURT

20        IS THAT IF DR. WILSON WANTS TO SAY SOMETHING ABOUT THAT AFTER

21        SHE GOES AND LOOKS AT IT, THAT COUNSEL FOR GPNE IS NOT GOING TO

22        MOVE TO STRIKE HER TESTIMONY IN THAT REGARD, WHETHER THAT COMES

23        IN THROUGH A SHORT TWO-PAGE, THREE-PAGE SUPPLEMENT OR THEY JUST

24        WANT TO DEPOSE HER FOR A COUPLE HOURS OR ANY OF THE

25        COMBINATION.
```

```
 1              THE COURT:  SHE SHOULD HAVE ALREADY DONE IT.  I MEAN,

 2      THE DEADLINES HAVE PASSED.

 3              MR. ELACQUA:  I UNDERSTAND THE COURT'S ORDER, YOUR

 4      HONOR.

 5              THE COURT:  YEAH.

 6              MR. ELACQUA:  I GUESS I WOULD ASK FOR THE SAME ON --

 7      MR. DANSKI IS GETTING A DO-OVER HERE, SO WE'D JUST ASK THAT

 8      DR. WILSON BE --

 9              THE COURT:  WELL, I MEAN, I THINK I WOULD GET

10      REVERSED IF I MAKE THEM GO TO TRIAL WITH NO DAMAGES THEORY AND

11      NO DAMAGES EXPERT, WOULDN'T YOU AGREE?

12              MR. ELACQUA:  THEY'VE GOT 13 LICENSES, YOUR HONOR,

13      AND THEY COULD STAND UP THERE AND TALK ABOUT THEM AND THEY'VE

14      IGNORED ALL OF THEM.

15              MR. BUMGARDNER:  YOUR HONOR, I -- I JUST SEE THIS AS

16      VERY DIFFERENT, THE DAMAGES EXPERT SITUATION VERSUS -- I MEAN,

17      MR. DANSKI TRIED.

18              THE COURT:  YEAH.  I THINK I'M NOT GOING TO ALLOW A

19      SUPPLEMENTATION ON THAT.  THE TIME HAS PASSED.

20          OKAY.  LET'S TALK ABOUT ALTERNATIVE DISPUTE RESOLUTION.

21      IS THAT SOMETHING THAT APPLE IS INTERESTED IN?  I GET THE SENSE

22      THE PLAINTIFFS ARE INTERESTED IN IT.  IF YOU ARE, THEN I'D LIKE

23      TO ORDER IT.  IF YOU'RE NOT, I'M NOT GOING TO REQUIRE IT.

24              MS. LUTTON:  WE DON'T THINK THAT WOULD BE PRODUCTIVE

25      IN LIGHT OF THE CHINA LITIGATION, YOUR HONOR.
```

```
 1              THE COURT:  ALL RIGHT.  THEN I'M NOT GOING TO REQUIRE

 2      IT.

 3          OKAY.  WHAT ELSE DO WE HAVE TO DO FOR TODAY?  I THINK THAT

 4      MAY BE -- THAT MAY BE IT.

 5          I GUESS THEN I WON'T SEE YOU AGAIN UNTIL THE PRETRIAL

 6      CONFERENCE, WHICH WILL BE JUNE 26TH.  THAT'LL BE AT 1:30.  I

 7      GUESS AT THAT TIME WE CAN, YOU KNOW, WORK OUT THE LOGISTICS ON

 8      TIME LIMITS AND NUMBER OF JURORS AND NUMBER OF PEREMPTORIES AND

 9      THE LIKE.

10          I DON'T THINK THERE'S -- DO YOU THINK THERE'S ANYTHING

11      ELSE THAT WE NEED TO DO TODAY?

12              MR. BUMGARDNER:  I'M NOT AWARE OF ANYTHING, YOUR

13      HONOR.

14              THE COURT:  OKAY.

15              MS. LUTTON:  NO, YOUR HONOR.

16              THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.  I

17      APPRECIATE IT.

18              MR. BUMGARDNER:  THANK YOU, YOUR HONOR.

19              MS. LUTTON:  THANK YOU, YOUR HONOR.

20              MR. ELACQUA:  THANK YOU, YOUR HONOR.

21              MR. SUSSER:  THANK YOU, YOUR HONOR.

22          (THE PROCEEDINGS WERE CONCLUDED AT 4:41 P.M.)

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

     LEE-ANNE SHORTRIDGE, CSR, CRR

17   CERTIFICATE NUMBER 9595

18        DATED:  APRIL 11, 2014

19

20

21

22

23

24

25