1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GPNE CORP., | Case No.: 12-CV-02885-LHK |
| Plaintiff, | ORDER RE GPNE AND APPLE'S |
| v. | MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION |
| APPLE, INC., | TO STRIKE EXPERT REPORT AND INFRINGEMENT CONTENTIONS |
| Defendant. | [REDACTED VERSION] |

Plaintiff GPNE Corp. ("GPNE") brings this action for patent infringement against Defendant Apple Inc. ("Apple"). GPNE alleges that Apple infringes U.S. Patent Nos. 7,555,267 ("'267 Patent"), 7,570,954 ("'954 Patent"), and 7,792,492 ("'492 Patent") (collectively, "Patents-in-Suit"). Apple now moves to exclude the expert testimony of Michael Dansky and Esmael Dinan, and GPNE moves to exclude the expert testimony of Paul Meyer. For the following reasons, Apple's motion to exclude Mr. Dansky's testimony is GRANTED, Apple's motion to exclude Mr. Dinan's testimony is DENIED, and GPNE's motion to exclude Mr. Meyer's testimony is DENIED.

## I.     PROCEDURAL BACKGROUND

On July 1, 2011, GPNE filed a Complaint in the District of Hawaii against Apple, as well as Barnes & Noble, Sharp Company, and several other defendants. *See GPNE v. Amazon.com, Inc.*, Case No. 11-CV-00426 JMS RLP (D. Haw. 2011). Subsequently, the District Court in Hawaii

1

**United States District Court**
**For the Northern District of California**

1   severed the GPNE's cases against each of the defendants in the Hawaii action and transferred

2   several of the separate actions to the instant Court. *See id.*, ECF Nos. 246, 295; *GPNE Corp. v.*

3   *Nokia Corp.*, Case No. 12-CV-00250 SOM RLP, ECF No. 14; *GPNE Corp. v. Pantech Co., Ltd.*

4   *and Pantech Wireless, Inc*., Case No. 12-CV-00251 SOM RLP, ECF No. 10. After the actions

5   against the instant Defendants were transferred to the Northern District of California, this Court

6   related the cases. *See GPNE v. Apple, Inc.*, Case No. 12-CV-2885 LHK PSG, ECF No. 35 (N.D.

7   Cal. 2012).

8       After holding a tutorial and claim construction hearing on June 6, 2013, this Court issued an

9   order construing disputed claim terms. *See* ECF No. 87. On October 16, 2013, GPNE, in

10  compliance with the Court's Case Management Order, *see* ECF No. 98, limited the case to the

11  following ten asserted claims: claims 19 and 22 of the '954 Patent, claims 13, 18, 30, 31, 39, and

12  42 of the '267 Patent, and claims 37 and 44 of the '492 Patent. ECF No. 107. Along with Apple's

13  summary judgment motion, Apple filed *Daubert* motions to exclude the testimony of GPNE's

14  experts Mr. Dansky and Dr. Dinan, *see* ECF Nos. 184-4 ("Dansky Mot."), 188 ("Dinan *Daubert*

15  Mot."),  as well as a motion to strike Dr. Dinan's expert report and one of GPNE's infringement

16  contentions, *see* ECF No. 189 ("Mot. to Strike"). GPNE filed a motion to exclude the testimony of

17  Apple's damages expert Mr. Meyer. *See* ECF No. 186-4 ("Meyer Mot."). The parties filed

18  oppositions and replies to all motions. *See* ECF Nos. 205-4 ("Dansky Opp."), 224-4 ("Dansky

19  Reply"), 198-4 ("Dinan *Daubert* Opp."), 221 ("Dinan *Daubert* Reply"), 207-4 ("Meyer Opp."),

20  226-4 ("Meyer Reply"), 215-1 ("Strike Opp."), 222 ("Strike Reply"). The Court held a hearing on

21  the summary judgment motions and the motions addressed in this order on April 3, 2014.

22  **II.        LEGAL STANDARD**

23      **A. *Daubert* Standard**

24      Federal Rule of Evidence 702 allows admission of "scientific, technical, or other

25  specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the

26  evidence or to determine a fact in issue." Expert testimony is admissible pursuant to Rule 702 if it

27  is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). A

28  district court's decision to admit expert testimony under *Daubert* in a patent case follows the law of

2

United States District Court
For the Northern District of California

1  the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

2  When considering expert testimony offered pursuant to Federal Rule of Evidence 702, the trial

3  court acts as a "gatekeeper" by assessing the soundness of the expert's methodology to exclude

4  junk science. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014); *see*

5  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S.

6  136, 142 (1997); *Daubert*, 509 U.S. at 589-90. An expert witness may provide opinion testimony

7  if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of

8  reliable principles and methods; and (3) the expert has reliably applied the principles and methods

9  to the facts of the case. Fed. R. Evid. 702; *see Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550

10  F.3d 1356, 1360 (Fed. Cir. 2008). Under *Daubert*, courts consider (1) whether a theory or

11  technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected

12  to peer review and publication;" (3) "the known or potential rate of error;" and (4) whether there is

13  "general acceptance" of the methodology in the "relevant scientific community." *Daubert*, 509

14  U.S. at 593-94.

15       The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but

16  admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the

17  burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing

18  *Daubert*, 509 U.S. at 594, 596). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact

19  finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the

20  expert may testify and the jury decides how much weight to give that testimony." *Id.* (quoting

21  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

22       **B.** ***Georgia-Pacific* Factors**

23       Both parties' damages experts undertake an analysis using the *Georgia-Pacific* factors to

24  propose a reasonable royalty as damages for Apple's alleged infringement of the Patents-in-Suit.

25  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The

26  *Georgia-Pacific* factors are used in the "hypothetical negotiation" approach to determining a

27  reasonable royalty. The hypothetical negotiation approach "attempts to ascertain the royalty upon

28  which the parties would have agreed had they successfully negotiated an agreement just before

3

1    infringement began." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir.

2    2009). "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing

3    negotiation scenario and to describe the resulting agreement." *Id.* at 1325.

4         The *Georgia-Pacific* factors are a non-exhaustive list of fifteen factors for experts to

5    consider in determining what reasonable royalty would result from the hypothetical negotiation.

6    *See Georgia-Pacific*, 318 F. Supp. at 1120. Examples of *Georgia-Pacific* factors are "[t]he

7    royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove

8    an established royalty" (Factor 1), "[t]he established profitability of the product made under the

9    patent; its commercial success; and its current popularity" (Factor 8), and "[t]he portion of the

10   realizable profit that should be credited to the invention as distinguished from non-patented

11   elements, the manufacturing process, business risks, or significant features or improvements added

12   by the infringer" (Factor 13). *Id.*

13   **III.    DISCUSSION**

14        This order concerns five motions: (1) Apple's motion to exclude Mr. Dansky's expert

15   testimony, (2) GPNE's motion to exclude Mr. Meyer's expert testimony, (3) Apple's motion to

16   exclude Dr. Dinan's expert testimony, (4) Apple's motion to strike Dr. Dinan's expert report, and

17   (5) Apple's motion to strike a change in GPNE's infringement contentions. The Court addresses

18   each in turn.

19        **A.  Apple's Motion to Exclude Mr. Dansky's Testimony**

20        Mr. Dansky's damages theory first uses financial documents produced in discovery to

21   calculate Apple's average net incremental profit per device that Mr. Dansky attributes to the

22   device's cellular capability. Although Apple disagrees with Mr. Dansky's profit calculation, Apple

23   does not challenge that calculation for the purposes of this *Daubert* motion. Mr. Dansky's profit

24   calculation yields an average net incremental profit per device for cellular capability of $86.[1] In the

25   next step, which is the subject of Apple's *Daubert* motion, Mr. Dansky recites a number of

26   qualitative factors—generally indicating the importance of 3G and 4G cellular technology—before

27   _____

28   [1] At the April 3, 2014 hearing, Apple stated that it does not seek to seal Mr. Dansky's $86 figure
     because Apple asserts that the $86 figure reflects Mr. Dansky's calculation and not "any
     confidential Apple information." ECF No. 241, 4/3/14 Hearing Tr. at 42:6-15.

**United States District Court**
For the Northern District of California

1    simply concluding that Apple and GPNE would agree to a per unit royalty of $1 per accused

2    device.

3         Specifically, Mr. Dansky largely bases his analysis on GPNE's technical expert's

4    conclusion that GPNE's patents are essential to the standard. *See* ECF No. 201-11, Susser Decl.

5    Ex. I, Dinan Expert Report ¶¶ 17-19 (assuming that the accused devices pass conformance test

6    demonstrating that the accused devices are compatible with the standard); *see also* ECF No. 241,

7    4/3/14 Hearing Tr. at 21:6-14 (explaining that Dr. Dinan had to assume conformance tests were

8    passed because he was not allowed to view them under the protective order, and that another

9    expert, Neil Burkett, was retained to view the conformance tests). Relying on the GPNE patents'

10   alleged essentiality, Mr. Dansky asserts that "GPNE's Patents-in-Suit were fundamental to [cellular

11   connectivity] capability" because "Apple had no ability to design around GPNE's patents and sell

12   devices that operated on the GPRS, EDGE, and/or LTE networks."[2] Dansky Expert Report at 86.

13   Mr. Dansky then recites a list of reasons why cellular technology in general is valuable and

14   concludes that, because Apple allegedly could not make and sell its cellular devices without a

15   license to GPNE's patents, GPNE's patents are therefore valuable. The following list outlines Mr.

16   Dansky's full explanation for his determination that, starting with Mr. Dansky's calculation that

17   Apple derives $86 per unit in profit from cellular connectivity, Apple would agree to pay GPNE $1

18   per unit for a license to GPNE's specific patents.

- "Apple's marketing of the iPhone 3G had touted the value of the patented technology . . . '*iPhone 3G supports Wi-Fi, 3G and EDGE networks and automatically switches between them to ensure the fastest possible download speeds*. The new iPhone 3G also makes it easier to multitask with *simultaneous voice and data communications* . . . ."
  ECF No. 184-5, Dansky Expert Report, at 85 (emphasis in original, meant to emphasize where Apple's marketing materials refer to GPNE's technology).

- "Apple had no ability to design around GPNE's patents and sell devices that operated on the GPRS, EDGE, and/or LTE networks. A lost license, beginning in June 2009, would have had a devastating impact on Apple's iPhone business and caused Apple to be able to sell only WiFi-capable iPads in 2010."
  *Id*. at 86.

- "Apple's follow-on sales of accessories, downloads, and warranties would also be at risk. Since many of Apple's customers are follow-on customers who have already bought one

---

[2] For statements such as these, which assume a technical finding—in this case, that the Patents-in-Suit are essential to the standard—Mr. Dansky relies on Dr. Dinan's technical analysis. *See* Dansky Expert Report at 84.

5

Apple device and often continue to buy Apple devices based on the performance of the currently owned products, a lost sale of the original device would cascade through its business."
*Id.*

- "GPNE would have to be cognizant that the royalty rate in a license to Apple could have implications for its license rates offered to other infringers/competitors in the market." *Id.* at 87.

- One dollar per accused unit "is only a fraction of its overall profit earned on an infringing device."
*Id.*

- "In order to compete, Apple products needed to be compliant with GPRS, EDGE, and LTE standards, and the Patents-in-Suit are required for operability on those networks." *Id.* at 87-88.

- "Nielsen reported in July 2011, that 12% of the purchasers of an iPad Wi-Fi + 3G specifically stated that having cellular connectivity as an alternative to WiFi was a main driver of their intent to purchase."
*Id.* at 88.

- "Whether the customers "planned" to use the data network or not, the unit when turned on is in constant contact with the data network. Many more could be expected to activate their cellular data plans, since they paid an additional $130 for the capability – a purposeful purchase."
*Id.*

- "Apple understood the importance of cellular data access to its overall business and the high demand in the market. Many of the owners of Wi-Fi-only iPads, who also owned an iPhone, have been able to make use of the patented technology in the iPhone to connect to a GPRS, EDGE, or LTE network with their Wi-Fi-only iPads as well."
*Id.*

- "Apple earns significant additional revenue and profits from its sales of follow-on products and services to the purchasers of the accused products."
*Id.* at 89.

- Apple entered into ███████████ licenses with Nokia, Ericsson, and Sipro Labs for ████ ██████████
*Id.*

- "GPNE had the power to "hold up" Apple, giving it considerable negotiating leverage based on the scope of its intellectual property rights. GPNE had no obligations to use an *ex ante* framework to license its [standard-essential patents] – the *ex ante* evaluation would be irrelevant as would be the consideration of rates for patent pools in determining an appropriate royalty rate in this matter."
*Id.*

After this list, which is principally directed to reasons why 3G and 4G LTE capability is important to Apple, Mr. Dansky decides that $1 per unit is an appropriate royalty, concluding that

"[c]onsequently, given its critical need for a license to enable its business, Apple would certainly

be willing to agree to pay GPNE a royalty of $1.00 per unit." *Id.*

6

**United States District Court**
For the Northern District of California

1    The Court GRANTS Apple's motion to exclude Mr. Dansky's testimony for three main

2   reasons: (1) Mr. Dansky provides no methodology to derive his $1 per unit royalty from the $86

3   average net incremental profit, (2) Mr. Dansky performs no apportionment analysis, nor does he

4   even consider whether apportionment is appropriate, and (3) Mr. Dansky's brief citation to Nokia,

5   Ericsson, and Sipro ▇▇▇▇ licenses do not support his $1 per unit figure.

6    First, Mr. Dansky advances no reasoned basis for deriving his $1 per unit royalty from the

7   $86 average net incremental profit. When Mr. Dansky was asked in deposition how he "get[s] from

8   86 dollars a unit to one dollar a unit as [his] royalty that [he's] advocating," Mr. Dansky responded:

9   "It's my opinion based on all of the evidence in the record and my years of licensing and doing this

10  that this [sic] under the circumstances in this case, it would be the appropriate rate taking into

11  account the interests of both parties." ECF No. 184-7, Dansky Deposition Tr. at 40:2-9. Later, Mr.

12  Dansky again cited his general reliance upon "all the evidence in the record" and his "30 years of

13  experience in the licensing world and the valuation of intellectual property and the hundreds of

14  transactions that [he's] ultimately done . . . ." *Id*. at 40:15-41:1. When pressed to provide the

15  calculations from which he derived the $1 per unit figure, Mr. Dansky conceded that "[t]here's no

16  specific math." *Id*. at 40:13. Mr. Dansky also admitted that "there is no mathematical calculation

17  once we get to the 86 dollars to derive the one dollar," and that "[t]here's not a mathematical

18  calculation." *Id*. at 41:5-18.

19   The Court finds that Mr. Dansky's "30 years of experience" alone does not constitute a

20  sufficiently reliable and testable methodology to prevent exclusion under *Daubert*. As outlined

21  above, an expert witness may provide opinion testimony if: (1) the testimony is based upon

22  sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3)

23  the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid.

24  702; *see Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

25  Experts must follow some discernable methodology, and may not be "a black box into which data

26  is fed at one end and from which an answer emerges at the other." *Lawrence v. Raymond Corp.*,

27  No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x 515 (6th

28  Cir. 2012). Rather, "the Court must be able to see the mechanisms in order to determine if they are

7

**United States District Court**
For the Northern District of California

reliable and helpful." *Id.*; *accord Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court . . . the court cannot simply take an expert's word for a specific proposition."). Significantly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Finally, while it is worth noting that the Federal Circuit allows for "some approximation" in the reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-cv-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (Rader, C.J., sitting by designation) (citing *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

Mr. Dansky's analysis is an impermissible black box without "sound economic and factual predicates." *Riles*, 298 F.3d at 1311. Mr. Dansky himself even admits that there is no methodology other than his "30 years of experience." Dansky Deposition Tr. at 40:2-41:18. While the Court does not doubt that Mr. Dansky is an experienced professional, Mr. Dansky's "30 years of experience" does not constitute "sufficient facts or data," or "reliable principles and methods." Fed. R. Evid. 702. "30 years of experience" cannot be tested or "subjected to peer review and publication," nor is there a "known or potential rate of error." *Daubert*, 509 U.S. at 593-94. Mr. Dansky's derivation of the $1 per unit royalty from Apple's average net incremental profit "is classic *ipse dixit*" reasoning, "[p]icking th[e] million dollar number." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1158 (N.D. Cal. 2003). The analytical gap between Apple's profits and Mr. Dansky's royalty figure "is simply too great." *Gen. Elec.*, 522 U.S. at 146.

Second, Mr. Dansky attempts no apportionment analysis, nor does he even consider whether apportionment is appropriate. Instead, Mr. Dansky cloaks his lack of a methodology in a list of considerations that relate to the value of 3G and 4G LTE technology generally. As outlined above, Mr. Dansky's report relies on highly generic statements about 3G and 4G LTE technology, and how important cellular connectivity is to Apple. However, GPNE's three patents do not cover

8

all of 3G and 4G LTE technology—far from it. The Court found in its claim construction order that the Patents-in-Suit relate primarily to pager technology, which is just one aspect of 3G and 4G LTE technology. ECF No. 87, Order Construing Claims, at 8-19; '267 Patent at 1:32-33 ("this invention pertains to communications paging, and particularly to two-way paging method and apparatus"); '267 Patent at 14:14-15 ("the invention provides a two-way paging system"); *see also* '267 Patent at 1:34-62 (related art section referring only to paging technology).[3] GPNE must make some attempt to distinguish the allegedly infringing features of 3G and 4G LTE from the non-infringing features, so that Mr. Dansky may apportion value between them. Yet GPNE presents and Mr. Dansky cites no evidence indicating the value of the specific technology claimed by GPNE's patents.

Third, Mr. Dansky's citation to the Nokia, Ericsson, and Sipro Lab Telecom licenses, which is his only attempt to supply any quantitative support for his $1 per unit royalty, is misplaced. The Court is not persuaded by Mr. Dansky's use of the Nokia, Ericsson, and Sipro licenses for two reasons: (1) Mr. Dansky argues earlier in his report that the Nokia, Ericsson, and Sipro licenses are not comparable, and (2) the Nokia, Ericsson, and Sipro licenses are in fact not sufficiently comparable to support Mr. Dansky's $1 per unit royalty.

First, earlier in his report, Mr. Dansky acknowledges that ████████████████████ ████████████████████. Dansky Expert Report at 53 ("████████████████████ ████████████████████."). Mr. Dansky also states that none of the Nokia, Ericsson, or Sipro licenses are sufficiently comparable to be probative for his analysis because, among other reasons, the Ericsson license "contain[s] ████ ████████████████," the Nokia and Sipro licenses were ████████████████, and all licenses cover ████████████████. *Id.* at 53-55.

Despite this earlier rejection of the Nokia, Ericsson, and Sipro licenses, Mr. Dansky later cites to the Nokia, Ericsson, and Sipro licenses—which involve royalties of ████████████

---

[3] GPNE is now trying to read those patents on smartphones—a factual question that will be resolved by the jury. The Court issued a separate order denying Apple's motion for summary judgment of noninfringement, which Apple brought on the basis that Apple's iPhones and iPads are not "pagers" within the scope of the asserted patent claims. ECF No. 239.

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

██████████████████ respectively—when attempting to justify his $1 per unit royalty. *Id.* at 89. Mr. Dansky asserts, with little supporting reasoning, that GPNE's three patents relating to pager technology are similar in value to the ████████████ of major telecommunications companies like Nokia and Ericsson.[4] This contention is strained at best. Mr. Dansky first observes that, unlike Nokia, Ericsson, and Sipro, GPNE is not obligated to license on fair, reasonable, and nondiscriminatory ("FRAND") terms. However, a FRAND commitment does not reduce a reasonable royalty such that the ████████████ of major telecommunications companies like Nokia and Ericsson are ██████████████████.

Furthermore, Mr. Dansky's other contention—that the Nokia, Ericsson, and Sipro licenses were ████████—is problematic for two reasons. First, the fact that a license is ████████ weighs against its comparability in the instant case. *See, e.g.*, ██████████████ ████████████████████ ████████████████████ ██████████████ ██████████████). As mentioned above, Mr. Dansky cited this exact fact as a reason he did not consider the same licenses comparable.

Second, the Nokia and Sipro licenses are ████████████. Rather, as Mr. Dansky recognized earlier in his report, the Nokia and Sipro licenses were ████████████ ███. Dansky Expert Report at 54. The ██████████████████ ████████████████████ ██████████████. *Id.* Mr. Dansky therefore asserts that Apple would license GPNE's three patents relating to pager technology for ████████████ ██████████████. Especially in light of Mr. Dansky's earlier disavowal of the Nokia, Ericsson, and Sipro licenses' relevance, the Court finds that Mr. Dansky's reference to the Nokia, Ericsson, and Sipro licenses does not constitute a sufficient damages methodology under *Daubert*.

---

[4] Note that Sipro Lab Telecom is a major licensing company specializing in patent pool creation and administration, particularly for telecommunications standards. Sipro Lab Telecom, *About Us*, *available at* http://www.sipro.com/About-Sipro.html.

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

1       To summarize, Mr. Dansky's analysis is a black box that provides no basis for the $1 per

2   unit royalty figure, cloaking this arbitrary choice in broad statements about the general value of

3   cellular connectivity. In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, the Federal Circuit

4   excluded expert damages testimony because the expert's apportionment analysis "appears to have

5   been plucked out of thin air based on vague qualitative notions of the relative importance of the

6   [patented] technology." 694 F.3d 51, 69 (Fed. Cir. 2012). Notably, "[t]his complete lack of

7   economic analysis to quantitatively support the [expert's] apportionment echoes the kind of

8   arbitrariness of the '25% Rule' that [the Federal Circuit] recently and emphatically rejected from

9   damages experts, and would alone justify excluding [the expert's] opinions." *Id*. In this case, Mr.

10  Dansky's expert testimony presents the same problem. Mr. Dansky's $1 per unit royalty "appears

11  to have been plucked out of thin air based on vague qualitative notions of the relative importance

12  of the [signaling] technology." *Id*. Cross-examination cannot cure the deficiencies in Mr. Dansky's

13  analysis because Mr. Dansky has already indicated his intention to rely on his "30 years of

14  experience" and his numerous statements that 3G and 4G LTE technology is valuable. Without a

15  methodology, an explicit apportionment analysis, or an explanation of why apportionment is

16  inappropriate, cross-examination is futile. Apple cannot cross-examine Mr. Dansky on his

17  assertions, all of which fundamentally reduce to taking his opinion based on 30 years of experience

18  for granted. *See Fail-Safe*, 744 F. Supp. 2d at 888 ("the court cannot simply take an expert's word

19  for a specific proposition"). The Court therefore GRANTS Apple's motion to exclude Mr.

20  Dansky's expert testimony without prejudice to GPNE.

21      **B.  GPNE's Motion to Exclude Mr. Meyer's Testimony**

22      GPNE moves to disqualify Apple's damages expert, Mr. Paul Meyer, who employs a self-

23  dubbed "Component Royalty Stack Approach" to calculate the reasonable royalty that would result

24  from a hypothetical negotiation between GPNE and Apple. Mr. Meyer's methodology

25  encompasses five steps: (1) choose the baseband processor as the smallest salable patent-practicing

26  unit for use as the royalty base, (2) determine the baseband processor supplier's profits in

27  manufacturing baseband processor chips, (3) estimate the number of patent families that are

28  essential to practicing the GPRS and LTE standards, (4) divide the supplier's profits by the number

11

United States District Court
For the Northern District of California

1    of patent families to arrive at an apportioned per-patent family profit figure, and (5) review the

2    *Georgia-Pacific* factors to understand whether the per-patent family profit figure is reasonable. The

3    Court finds that Mr. Meyer's methodology is sufficiently reliable to meet the *Daubert* standard and

4    accordingly DENIES GPNE's motion to exclude. Before delving into GPNE's arguments, the

5    Court first reviews Mr. Meyer's methodology in further detail.

6    Mr. Meyer states that he ▮▮▮▮ his Component Royalty Stack Approach ▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ECF No. 186-6, Meyer Expert Report ¶ 66-67. According to

8    Ms. Taraneh Maghame, Senior Counsel of Licensing and Strategy at Apple, ▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 67. In

10   this case, the smallest salable patent-practicing unit is the baseband processor. *Id.* ¶ 68. Mr. Meyer

11   then uses documents from various Apple suppliers to determine the average profit made on each

12   baseband processor. *Id.* ¶ 76-80.  Mr. Meyer separates out the baseband processor profits because

13   Ms. Maghame ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

14   *Id.* ¶ 69. Next, recognizing that GPNE's patents are not subject to a fair, reasonable, and non-

15   discriminatory ("FRAND") royalty commitment, Mr. Meyer nonetheless chooses to apportion the

16   baseband processor profits based on an estimate of the number of patent families included in the

17   standard. *Id.* ¶ 71-75. Even though GPNE's patents need not be licensed on FRAND terms, Mr.

18   Meyer finds that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮ *Id.* Thus, Mr. Meyer identifies a study conducted by Fairfield

22   Resources International, which determined approximately 800 patent families to be declared

23   essential to the GSM and WCDMA standards, upon which GPRS and LTE are based. *Id.* ¶ 82.

24   According to Mr. Meyer, this figure is conservative because numerous patents have been declared

25   essential to the GSM and WCDMA standards after the Fairfield study, and even more patents

26   became essential after adoption of the GPRS and LTE standards. *Id.* ¶ 83. Finally, the baseband

27   processor profits are divided by the 800 patent families identified by Fairfield to arrive at a final

28   per-unit royalty amount. *Id.* ¶ 84, Table 6.

Mr. Meyer next accounts for the contribution of GPNE's patents to the standard by relying on analysis from Apple's technical experts Mr. Peter Rysavy and Dr. S. Kate Wilson that GPNE's patents were no more valuable than the average patent. In particular, Mr. Meyer relies on Mr. Rysavy and Dr. Wilson's analysis that the "alleged incremental contribution of the patents-in-suit to the GPRS, EDGE and LTE standards would not impact user experience (*i.e.*, the customer would not notice performance change in a meaningful way) for reasons including: 1) improvements in throughput speeds between the GPRS standard through the LTE standard would not be attributed to the patents-in-suit; 2) the patents-in-suit are unrelated to the downlink of data transmission which is responsible for the majority of data that is transmitted; 3) consumers would not notice if the non-infringing single phase approach was used within the radio access network instead of a two phase approach; 4) the patents-in-suit only relate to one small aspect of the entire specifications for GPRS, EDGE and LTE; and 5) significant players in the telecommunications industry have declared many patents essential to telecommunication standards." Meyer Expert Report ¶ 87. As a result, Mr. Meyer does not adjust the final royalty figure upward. *Id.* ¶ 87. Mr. Meyer then discusses the *Georgia-Pacific* factors in detail, confirming to his satisfaction that the results of his Component Royalty Stack Approach are reasonable. *Id.* ¶¶ 89-263.

Besides a dispute over the smallest salable patent-practicing unit to be addressed in the next section, GPNE argues that Mr. Meyer's testimony should be excluded because the Component Royalty Stack Approach is improper for these patents, and because Mr. Meyer considers what GPNE contends are unrelated license agreements. The Court will consider each in turn.

GPNE alleges four main flaws with the Component Royalty Stack Approach. First, GPNE contends that the Component Royalty Stack Approach employs basic patent counting criticized by the district courts in *Microsoft Corp. v. Motorola, Inc.*, C10-1823 JLR, 2013 WL 2111217, at *80 (W.D. Wash. Apr. 25, 2013), and *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL 2303, 2013 WL 5593609, at *39 (N.D. Ill. Oct. 3, 2013). Patent counting, or counting the number of patents essential to a standard and determining the value of a single patent by dividing the value of the standard by the number of essential patents, is imprecise because it does not account for the value of the asserted patent relative to the other standard essential patents. *Microsoft*, 2013 WL 2111217,

1  at *80; *In re Innovatio*, 2013 WL 5593609, at *39. Although patent counting is of limited probative

2  value, as long as the expert adjusts her final royalty figure based on the value of the asserted patent

3  relative to the other standard essential patents, a patent counting approach is not by itself grounds

4  for exclusion. As Mr. Meyer here takes several steps not to rely solely on patent counting, such as

5  accounting for the asserted patents' contributions to the standard, and reviewing the *Georgia-*

6  *Pacific* factors to measure the reasonableness of the royalty to arrive at his final figure, the Court

7  will not exclude Mr. Meyer's testimony solely for including patent counting. *See, e.g.*, *Realtek*

8  *Semiconductor Corp. v. LSI Corp.*, C-12-03451 RMW, 2014 WL 46997, at *3-4 (N.D. Cal. Jan. 6,

9  2014) (excluding a patent citation counting methodology because 93% of the citations in the pool

10  were attributable to a non-asserted patent). "Shaky but admissible evidence is to be attacked by

11  cross examination, contrary evidence, and attention to the burden of proof, not exclusion."

12  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596).

13  Second, GPNE argues that Mr. Meyer's testimony should be excluded because it treats

14  GPNE's patents as if they are encumbered with a FRAND licensing commitment. The Court finds

15  that this criticism goes to weight and not admissibility. While GPNE is correct that no FRAND

16  obligation is attached to its patents, Mr. Meyer's report acknowledges this fact. Meyer Expert

17  Report ¶ 72. Instead, Mr. Meyer relies on █████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ████████████. Thus, Mr. Meyer finds that even though GPNE need not license its patents on

20  FRAND terms, "████████████████████████████████████████████████████████

21  ███  *Id*. GPNE's expert contends that in negotiating for a reasonable royalty, GPNE would assert

22  its superior bargaining position by virtue of its patents being essential to the standard and try to

23  extract higher royalties based on its ability to hold Apple up. Dansky Expert Report, at 86, 89.

24  GPNE is certainly welcome to present that testimony to the jury. However, Mr. Meyer's reliance

25  on ████████████████████████████████ to determine the outcome of a hypothetical

26  negotiation between Apple and GPNE is a sufficiently "reliable principle[] and method[]" to avoid

27  exclusion under Fed. R. Evid. 702 and *Daubert*. Fed. R. Evid. 702.

28

14

1    Third, GPNE claims that Mr. Meyer's testimony should be excluded because it does not

2    account for whether any of the 800 patent families identified by Fairfield are owned or already

3    licensed by Apple. Mr. Meyer defends his use of 800 as the divisor in his report as "understated"

4    because the Fairfield study does not account for patents later declared essential to the GSM or

5    WCDMA standards, and it does not account for future patents essential to the GPRS or LTE

6    standards. Meyer Expert Report ¶ 83. GPNE's criticism is valid, but the proper remedy is cross-

7    examination, not exclusion. Assuming Apple owns or licenses some of the 800 patent families

8    found by Fairfield to be essential to the GSM and WCDMA standards, dividing the baseband

9    processor profit by 800 would yield a smaller royalty rate than is appropriate because Apple's

10   profits have already been reduced by the royalties Apple pays for patent families it has already

11   licensed. GPNE can make this point on cross-examination and in closing argument. However,

12   because there is some support for finding that Mr. Meyer's royalty figure is reliable because the

13   800 patent families do not account for all patents that have been and will be declared essential, the

14   Court will not exclude Mr. Meyer's testimony.

15   Fourth, GPNE argues that Mr. Meyer's Component Royalty Stack Approach should be

16   excluded because Apple cannot identify any peer-reviewed articles or other court opinions

17   sanctioning the methodology. However, the Court finds Mr. Meyer's methodology to be

18   sufficiently sound to meet the *Daubert* standard. A primary guideline of Fed. R. Evid. 702 and the

19   *Daubert* standard is that the damages methodology must be reliable. Fed. R. Evid. 702 (testimony

20   must be "the product of reliable principles and methods"); *Daubert*, 509 U.S. at 589 ("under the

21   Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not

22   only relevant, but reliable"). As discussed above, Mr. Meyer's methodology is fundamentally

23   reliable because it ███████████████████████████████████████. The *Daubert* standard

24   would be perverse if it required exclusion of ██████████████████████████████ to

25   determine the outcome of a hypothetical royalty negotiation simply because no court or peer-

26   reviewed article had yet to sanction the methodology. Additionally, other courts have in fact

27   sanctioned methodologies essentially identical to Mr. Meyer's Component Royalty Stack

28   Approach. For example, the court in *In re Innovatio* approved of a methodology called the "Top

15

Down approach." The Top Down approach "starts with the average price of a Wi-Fi chip," "calculate[s] the average profit that a chipmaker earns on the sale of each chip," "multiplie[s] the available profit on a chip by . . . the number of Innovatio's 802.11 standard-essential patents, divide[s] by the total number of 802.11 standard-essential patents," and then considers the relative value of Innovatio's patents to the 802.11 standard. *In re Innovatio*, 2013 WL 5593609, at *38. Although Mr. Meyer uses a different name for his methodology, the approach of calculating the average profit earned on the sale of the smallest salable patent-practicing unit, and then apportioning that profit based on the relative value of the asserted patents to the standard, is the same. The *Innovatio* court found the Top Down approach to be based on "objective considerations and sound hypotheses, rather than on mere speculation." *In re Innovatio*, 2013 WL 5593609, at *39. Likewise, this Court finds Mr. Meyer's Component Royalty Stack Approach to be objective, based on quantifiable inputs, and not so unreasonable as to merit exclusion under *Daubert*.

GPNE's final argument against Mr. Meyer's testimony is that "Mr. Meyer improperly considers unrelated licenses and incomparable settlement agreements." Meyer Mot. at 16. GPNE's assertion that the GPNE patent litigation settlements are so irrelevant as to require the exclusion of Mr. Meyer's testimony is unmeritorious. While this Court has previously recognized "the general debate over the relevance of settlement agreements to the hypothetical negotiation,"[5] the Federal Circuit has found that, in certain circumstances, the most reliable license in the record can be one that arose out of litigation. *ResQNet.com*, 594 F.3d at 872 ("the most reliable license in this record arose out of litigation"). The Federal Circuit also instructs that in determining which licenses are most comparable under the first *Georgia-Pacific* factor, experts "must consider licenses that are commensurate with what the defendant has appropriated." *Id*. at 872. To survive GPNE's *Daubert* challenge, Apple must only show that Mr. Meyer's consideration of GPNE's patent litigation

---

[5] *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 11-CV-01846 LHK, 2013 WL 5958176, at *5 (N.D. Cal. Nov. 7, 2013); *compare LaserDynamics*, 694 F.3d at 77 ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable."), with *In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."), and *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (per curiam) (acknowledging that "litigation itself can skew the results of the hypothetical negotiation," but concluding that a settlement agreement was "most reliable license in this record").

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

1  settlements is sufficiently reliable to be admissible under *Daubert*. Apple has certainly met this

2  standard. Mr. Meyer acknowledges that licenses resulting from litigation settlements are not

3  perfectly comparable. However, Mr. Meyer relies on GPNE's licenses because GPNE's licenses

4  generally involve ██████████████████, and every GPNE license ████████

5  ████████████. Further, GPNE's business model is based entirely on litigation and licensing.

6  ECF No. 207-5, Elacqua Decl. Ex. B, Wong Deposition Tr. at 74:5-76:16, 258:5-19. In fact, ████

7  of GPNE's ████ licenses ████████████████████████, and were

8  negotiated in settlement of the instant litigation. As such, on the particular facts of this case,

9  GPNE's licenses are at the very least probative of the royalty to which Apple and GPNE would

10  have agreed in a hypothetical negotiation at the time of first infringement. *See Lucent Techs., Inc.*

11  *v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009) (holding that it is permissible to consider

12  post-infringement information in reconstructing the hypothetical negotiation, as "factual

13  developments occurring after the date of the hypothetical negotiation can inform the damages

14  calculation . . . our case law affirms the availability of post-infringement evidence as probative in

15  certain circumstances").

16        In asserting otherwise, GPNE relies on an order from this Court in another case ruling a

17  patent litigation settlement license inadmissible at trial. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 11-

18  CV-01846 LHK, 2013 WL 5958176, at *4-6 (N.D. Cal. Nov. 7, 2013). However, GPNE ignores

19  six factors distinguishing that decision from the *Daubert* question at issue here. First, the license

20  agreement at issue in the *Apple v. Samsung* case was a settlement of approximately 50 worldwide

21  litigations by a cross-license of competitor smartphone companies' patent portfolios. *Id.* at *6.

22  Such an agreement has little relevance for determining a reasonable royalty for GPNE's three

23  patents in a hypothetical negotiation involving Apple and GPNE, whose business model is based

24  entirely on litigation and licensing of GPNE's patents. *Id.* ("in this particular case, the Court

25  questions whether the benefit to Apple and to HTC of eliminating the risks and costs of 50

26  worldwide patent infringement litigations and other patent proceedings between HTC and Apple

27  could even be quantified in the HTC Agreement and thus could further obscure the true value of

28  the rights Apple granted to HTC"). Second, the HTC license had unsettled terms, so it was

impossible to extrapolate a royalty rate from the agreement. *Id*. at *4 ("Neither the HTC Agreement itself nor the parties' experts attempt to place a dollar amount on the value of the license to Apple."). Third, all experts in the *Apple* case determined that the litigation settlement in question was "not probative" to their primary opinions. *Id*. at *5. Fourth, the HTC license was not exemplary of "the type of license Samsung arguably needed for its products at the time of the hypothetical negotiation" because it contained a "complicated anti-cloning provision." *Id*. at *4. Fifth, the Court found that the probative value of the HTC agreement, if any, was outweighed by the risk of unfair prejudice and undue delay. The HTC license risked misleading the jury, and introduction of the HTC license would consume an undue amount of time, as it risked creating a mini-trial on HTC. *Id*. at *5. Sixth, and finally, the Court applied its "rule against introducing new evidence and argument in the [damages] retrial" to avoid punishing Apple for operating under the rule during its pretrial preparation. *Id*.

In addition, Mr. Meyer does not rely on GPNE's licenses to precisely measure the value of the GPNE patents. Instead, Mr. Meyer uses the allegedly comparable licenses as mere data points to verify whether his Component Royalty Stack Approach result is reasonable. Mr. Meyer explains that he adjusted his royalty figure upward for the following reasons: "the assumption [that the asserted patents are] valid and infringed at the hypothetical negotiation; GPNE does not have foreign counterparts in all countries; relative value issues related to patents 'licensed in' by Apple; the results of my analyses of the *Georgia-Pacific* factors addressed above; and to be conservative." Meyer Expert Report ¶ 261. Moreover, contrary to GPNE's assertion, Mr. Meyer does take into account the differences between GPNE's licenses and the hypothetical negotiation. Furthermore, GPNE can cross-examine Mr. Meyer regarding whether he accounted for all the differences between GPNE's licenses and the hypothetical negotiation in this case. As cross-examination can cure any residual defect in Mr. Meyer's license comparison, exclusion under *Daubert* would be improper. Finally, the Court observes that GPNE complains that "Mr. Meyer utilizes the settlements to magically increase the average per patent settlement average to arrive at his final number, without clear explanation," but GPNE fails to mention that, based on GPNE's settlement

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1   agreement licenses, Mr. Meyer slightly adjusted the reasonable royalty upward, which favors

2   GPNE.

3          Therefore, while prior litigation settlement licenses may generally be of debatable relevance

4   in determining the outcome of a hypothetical negotiation for a reasonable royalty, five facts in this

5   case all counsel against granting GPNE's motion to exclude Mr. Meyer's testimony: (1) Mr. Meyer

6   only relies on the GPNE settlement licenses to check the reasonableness of his royalty calculation,

7   (2) all of GPNE's licenses ███████████████████, (3) ███ of GPNE's ███ licenses

8   ████████████████████████████, (4) GPNE's sole business is litigation

9   and licensing, and (5) GPNE can cross-examine Mr. Meyer on the comparability of the GPNE

10  settlement licenses to the hypothetical negotiation. GPNE's criticisms go to weight and not

11  admissibility. *See Primiano*, 598 F.3d at 564 ("[s]haky but admissible evidence is to be attacked by

12  cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing

13  *Daubert*, 509 U.S. at 594, 596). Apple has proven that Mr. Meyer's testimony is sufficiently

14  reliable for admissibility under *Daubert*.

15         In sum, GPNE's criticisms of Mr. Meyer's testimony all go to weight and not admissibility.

16  Apple has proven that Mr. Meyer's methodology is sufficiently reliable to meet the *Daubert*

17  standard. Mr. Meyer's approach is reproducible, based on reasonable inputs, and entirely

18  quantitative except for a minor upward adjustment in GPNE's favor resulting from Mr. Meyer's

19  consideration of comparable licenses. Accordingly, GPNE's motion to exclude Mr. Meyer's

20  testimony is DENIED.

21         **C.  Dispute over the Smallest Salable Patent-Practicing Unit**

22         The parties in both the motion to exclude Mr. Dansky's testimony and the motion to

23  exclude Mr. Meyer's testimony dispute the identification of the smallest salable patent-practicing

24  unit. As discussed above, Mr. Meyer's methodology uses the average price of the baseband

25  processor chips Apple purchases and installs in its devices as the royalty base. Mr. Dansky, on the

26  other hand, derives his royalty base from the price of Apple's iPads. Each party argues that the

27  other violates the smallest salable patent-practicing unit rule.

28

19

"By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement.'" *LaserDynamics*, 694 F.3d at 66 (citing 35 U.S.C. § 284). To most accurately calculate the minimum amount of infringement damages adequate to compensate for the infringement, "it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Id.* at 67 (citing *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). A "narrow exception to the general rule" requiring royalties to be based on the smallest salable patent-practicing unit is the entire market value rule. *Id.* "If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id*. (citing *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549, 1551 (Fed. Cir. 1995).

An important policy concern underlies the smallest salable patent-practicing unit doctrine. "Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *Id*. In describing how error manifests from violation of the smallest salable patent-practicing unit rule, the Federal Circuit explained:

> Regardless of the chosen royalty rate, one way in which the error of an improperly admitted entire market value rule theory manifests itself is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only. In *Uniloc*, we observed that such disclosure to the jury of the overall product revenues "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." [*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)] (noting that "the $19 billion cat was never put back into the bag," and that neither cross-examination nor a curative jury instruction could have offset the resulting unfair prejudice). Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is "adequate to compensate for the infringement." *Id.*; *see* 35 U.S.C. § 284.

*Id.* at 67-68.

This concern was made explicit not just in *LaserDynamics*, but also in an earlier seminal case, *Cornell University v. Hewlett-Packard Co.*, in which Federal Circuit Chief Judge Rader, sitting by designation on the Northern District of New York, repeatedly rejected expert

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

1    methodology that "attempt[ed] to show economic entitlement to damages based on technology

2    beyond the scope of the claimed invention." 609 F. Supp. 2d at 284-85. This reasoning behind the

3    smallest salable patent-practicing unit rule is also consistent with the Federal Circuit's rejection of

4    the "25 percent rule of thumb" in *Uniloc* and the U.S. Supreme Court's early apportionment case

5    law, which holds that a patentee "must in every case give evidence tending to separate or apportion

6    the defendant's profits and the patentee's damages between the patented feature and the unpatented

7    features." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting

8    *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

9        With this background in mind, the Court turns to the parties' arguments. GPNE asserts that

10   Apple's expert testimony from Mr. Meyer should be excluded because Mr. Meyer uses the

11   baseband processor chips as the royalty base rather than the entire accused iPhones and iPads.

12   GPNE advances two principal arguments in support of its position that the accused devices are the

13   smallest salable patent-practicing units: (1) that the smallest salable patent-practicing unit must be

14   an item that is sold by Apple, and (2) that the patent claims are directed to the entire device, not

15   just the chip, meaning that the baseband processor chips cannot practice the entire patent claim.

16   GPNE's position is ultimately unpersuasive.

17       As to GPNE's first argument that the smallest salable patent-practicing unit must be an item

18   that is sold by Apple, the *LaserDynamics* court itself indicated that third-party items can suffice as

19   the smallest salable patent-practicing unit. *See, e.g.*, *LaserDynamics*, 694 F.3d at 70 (finding that

20   LaserDynamics could "derive[e] or obtain[] accurate information concerning [optical disk drive

21   ("ODD")] values from third parties, industry practices, etc." and noting that "LaserDynamics in

22   fact did obtain and use alternative pricing information from Sony-made ODDs in the second

23   trial."). In fact, GPNE can point to no case that requires the smallest salable patent-practicing unit

24   to be made or sold by the accused infringer.

25       GPNE responds that Apple, and not a third-party chip maker, participates in the

26   hypothetical negotiation. However, in approaching a reasonable royalty negotiation with GPNE,

27   Apple may well use the price of the baseband processor chips made by a third party as the starting

28   point from which to apportion the patents' value. Furthermore, although Mr. Meyer did attempt to

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

█████████████████████, damages experts do not have to recreate exactly how the parties would have arrived at a royalty—rather, damages experts must only "recreate the *ex ante* licensing negotiation scenario" and apply a reliable methodology to arrive at the same reasonable royalty that the parties would have negotiated. *Lucent*, 580 F.3d at 1325; *see also Daubert*, 509 U.S. at 590-91.

GPNE also contends that the law requires the smallest salable patent-practicing unit to be an item made by Apple because Apple could receive lower prices on its chip orders, as the chips may include some of Apple's intellectual property and Apple surely benefits from bulk order discounts. Neither of these arguments are reasons to reject the baseband processor chips as the smallest salable patent-practicing unit. GPNE's contentions go to weight and not admissibility. GPNE can raise these arguments in cross-examination and closing argument.

GPNE's position becomes even weaker after consideration of the policy behind the smallest salable patent-practicing unit doctrine. As reviewed above, the smallest salable patent-practicing unit doctrine exists because disclosure of overall product revenues threatens to "skew the damages horizon for the jury." *LaserDynamics*, 694 F.3d at 68 (quoting *Uniloc*, 632 F.3d at 1320). Interpreting the smallest salable patent-practicing unit doctrine to require that the accused infringer make or sell the smallest salable patent-practicing unit would, in circumstances where the accused infringer makes a multicomponent end product and the component manufacturer is not joined, render the smallest salable patent-practicing unit doctrine ineffective. A patentee should not be able to opt in or out of the smallest salable patent-practicing unit doctrine based on its decision of whom to sue. Therefore, not limiting the smallest salable patent-practicing unit to items sold by the accused infringer is consistent with the rationale for the doctrine.

The Court is also not persuaded by GPNE's second argument that the entire accused devices must be the smallest salable patent-practicing units because the patent claims are directed to the entire devices and not just the baseband processor chips. The asserted claims recite a "node in a data network," which GPNE alleges is an iPhone or an iPad, and "a memory," which GPNE alleges is a generic random access memory for storage, or "RAM," in addition to the baseband

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

**United States District Court**
For the Northern District of California

processor, which directly implements the patented invention.[6] This cursory recitation of the entire

device in the asserted claims does not foreclose the component that directly implements the

invention from being the smallest salable patent-practicing unit for reasonable royalty purposes.

Neither party contests that the patent's contribution to the art is a signaling technique

performed by the baseband processor. *See* Dansky Expert Report at 67 (citing discussions with Dr.

Dinan and opining that "[t]he benefits of the use of GPNE's patented technology are based upon

the enablement of easy and rapid as well as efficient access to data by mobile devices at any

location supported by GPRS, EDGE, and/or LTE cellular networks"); *Id*. ("GPNE invented an

improved, two phase access process for data transfer from a mobile device to a cellular network,

which was embodied by companies and [standard-setting organizations] developing and

implementing the standards for GPRS, EDGE, and LTE networks."); ECF No. 184-9, Elacqua

---

[6] For example, representative claim 13 of the '954 Patent, upon which asserted claims 19 and 22 depend, recites:

13. A first *node in a data network*, the data network including a plurality of nodes including a first node, the first node comprising:

at least one processor;

a *memory* providing code to the at least one processor; and

an interface controlled by the at least one processor to:

receive a clocking signal used to enable requests including a first request from the first node, the clocking signal provided from the first communication controller;

transmit the first request signal from the first node to the communication when the first node has a communication message to transmit;

receive an authorization signal from the first communication controller; and

transmit the communication message to the first communication controller subsequent to receiving said authorization signal;

wherein each of the clocking signal, the first request signal, the authorization signal, and the communication message are transmitted on differing frequencies, and

wherein the clocking signal enables a second request signal to be transmitted to the first communication controller by a second node, and wherein the second request signal can be provided simultaneous with transmission of the communication message by the first node.

'954 Patent at 16:52-17:13 (emphasis added).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Decl. Ex. G, Birkett Dep. Tr. at 24:12-16 ("Q. Would it be correct that each of the GPRS and LTE

2    signals identified in your report are processed by the ███████ and ███████ base band processors

3    in Apple products? A. That would be fair to say that, yes."); ECF No. 184-9, Elacqua Decl. Ex. H

4    Birkett Report at 30-32, 44-48 (offering the same infringement theory for the accused iPad 2 and

5    iPad Mini products as the other accused products because the iPad 2 and iPad Mini have the same

6    baseband processor chip as the iPhone 4 and iPhone 5, respectively); Dansky *Daubert* Mot. at 3

7    ("the baseband processor . . . enables the cellular functionality in Apple's products").

8            Accordingly, the Court will not disregard the policy behind the smallest salable patent-

9    practicing unit doctrine based on GPNE's assertion that the invention is the entire device. Adopting

10   GPNE's reasoning would allow patent drafters to effectively abolish the smallest salable patent-

11   practicing unit doctrine by simply drafting patent claims to cover end products rather than the

12   individual components that actually embody the invention. *Cf. Mayo Collaborative Servs. v.*

13   *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012) (holding in the patentable subject matter

14   context that legal outcomes should not "depend simply on the draftsman's art" (quoting *Parker v.*

15   *Flook*, 437 U.S. 584, 593 (1978))). Patent drafters must operate within the dictates of the law, not

16   vice versa. Therefore, GPNE may not claim the entire accused iPhones and iPads as the smallest

17   salable patent-practicing units for damages purposes solely because GPNE claimed a "node"

18   having a processor that can perform the invented signaling steps rather than just the processor

19   itself. The smallest salable patent-practicing unit doctrine seeks to prevent the "[a]dmission of []

20   overall revenues [for the accused device], which have no demonstrated correlation to the value of

21   the patented feature alone, only serve to make a patentee's proffered damages amount appear

22   modest by comparison, and to artificially inflate the jury's damages calculation beyond that which

23   is adequate to compensate for the infringement." *LaserDynamics*, 694 F.3d at 67-68. The Court

24   will not contravene that policy because asserted patent claims recite generic "node" and "memory"

25   limitations. As a result, the Court does not exclude Mr. Meyer's testimony on the basis that it uses

26   the baseband processor as the royalty base.

27           As the parties do not dispute any facts underlying the smallest salable patent-practicing unit

28   determination, the Court holds as a matter of law that in this case, the baseband processor is the

                                                     24

United States District Court
For the Northern District of California

1  proper smallest salable patent-practicing unit. *See Cornell*, 609 F. Supp. 2d at 287 ("no reasonable

2  jury could have relied on this royalty base in determining Cornell's damages award"); Dansky Rep.

3  at 2 ("The parties are divided on a basic legal question."). Mr. Dansky's current damages theory

4  does not implicate the smallest salable patent-practicing unit doctrine, and Mr. Dansky's new

5  damages theory need not do so either. However, if Mr. Dansky's new damages theory adopts a

6  smallest salable patent-practicing unit-based methodology, the new damages methodology must

7  use the baseband processor as the smallest salable patent-practicing unit.

8        **D.  Apple's Motion to Exclude Dr. Dinan's Testimony**

9        Apple moves to exclude Dr. Dinan's GPRS emulation testing allegedly showing that the

10  accused devices can operate independently of the GSM telephone network. The Court DENIES

11  Apple's motion. Dr. Dinan acquired from Agilent a GPRS data network emulator—the same

12  device that Apple and third party certification entities use for internal product testing—to simulate

13  a GPRS network in a lab. To test the Apple devices, Dr. Dinan inserted an Agilent Subscriber

14  Identity Module ("SIM") card into each device. ECF No. 201-11, Susser Decl. Ex. I, Dinan Expert

15  Report ¶ 56. The Agilent test equipment was configured to certain settings laid out in Dr. Dinan's

16  report to emulate a GPRS network. *Id.* ¶¶ 52-54. The artificial GPRS network built by Dr. Dinan

17  was "not connected to any telephony network." *Id.* ¶ 51. Dr. Dinan then set up the device and test

18  equipment to exchange messages, logging all messages sent and received. *Id.* ¶ 57-61. By studying

19  the resulting call logs, Dr. Dinan states that he was able to determine whether the accused devices

20  infringe the patent claims. *Id.* ¶ 64. According to Dr. Dinan, the accused devices in testing were

21  capable of data communications on the GPRS network without being connected to any telephone

22  network. *Id.* at ¶ 116.

23        Apple argues that Dr. Dinan's emulation testing should be excluded because the accused

24  devices' ability to operate independently of a telephone network in an artificial environment is not

25  relevant to whether the devices can actually operate independently of a telephone network as

26  required for infringement. The Court addressed this argument in its summary judgment order,

27  where it found that Dr. Dinan's testing is probative of the accused devices' abilities to operate

28

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

1   independently of a telephone network, and thus Dr. Dinan's testing is probative of whether the

2   accused devices infringe. *See* ECF No. 239 at 13-14.

3          Apple also contends that Dr. Dinan inappropriately modified the accused Apple devices

4   because he had to insert a SIM card into the devices for them to interoperate with the testing

5   equipment. However, as the Court's summary judgment order addressed, Apple's second argument

6   is a red herring. Dr. Dinan testified in his deposition that network-supplied SIM cards have no

7   effect on the claimed signaling. ECF No. 201-13, Susser Decl. Ex. K, Dinan Deposition Tr. at

8   287:22-288:11 (SIM cards are "irrelevant . . . because none of the parameters in the SIM card

9   would affect the outcome of the messages because there is no parameter in the SIM card that is

10  related to the messages that we have identified in the chart."). Moreover, Apple does not supply

11  SIM cards, which are required to connect to any network, so under Apple's logic, no device sold by

12  Apple is even capable of operating on a telephone network. *Id.* Inserting a SIM card into a device

13  does not change whether the device has a pre-programmed ability to operate independently of a

14  telephone network. Therefore, Dr. Dinan's use of an Agilent SIM card with the accused devices is

15  not a reason to exclude his testing.

16         Finally, Apple asserts that Dr. Dinan's testimony should be excluded because he used

17  "mobile test adaptation layer" ("MTAL") protocol messages, which is artificial to the Agilent

18  testing environment, to determine whether Apple's devices could operate independently of a

19  telephone network. Apple asks the Court to find that its devices can only send messages

20  independently of a telephone network with the assistance of the MTAL protocol. However, this is

21  simply not true. Agilent's literature explains that "[t]he mobile test adaptation layer (MTAL) is a

22  proprietary protocol that carries information specific to the test set to the wireless protocol advisor

23  software. Message discrimination is one of MTAL's functions." ECF No. 197-15, Hartsell Decl.

24  Ex. M, at 5. The MTAL protocol's function is to aid the tester—Dr. Dinan—in analyzing the data

25  resulting from the testing. Agilent documents also describe the MTAL as providing information

26  regarding (1) system time, (2) protocol stack description, and (3) event type. ECF No. 188-5, Green

27  Decl., Ex. D, at 24. Essentially, all the MTAL protocol does is provide additional data about the

28  test to enable easy analysis—"[i]t doesn't have to do anything with transmission of signals over the

26

air." Hartsell Decl. Ex. L, Dinan Deposition Tr. at 55:3-4. GPNE has therefore demonstrated that

Dr. Dinan's testimony is sufficiently reliable under *Daubert* to avoid exclusion.

### E.  Apple's Motion to Strike Dr. Dinan's Expert Report

Apple also moves to strike Dr. Dinan's expert report. In its motion to strike, Apple argues

that GPNE withheld evidence of testing, did not provide all of the test equipment's configuration

settings, and refused to supply the raw testing data. The Court disagrees with Apple's

characterization of GPNE's actions, and DENIES Apple's motion to strike Dr. Dinan's expert

report.

Apple bases its motion to strike on Fed. R. Civ. P. 37(c)(1). Under that rule, "[i]f a party

fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial,

unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37. As the moving

party, Apple bears the burden of showing a discovery violation has occurred. *See, e.g.*, *Dong Ah

Tire & Rubber Co. v. Glasforms, Inc.*, No. 06-cv-3359, 2008 WL 4786671, *2 (N.D. Cal. Oct. 29,

2008). Once Apple satisfies that burden, it becomes GPNE's burden to show that GPNE's failure

to comply with Rule 26 was either justified or harmless. *See Yeti by Molly Ltd. v. Deckers Outdoor

Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Fed. R. Civ. P. 26(a)(2), which governs the disclosure

of expert witnesses, only requires that experts and the evidence upon which they rely be disclosed.

As GPNE appears to have fully complied with this rule, Apple instead charges GPNE with the

intentional destruction of potentially relevant evidence.

Apple asserts that GPNE failed to preserve potentially relevant evidence when it returned

the rented Agilent test equipment without allowing Apple the opportunity to inspect Dr. Dinan's

testing setup. Upon being served with Dr. Dinan's expert report, Apple asked for the opportunity to

inspect the testing setup. GPNE responded that the equipment had been returned, but it provided

Apple with invoices showing the equipment used, including serial numbers, so that Apple could

arrange an inspection with the rental company if Apple desired. Apple's expert, Dr. Sarah Wilson,

testified that Apple never attempted to inspect the testing equipment because she believed Dr.

Dinan's test to be irrelevant. ECF No. 210-30, Hartsell Decl. Ex. O, Wilson Deposition Tr. 60:18-

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

1   62:24 ("Q. Did you, in preparing your report, try to contact TRS-Ren Telco to procure the

2   equipment Dr. Dinan used to carry out his test? A. I did not contact them. I didn't think it was a

3   relevant test."). Apple's rhetoric that GPNE spoiled evidence thus exaggerates the facts. Apple has

4   had the opportunity to acquire the exact same testing equipment that Dr. Dinan used. There is also

5   evidence that Apple possesses its own Agilent equipment for testing its devices, should it have

6   wanted to recreate Dr. Dinan's tests. *See* ECF No. 210-15-210-28, Hartsell Decl. Ex. H-N (Apple

7   documents showing quotes from Agilent equipment). Unlike where there has been spoliation of

8   evidence, the equipment still exists, and Apple is fully capable of inspecting it. *Compare, e.g.,*

9   *Nat'l Grange Mutual Ins. Co. v. Hearth & Home, Inc.*, 2006 WL 5157694 (N.D. Ga. 2006)

10  (excluding plaintiff's expert testimony regarding the cause of a house fire where expert performed

11  inspection on suspected fireplace and fireplace was disconnected and removed before the

12  defendant's expert could conduct his own testing, rendering the defendant's expert unable to

13  oppose the plaintiff's expert testimony). In sum, Apple can recreate Dr. Dinan's testing using the

14  same test equipment, Apple has thus far declined to do so, and Apple maintains that Dr. Dinan's

15  testing is irrelevant. Thus, spoliation of evidence did not occur, and, moreover, Apple has suffered

16  no prejudice from GPNE's failure to preserve Dr. Dinan's emulation testing environment.

17          Apple also argues that Dr. Dinan's expert report should be stricken because it does not

18  provide all of the settings Dr. Dinan used in configuring the test equipment. While GPNE admits

19  that Dr. Dinan does not provide the exact value for every setting, Dr. Dinan is adamant that he

20  disclosed all relevant test settings in his report. Dinan Expert Report ¶¶ 52-54. In fact, in Dr.

21  Dinan's deposition, Dr. Dinan explained that all parameters not discussed in his report were set to

22  default values. *Id.* at 284:23-285:6 ("Anything that is not in the expert report and was questioned

23  by Mr. Green we set them to the default values."). In addition, Apple asked Dr. Dinan about

24  various settings that he does not mention in his report, and Dr. Dinan informed Apple that those

25  settings did not impact his test results. ECF No. 210-34, Hartsell Decl. Ex. Q, Dinan Deposition Tr.

26  at 55:20-56:3-13 ("You can change many of those parameters and still get the same results."). The

27  record is clear that Dr. Dinan disclosed all relevant test settings in his report, and that Apple never

28  attempted to reproduce Dr. Dinan's test results using his report because Apple considered Dr.

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1    Dinan's testing irrelevant. The Court will not strike Dr. Dinan's expert report based on Apple's

2    bare speculation that one of the omitted test settings, despite Dr. Dinan's repeated assurances to the

3    contrary, might materially affect Dr. Dinan's test results.

4           Apple's final argument to strike Dr. Dinan's expert report is that GPNE did not timely

5    produce the raw testing data created by Dr. Dinan's tests. GPNE originally produced human

6    readable versions of Dr. Dinan's testing results in PDF format to Apple when it produced Dr.

7    Dinan's expert report. Apple never requested that GPNE produce any other versions of Dr. Dinan's

8    testing results, instead choosing to file the instant motion to strike Dr. Dinan's expert report, based

9    in part on GPNE's alleged failure to produce the raw testing data. Within 10 days of Apple's

10   motion, GPNE supplied Apple with the raw data files to complement the human readable versions

11   GPNE had already produced.

12          The Court finds that GPNE timely produced Dr. Dinan's testing results. The raw data files

13   now requested by Apple are in binary format, meaning that they are a series of 1's and 0's that are

14   not human readable. By contrast, the results documents produced by GPNE with Dr. Dinan's

15   expert report were in a human readable PDF format, allowing Apple to scrutinize Dr. Dinan's

16   findings without resorting to computer assistance.

17          Apple, attempting to demonstrate prejudice, asserts that the raw binary format data files

18   were necessary for Apple to know whether Dr. Dinan omitted any results from his report.

19   However, Dr. Dinan testified that the PDF documents are consistent with the raw data. Dinan

20   Deposition Tr. at 297:24-298:12. When pressed by Apple's counsel, Dr. Dinan confirmed that he

21   had no reason to believe that any data was omitted. *Id.* at 299:1-7. Further, Apple's complaint rings

22   hollow given that Apple never requested the raw data files before filing its motion to strike. If

23   Apple was truly concerned that Dr. Dinan omitted data from his test results, Apple surely would

24   have contacted GPNE to request the raw data files rather than immediately file a motion to strike

25   Dr. Dinan's expert report. Therefore, Apple has not proven that Dr. Dinan's emulator testing

26   should be stricken because GPNE did not initially produce Dr. Dinan's raw data files in addition to

27   the PDF results documents Apple received.

28

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

United States District Court
For the Northern District of California

1    To summarize, GPNE provided Apple with all information necessary so that Apple could

2 rent the exact equipment Dr. Dinan used in his test. Apple never attempted to acquire that

3 equipment, nor did Apple use its own Agilent emulators to recreate Dr. Dinan's test. Apple's

4 expert testified that she did not recreate Dr. Dinan's test because it was irrelevant. Dr. Dinan

5 disclosed all configuration parameters in his report necessary to reproduce his test, and he testified

6 that all other parameters were set to their default values. GPNE produced the testing results in a

7 human readable PDF format and, upon request, sent Apple the raw binary format data files.

8 Accordingly, Apple's motion to strike Dr. Dinan's expert report is DENIED.

9    **F.  Apple's Motion to Strike Infringement Contentions**

10    Apple moves to strike GPNE's new infringement contention related to the "reserve signal"

11 term in the '267 Patent. Apple's motion is DENIED.

12    Patent Local Rule 3-6 allows the parties to amend infringement and invalidity contentions

13 "only by order of the Court upon a timely showing of good cause." Pat. L. R. 3-6. "Non-exhaustive

14 examples of circumstances that may, absent undue prejudice to the non-moving party, support a

15 finding of good cause include: (a) [a] claim construction order by the Court different from that

16 proposed by the party seeking amendment; [or] (b) [r]ecent discovery of material, prior art despite

17 earlier diligent search." *Id.* "The local patent rules in the Northern District of California . . .

18 requir[e] both the plaintiff and the defendant in patent cases to provide early notice of their

19 infringement and invalidity contentions, and to proceed with diligence in amending those

20 contentions when new information comes to light in the course of discovery. The rules thus seek to

21 balance the right to develop new information in discovery with the need for certainty as to the legal

22 theories." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365-66 (Fed. Cir.

23 2006).

24    "If the court finds that the moving party was not diligent in amending its infringement

25 contentions, it does not need to consider the question of prejudice to the nonmoving party." *Linex*

26 *Techs., Inc. v. Hewlett-Packard Co.*, No. C13-159 CW, 2013 WL 5955548, at *1 (N.D. Cal. Nov.

27 6, 2013) (citing *02 Micro*, 467 F.3d at 1368 (affirming the district court's decision refusing leave to

28 amend upon finding the moving party was not diligent, without considering the question of

30

United States District Court
For the Northern District of California

1   prejudice to the non-moving party). "However, even if the movant was arguably not diligent, the

2   court retains discretion to grant leave to amend." *Linex*, 2013 WL 5955548, at *1; *see also Apple*

3   *Inc. v. Samsung Elecs. Co.*, No. 12-cv-00630 LHK, 2012 WL 5632618, at *5-6 (N.D. Cal. Nov. 15,

4   2012) (granting leave to amend infringement contentions, even though court found plaintiff failed

5   to establish diligence, because of lack of prejudice to the defendants).

6         The current dispute stems from some ambiguity in the '267 Patent claims. Claim 1 of the

7   '267 Patent recites a "random access request signal," a "reserve access request signal," and a

8   "request signal." *See* '267 Patent at 14:60-15:21. Both parties interpret the "request signal"

9   limitation to refer to one of the "random access request signal" or the "reserve access request

10  signal." In its original infringement contentions and first amended infringement contentions, GPNE

11  identified the "request signal" to be a "███████████████," corresponding with its

12  identification of the "random access request signal" as a ███████████. *See* ECF No. 209-

13  22, GPNE's Original Infringement Contentions, at 3-5. However, in Dr. Dinan's Infringement

14  Report following the Court's claim construction order, GPNE modified its position so that it now

15  claims the "request signal" to be a "███████████," corresponding with its identification

16  of the "reserve access request signal" as a ███████████. ECF No. 189-2, Dinan

17  Infringement Report, at 50.

18        It is clear that GPNE was not diligent in amending its infringement contentions. GPNE's

19  main claim is that their infringement theory has always been the same, and that this change was

20  just to correct an innocent mistake. However, GPNE has previously amended its infringement

21  contentions, including its contentions regarding the limitation at issue, yet it did not catch this

22  alleged error. Further, Dr. Dinan did not testify at his deposition that the change was due to an

23  error. *See* ECF No. 190-5, Dinan 2/21/14 Deposition Tr. at 209:17-210:16. Given the ambiguity in

24  the claim term, it appears that GPNE wished to change its infringement theory, not that it intended

25  to correct an error.

26        Nevertheless, the Court exercises its discretion to deny Apple's motion to strike because

27  GPNE's amendment does not prejudice Apple. *Linex*, 2013 WL 5955548, at *1; *see also Apple*,

28  2012 WL 5632618, at *5-6. The only prejudice to which Apple even alludes—and which Apple

first mentions in a concluding sentence in its reply brief—is that GPNE's new theory may have changed Apple's claim construction strategy. However, the Court finds this scenario unlikely. Of the nine terms the parties asked the Court to construe, none appear to have any effect on the term "request signal." *See* ECF No. 87, Order Construing Claims, at 58-59. Moreover, if this infringement contention amendment truly would have affected Apple's strategy at claim construction, Apple surely would have raised this prejudice earlier, rather than alluding to it offhand in the close of its reply brief. Additionally, both parties have already taken substantial discovery on the operation of both the ███████████████ and ███████████████ signals, and Apple has had the opportunity to depose Dr. Dinan regarding the new infringement theory. *See, e.g.*, Dinan 2/21/14 Deposition Tr. at 205:1-210:16. According to Dr. Dinan, the accused devices infringe under both the old and new theories. *Id.* at 209:10-16. As such, the Court sees no prejudice to Apple in allowing GPNE to amend its infringement contentions as to this single limitation. Therefore, while the Court does not condone GPNE's lack of diligence in amending its infringement contentions, and while an identification of actual prejudice by Apple would have likely changed the outcome of this motion, the Court DENIES Apple's motion to strike GPNE's infringement contentions in this narrow set of circumstances.

### IV.   CONCLUSION

For the foregoing reasons, the Court rules as follows. Apple's Motion to Exclude Mr. Dansky's Testimony is GRANTED without prejudice to GPNE. Any amended expert report and further expert discovery will proceed according to the schedule set at the April 3, 2014 hearing.[7] *See* ECF No. 231. GPNE's Motion to Exclude Mr. Meyer's testimony is DENIED. Apple's Motions to Exclude Dr. Dinan's Testimony and to Strike Dr. Dinan's Expert Report are DENIED. Apple's Motion to Strike GPNE's infringement contentions is DENIED.

---

[7] The parties may meet and confer and propose a new expert discovery schedule to the Court, if necessary.

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE

1    **IT IS SO ORDERED.**

2

3    Dated: April 16, 2014

4    LUCY H. KOH
     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 12-CV-02885-LHK
ORDER RE MOTIONS TO EXCLUDE EXPERT TESTIMONY AND APPLE'S MOTION TO STRIKE